IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | C.A. No. 19-97 (CFC)(CJB) |
| v. | ) ) | REDACTED - PUBLIC VERSION |
| | ) | Original filing date: June 9, 2022 |
| KURIN, INC., | ) | Redacted filing date: June 16, 2022 |
| | ) | |
| Defendant. | ) | |

## JOINT [PROPOSED] PRETRIAL ORDER
### (Volume 2 of 2)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Ashok Ramani
David J. Lisson
Micah G. Block
Philip T. Sheng
Ian Hogg
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
(650) 752-2000

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
pedi@rlf.com

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Kathryn B. Bi                                    *Attorneys for Defendant*
Alena Farber
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for Plaintiff*

June 9, 2022

# EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) |
| Defendant. | ) ) |

**EXHIBIT 15**

**MAGNOLIA'S MOTION *IN LIMINE* NO. 2:
TO EXCLUDE EVIDENCE OR ARGUMENT THAT MAGNOLIA
DRAFTED THE ASSERTED CLAIMS TO COVER THE KURIN LOCK
AND ANY REFERENCE TO THE TIMING OF THE ASSERTED
PATENTS RELATIVE TO THE RELEASE OF THE KURIN LOCK**

Magnolia moves to exclude any evidence or argument that Magnolia drafted the asserted claims to cover the Kurin Lock as well as any reference to the timing of the patents-in-suit relative to the release of the Kurin Lock.

The patents-in-suit claim priority to provisional patent applications filed in 2006 and 2011, long before Kurin launched the accused Kurin Lock in May 2017. U.S. Pat. No. 9,855,001 (the "'001 Patent"); U.S. Pat. No. 10,039,483 (the "'483 Patent"). However, the patents did not issue until after the launch. Magnolia filed its application for the '001 Patent in March 2017, and the patent issued in January 2018. Magnolia filed its application for the '483 Patent in December 2017, and the patent issued in August 2018. In light of these dates, Kurin has alleged that Magnolia wrote the '001 and '483 Patent claims to cover the Kurin Lock and that Magnolia's filing of continuation applications was somehow improper. Ex. 15.1 (Claim Construction Hr'g Tr.) at 43:14–44:4, Apr. 5, 2020 (complaining about Magnolia's continuations and that Magnolia wrote claims "in the context of having seen the Kurin device on the market"). The Court should preclude Kurin from making such assertions in front of the jury.

Whether Magnolia drafted claims to cover the Kurin Lock is irrelevant. "There is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to

cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. . . . [A claim's] genesis in the marketplace is simply irrelevant[.]" *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed. Cir. 1998); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004). Moreover, suggesting that Magnolia wrote claims to cover Kurin's product would confuse and mislead the jury to believe that Magnolia "took improper advantage of the patent system" or otherwise behaved in an "unprincipled" way. *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, C.A. No. 2:15-1202-WCB, 2017 WL 959592, *1–*3 (E.D. Tex. Mar. 13, 2017) (Bryson, J., sitting by designation). In order to prevent such prejudice, the Court should preclude Kurin from doing so. *Id.*

The Court should also exclude any comparison of the filing and issue dates of the patents-in-suit relative to the release of the Kurin Lock for similar reasons. Certainly, reference to the patents' issue dates in isolation is not improper. However, connecting or comparing the filing and issue dates to the release of the Kurin Lock is not relevant. Infringement began when patents issued and the infringement, invalidity, and damages analyses are the same regardless of how much earlier Kurin released the accused product. Kurin's written-description defense, for example, simply requires a comparison of the claims to the

specification.  And Magnolia's willfulness claim is based on years of Kurin

misconduct both before and after the patents issued, including █████████████

████████████████████████████████████████

███████████████████████████████████ *See*

D.I. 344 at 1–7, 10–14. ████████████████████████

████████████████████████████████████████

████████████████████████ D.I. 346, Ex. 1 at 521:6–20.

Kurin's knowledge and behavior is what is relevant, not the fact that Magnolia

asserts continuation patents that issued after Kurin's product launched.

There is nothing improper about Magnolia's filing of continuation

applications, but jurors unfamiliar with patent law and prosecution might

mistakenly believe otherwise when faced with a comparison of the timing of the

patents-in-suit and launch of the accused product.  Magnolia and the Court would

thus be required to spend time explaining the continuation application process and

the fact that it is both common and proper.  Even then, jurors are likely to be

confused as to how a product can infringe a patent filed or issued after its launch.

The Court should thus exclude such confusing and prejudicial comparisons.

Ex. 15 – Magnolia's MIL 2

# EXHIBIT 15.1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -


 4
     MAGNOLIA MEDICAL                 :   CIVIL ACTION
 5   TECHNOLOGIES, INC.,              :
                                      :
 6                  Plaintiff,        :
                                      :
 7         vs.                        :
                                      :
 8   KURIN, INC.,                     :
                                      :
 9                  Defendant.    :   NO. 19-00097-CFC


10
                                      - - -
11
                             Wilmington, Delaware
12                           Wednesday, April 15, 2020
                             9:15 o'clock, a.m.
13                           ***Telephone conference

14                          - - -

15   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

16                          - - -

17   APPEARANCES:

18
                    FISH & RICHARDSON P.C.
19                  BY:  DOUGLAS E. McCANN, ESQ.

20                       -and-

21

22

23

24                                  Valerie J. Gunning
                                    Official Court Reporter
25
```

operable to transition to the second state without manual

intervention as a direct result of filling the contaminant

reservoir, that to me falls within the functionality that is

addressed in MTD, and it would it seems to me then leave it

to the defendant to show whether there is a failure of the

claim to recite sufficient structure, and if it does, then

it seems to me means-plus-function applies, speaking solely

with respect to claim 17.

So can I hear from the defendant?

MR. HANGARTNER:  Yes, Your Honor.  So this is

the same problem we had before.  There is again insufficient

structure to perform this function of directing the flow

path.

So I think first I just want to take one second

to talk a little bit about how we got here with these

claims.  This '689 patent is the tenth continuation in this

family, so there are ten tries trying to come up with the

claim and really configure what they are trying to claim

from this very simple patent that discloses two structures

for diverting flow down one of two paths.

And they are writing these claims in the context

of having seen the Kurin device on the market for a couple

of years, and they are trying desperately to write a claim

that they can massage into a form that they think they can

file the case that we're dealing with right now.

```
 1                    So this is all premeditated.  This is all
 2      carefully crafted.  They've tried dozens of different claim
 3      formulations to come up with something they can read in
 4      context.  So within that context we now look at this claim
 5      and what we see is the same problem that we saw with
 6      diverter.  There is not sufficient structure here to perform
 7      the claimed function.
 8                    A junction, we don't disagree with what a
 9      junction is in the normal world.  A junction is a place and
10      it's an intersection and using the patent, and as used in
11      this patent, there's one reference to the word junction in
12      the specification.
13                    THE COURT:  So --
14                    MR. HANGARTNER:  And --
15                    THE COURT:  Sorry to interrupt, but I did say
16      60 minutes and we're already past that.  So can you just cut
17      right to the chase?  What's the structure that's lacking in
18      claim 17 that makes it means-plus-function?
19                    MR. HANGARTNER:  There's no structure to perform
20      the transition.
21                    THE COURT:  Okay.  What does the structure
22      accomplish via the functionality, the transition?  So, you
23      know, you did this earlier on in a pretty succinct way.  Do
24      you want to just do that?
25                    MR. HANGARTNER:  Yes.  So the junction, the
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No. 1:19-cv-00097-CFC (CJB) |
| KURIN, INC., | ) ) ) |
| Defendant. | ) ) ) ) |

**KURIN'S OPPOSITION TO MOTION *IN LIMINE* NO. 2: TO EXCLUDE EVIDENCE OR ARGUMENT THAT MAGNOLIA DRAFTED THE ASSERTED CLAIMS TO COVER THE KURIN LOCK AND ANY REFERENCE TO THE TIMING OF THE ASSERTED PATENTS <u>RELATIVE TO THE RELEASE OF THE KURIN LOCK</u>**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

May 27, 2022

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bioverativ Inc.* v. *Behring LLC*,
2020 WL 1332921 (D. Del. Mar. 23, 2020) ..........................................................3

*Erfindergemeinschaft UroPep GbR* v. *Eli Lilly & Co.*,
2017 WL 959592 (E.D. Tex. Mar. 13, 2017) .............................................1, 2, 3

*Gentry Gallery, Inc.* v. *Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ..........................................................................2

*Sri Int'l, Inc.* v. *Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) ..........................................................................3

*State Indus., Inc.* v. *A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985) ..........................................................................3

**Statutes**

35 U.S.C. § 112 ........................................................................................................2

Evidence of the timing of the patents-in-suit relative to the release of the Kurin Lock is highly relevant to Kurin's defenses in both phases of this case. Explaining that Magnolia had the opportunity during claim drafting to crib contested claim terms from publicly available Kurin Lock documents is key to rebutting Magnolia's attempt to depict Kurin's legacy use of such terms as admissions of infringement and evidence of willfulness.  Magnolia's own caselaw shows such relevant evidence should be admitted.  *Erfindergemeinschaft UroPep GbR* v. *Eli Lilly & Co.*, 2017 WL 959592, at *1, (E.D. Tex. Mar. 13, 2017) (allowing evidence "for any purpose relevant to a claim or defense in this case").

Magnolia prosecuted an extensive patent portfolio before the release of the Kurin Lock, but none of these patents, unasserted here, actually covered it.  After Kurin Lock and descriptions thereof became publicly available, Magnolia changed course and drafted the Asserted Claims using terms such as "divert" and "sequester" that Kurin had publicly used in describing the Kurin Lock.  *See* Ex. 1, PTX-0019 (12/2016 Kurin Lock FDA clearance with Device Description). Magnolia has made clear that in seeking to prove direct infringement in Phase 1, it will overwhelmingly focus on such legacy Kurin descriptions, rather than on the direct evidence available regarding the actual design and function of the Kurin Lock.[1]  *See* Kurin's MIL No. 3; Ex. 1 (listing 23 Kurin FDA documents before any

---

[1] Kurin's motion *in limine* No. 3 addresses such improper infringement arguments.

drawings or videos of the device).  If Magnolia is thus permitted to paint Kurin's descriptions as admissions of infringement, Kurin must be allowed to explain that Magnolia drafted the claims after Kurin's device, and the descriptions thereof, were made public.  Otherwise, Magnolia will be able to convey an incomplete and prejudicially misleading impression to the jury about why Kurin's documents use the same words used in the Asserted Claims.  Notably, the jury will already have the facts underlying this chronology—the dates of filing and issuance (which are reflected on the face of the patents-in-suit) and Kurin Lock's launch.

In Phase 2 these facts are relevant to Kurin's § 112 defenses and to rebutting Magnolia's willfulness claim. First, Magnolia's own caselaw recognizes this evidence is relevant to Kurin's written description defenses based on Magnolia's overreach in drafting claims to cover the Kurin Lock.  *Erfindergemeinschaft*, 2017 WL 959592, at *3; *see also Gentry Gallery, Inc.* v. *Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (drafting claims broadly after becoming aware of competitive products is relevant to, and supported a finding of, invalidity under § 112).  Second, courts have consistently relied on such evidence as refuting willfulness based on the type of pre-patent issuance evidence on which Magnolia relies. [2]  On exactly these facts, the Federal Circuit found no willfulness, pointing to a chronology in which patentee's original unasserted patents did not cover the

---

[2] Kurin's motion *in limine* No. 2 addresses such improper willfulness evidence.

accused product, but then after examining the accused product the patentee "commenced its efforts in the PTO to obtain claims" to cover the accused product, which "had been designed and built before the progenitors of claims 7 and 8 in suit were submitted to the PTO." *State Indus., Inc.* v. *A.O. Smith Corp.*, 751 F.2d 1226, 1235 (Fed. Cir. 1985).  This "familiar picture", where a patentee thus "manipulat[es] its secret pending patent application to cover the functionally competitive structure it did *not* think of but deems to embody its proprietary 'inventive concept'" is "classic commercial gamesmanship under the patent system" that does not support willful infringement. *Id.*  Other recent cases also rely on the chronology of events relative to the filing date as negating the requisite intent for willfulness. *Sri Int'l, Inc.* v. *Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) ("[T]he parent '203 patent was not even filed until several months after the parties met."); *Bioverativ Inc.* v. *Behring LLC*, 2020 WL 1332921, *3 (D. Del. Mar. 23, 2020) ("The complained-of development activities all appear to have taken place before the asserted patents' priority date.").  In stark contrast, the defendant in Magnolia's lone, inapposite district court case failed to articulate a willfulness defense to which the filing date (rather than just the issuance date) was relevant. *Erfindergemeinschaft*, 2017 WL 959592, at *2–3.

For the foregoing reasons, the Court should deny Magnolia's motion *in limine*.

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Nicholas Groombridge

Catherine Nyarady

Kripa Raman

Joshua D. Reich

Ariella Barel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 Avenue of the Americas

New York, NY 10019-6064

(212) 373-3000

ngroombridge@paulweiss.com

cnyarady@paulweiss.com

kraman@paulweiss.com

jreich@paulweiss.com

abarel@paulweiss.com

Kelly E. Farnan (#4395)

Richards, Layton & Finger, P.A.

920 N. King Street

One Rodney Square

Wilmington, DE 19801

(302) 651-7700

Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

May 27, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| v. | ) ) | |
| KURIN, INC., | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF ARIELLA BAREL IN SUPPORT OF
KURIN, INC.'S OPPOSITION TO MOTION *IN LIMINE* NO. 2:
TO EXCLUDE EVIDENCE OR ARGUMENT THAT MAGNOLIA
DRAFTED THE ASSERTED CLAIMS TO COVER THE KURIN LOCK
AND ANY REFERENCE TO THE TIMING OF THE ASSERTED
<u>PATENTS RELATIVE TO THE RELEASE OF THE KURIN LOCK</u>**

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's Opposition to Magnolia's Motion *in Limine* No. 2, which is filed herewith.

Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt from Magnolia's Trial Exhibit List, served May 20, 2022.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 27, 2022.

/s/ *Ariella Barel*
Ariella Barel

# EXHIBIT 1

| TRIAL EX. | PHASE 1* | DESCRIPTION | BEG BATES | END BATES | DEPO EXS | KURIN'S OBJECTIONS |
|---|---|---|---|---|---|---|
| PTX-0001 | Yes | Official ribbon copy of U.S. Patent No. 10,039,483 entitled, "Fluid Diversion Mechanism for Bodily-Fluid Sampling," to Bullington | MAG-DEL0000533 | MAG-DEL0000564 | Gaw 26 Rogers 18 Miazga 01 | |
| PTX-0002 | Yes | Official ribbon copy of U.S. Patent No. 9,855,001 entitled, "Systems and Methods for Parenterally Procuring Bodily-Fluid Samples with Reduced Contamination," to Patton | MAG-DEL0000618 | MAG-DEL0000636 | Miazga 19 Rogers 17 | |
| PTX-0003 | Yes | Prosecution history of U.S. Patent No. 9,855,001 entitled, "Systems and Methods for Complete K162233 510(k) submission | MAG-DEL0001488 | MAG-DEL0001747 | | 402, 403, 602, MIL |
| PTX-0004 | Yes | Kurin document titled as, "Manufacturing Procedure, BCS w/BD Vacutainer, BioMérieux | KUR-MAG-DE488364 | MAG-DE488754 | | 402, 403, 602, 802, MIL |
| PTX-0005 | Yes | Kurin document titled as, "Manufacturing Procedure, Assembly, Kurin Lock, Automation," | KUR-MAG-DE000075 | MAG-DE000096 | | 402, 403, 602, 802, MIL |
| PTX-0006 | Yes | Document entitled, "Attachment 6: Device Description." | KUR-MAG-DE000104 | MAG-DE000124 | | 402, 403, 602 |
| PTX-0008 | Yes | Document entitled, "Substantial Equivalence Discussion." | KUR-MAG-DE000147 | MAG-DE000155 | Nason 06 | 402, 403, 602, MIL |
| PTX-0009 | Yes | Report entitled, "Biocompatability Review of the Calliope Solutions, Inc. Kurin Blood Culture | KUR-MAG-DE000156 | MAG-DE000162 | | 402, 403, 602, MIL |
| PTX-0010 | Yes | K162233 Cover Letter | KUR-MAG-DE000274 | KUR-MAG-DE000304 | Rogers 35 | 402, 403, 602, MIL |
| PTX-0012 | Yes | K162233 Proposed Indications for Use | KUR-MAG-DE000606 | KUR-MAG-DE000608 | | 402, 403, 602, 802, MIL |
| PTX-0013 | Yes | K162233 "Truthful and Accuracy Statement per 21 CFR 807.87(k)" | KUR-MAG-DE000608 | KUR-MAG-DE000614 | | 402, 403, 602, MIL |
| PTX-0014 | Yes | K162233 Executive Summary | KUR-MAG-DE000614 | KUR-MAG-DE000650 | | 402, 403, 602, MIL |
| PTX-0015 | Yes | Correspondence from M. Job to the USFDA, re: Additional Information (K162233) | KUR-MAG-DE000649 | KUR-MAG-DE185616 | | 402, 403, 602, 802, MIL |
| PTX-0017 | Yes | Letter from Emily Davis to Regulatory Technology Services LLC re: "Response to email | KUR-MAG-DE185576 | KUR-MAG-DE000725 | Rogers 37 | 402, 403, 602, 802, MIL |
| PTX-0018 | Yes | Deficiency List from Department of Health & Human Services for K162233, Kurin Blood | KUR-MAG-DE000669 | KUR-MAG-DE000734 | | 402, 403, 602, 802, MIL |
| PTX-0019 | Yes | K162233 Clearance Letter | MAG-DEL0000663 | MAG-DEL0000670 | | |
| | | DHHS Letter from Tejashti Purohit-Sheth to Mark Job re: "K162233" | KUR-MAG-DE000735 | KUR-MAG-DE000743 | | 402, 403, 602, 802, MIL |
| PTX-0021 | Yes | K162233 Clearance Letter, Indications for Use, and 510(k) Summary, available at: | MAG-DEL0826409 | MAG-DEL0826416 | | 402, 403, 602, 802, MIL |
| PTX-0023 | Yes | Document titled as, "Kurin PIV Blood Collection Set with Pressure-Rated Extension Set, | KUR-MAG-DE000745 | KUR-MAG-DE001048 | | 402, 403, 602, MIL |
| PTX-0024 | Yes | Kurin document titled as, "Response to Acceptance Review Notification, Refuse to Accept | KUR-MAG-DE001300 | KUR-MAG-DE001380 | | 402, 403, 602, 802, MIL |
| PTX-0026 | Yes | Kurin document entitled, "Response to Request for Additional Information for K181895 Kurin PIV Blood Collection Set with Pressure-Rated Extension Set Deficiency Letter" | KUR-MAG-DE001416 | KUR-MAG-DE001618 | Nason 04 Rogers 36 | 402, 403, 602, MIL |
| PTX-0028 | Yes | K181895 Clearance Letter, Indications for Use, and 510(k) Summary, available at: https://www.accessdata.fda.gov/cdrh_docs/pdf18/K181895.pdf | KUR-MAG-DE156631 MAG-DEL0000671 | KUR-MAG-DE156638 MAG-DEL0000678 | | 402, 403, 602, 802, MIL |
| PTX-0029 | Yes | FDA Premarket Notification Database Entry for K181895, available at: | MAG-DEL0826426 | MAG-DEL0826428 | | 402, 403, 602 |
| PTX-0030 | Yes | Complete K181832 510(k) submission | KUR-MAG-DE495421 | KUR-MAG-DE496309 | | 402, 403, 602, MIL |
| PTX-0033 | Yes | K191832 Response to Deficiency Letter, dated 1/3/2020 | KUR-MAG-DE500175 | KUR-MAG-DE500687 | | 402, 403, 602, 802, MIL |
| PTX-0035 | Yes | Email from N. Hartman to B. Rogers et al., re: K181895/S001 was Accepted | KUR-MAG-DE072075 | KUR-MAG-DE072076 | | 402, 403, 602, 802 |
| PTX-0064 | Yes | Kurin Drawing Number KUR-2007 (Cap) | KUR-MAG-DE001627 | KUR-MAG-DE001624 | | |
| PTX-0065 | Yes | Kurin Drawing Number KUR-2005 (Top Housing) | KUR-MAG-DE001623 | KUR-MAG-DE001624 | | |
| PTX-0066 | Yes | Kurin Drawing Number KUR-2006 (Bottom Housing) | KUR-MAG-DE001625 | KUR-MAG-DE001626 | | |
| PTX-0067 | Yes | Kurin Drawing Number KUR-8036 (Assembly, Kurin Lock) | KUR-MAG-DE001659 | KUR-MAG-DE001659 | | |
| PTX-0068 | Yes | Kurin Drawing Number KUR-6010 (Hydrophobic Self-Sealing Plug) | KUR-MAG-DE001655 | KUR-MAG-DE001655 | | |
| PTX-0069 | Yes | Kurin Drawing Number KUR-6011 (Umbrella Valve) | KUR-MAG-DE001656 | KUR-MAG-DE001656 | | |
| PTX-0070 | Yes | Kurin Drawing Number KUR-8022 (Set, Kurin 21GA BCS w/ Standard Needle, BD | KUR-MAG-DE001657 | KUR-MAG-DE001658 | | |
| PTX-0071 | Yes | Kurin Lock device schematics | KUR-MAG-DE001621 | KUR-MAG-DE001621 | | |
| PTX-0072 | Yes | Label, Kurin PIV18 Blood Culture Collection Set with Kurin Lock® Technology, collection | KUR-MAG-DE001813 | KUR-MAG-DE001813 | | |
| PTX-0073 | Yes | Label, Kurin 21G Blood Culture Collection Set with Kurin Lock® Technology, collection | KUR-MAG-DE001853 | KUR-MAG-DE001853 | | |
| PTX-0074 | Yes | M-11223 Unit Label | KUR-MAG-DE001885 | KUR-MAG-DE001885 | | |
| PTX-0075 | Yes | M-21221 Unit Label | KUR-MAG-DE001917 | KUR-MAG-DE001917 | | |
| PTX-0076 | Yes | M-21223 Unit Label | KUR-MAG-DE001949 | KUR-MAG-DE001949 | | |
| PTX-0077 | Yes | M-PIV12 Unit Label | KUR-MAG-DE001980 | KUR-MAG-DE001980 | | |
| PTX-0078 | Yes | M-PIV18 Unit Label | KUR-MAG-DE002024 | KUR-MAG-DE002024 | | |
| PTX-0079 | Yes | T-11221 Unit Label | KUR-MAG-DE002156 | KUR-MAG-DE002156 | | |
| PTX-0080 | Yes | T-11223 Unit Label | KUR-MAG-DE002188 | KUR-MAG-DE002188 | | |
| PTX-0081 | Yes | T-21221 Unit Label | KUR-MAG-DE002220 | KUR-MAG-DE002220 | | |
| PTX-0082 | Yes | T-21223 Unit Label | KUR-MAG-DE002252 | KUR-MAG-DE002252 | | |
| PTX-0083 | Yes | Kurin document titled as, "Kurin PIV12 Blood Culture Collection Set with Kurin Lock® | KUR-MAG-DE002283 | KUR-MAG-DE002283 | | 402, 403, 602, 802, MIL |
| PTX-0084 | Yes | T-PIV12 Unit Label | KUR-MAG-DE002284 | KUR-MAG-DE002284 | | |
| PTX-0085 | Yes | T-PIV18 Unit Label | KUR-MAG-DE002334 | KUR-MAG-DE002334 | | |

* Magnolia provides the marking of evidence by phase herein in reliance on Kurin's May 10, 2022 email confirming that "Kurin will not argue that Magnolia's good-faith disclosures of evidence by phase are binding or preclusive."

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGNOLIA MEDICAL<br>TECHNOLOGIES, INC.,<br><br>                         Plaintiff,<br><br>        v.<br><br>KURIN, INC.,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 19-97-CFC (CJB)<br>)<br>)<br>)<br>)<br>) |

## **EXHIBIT 15**

**MAGNOLIA'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 2:
TO EXCLUDE EVIDENCE OR ARGUMENT THAT MAGNOLIA
DRAFTED THE ASSERTED CLAIMS TO COVER THE KURIN LOCK
AND ANY REFERENCE TO THE TIMING OF THE ASSERTED
PATENTS RELATIVE TO THE RELEASE OF THE KURIN LOCK**

Kurin cites no authority to support the introduction of evidence of Magnolia's purported claim-drafting strategy in Phase One.  Opp'n at 1–2.  Nor can it.  Magnolia's purported conduct is proper, and allegations that Magnolia used Kurin's admissions about its product to draft claims do not make those admissions any less competent evidence of how the product works.  Mot. at 1–2.  Kurin must not be allowed to imply impropriety where there is none or beget the jury's sympathy by suggesting Magnolia unfairly entrapped it into infringement.

The Court should also exclude such evidence from Phase Two.  Whether an inventor drafted claims on an accused product is not, in itself, relevant to written description.  Instead, it *may be* admissible when it is necessary to provide context for other relevant evidence.  *See, e.g.*, *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (inventor admitted to having first learned of claim features *from the accused product*).  Neither Kurin nor its experts identify any aspect of Kurin's written-description defense that requires such context.  As to willfulness, none of the cases Kurin cites found that drafting claims on an accused product refuted willfulness.  Instead, each found no willfulness because the infringer *did not know about the patent during an alleged period of willful infringement*.  In contrast, ███████████████████████████████████████ ███████████████████████████████████ Evidence of the origin of Magnolia's claims should therefore be excluded from Phase Two.

Ex. 15 – Reply in Support of Magnolia's MIL 2

EXHIBIT 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

                Plaintiff,

     v.

KURIN, INC.,

                Defendant.

)
)
)
)
)
)
)  C.A. No. 19-97-CFC (CJB)
)
)
)
)
)

**EXHIBIT 16**

**MAGNOLIA'S MOTION *IN LIMINE* NO. 3:
TO EXCLUDE EVIDENCE OR ARGUMENT
DEVIATING FROM CLAIM-TO-PRODUCT COMPARISON**

Magnolia moves to preclude Kurin from offering argument or evidence that deviates from a proper claim-to-product infringement analysis through improper embodiment-to-product or product-to-product comparisons.

The "cardinal principle" in any infringement analysis is that "the accused device must be compared to the claims rather than to a preferred or commercial embodiment." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003); *see also, e.g.*, *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002) ("[I]nfringement is to be determined by comparing the asserted claim to the accused device, not by comparing the accused device to the figures of the asserted patent."); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481–82 (Fed. Cir. 1984).  This holds true in all patent cases, regardless of whether the plaintiff is asserting infringement literally or under the doctrine of equivalents.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit.").

The Court should hold Kurin to this principle and exclude any opinion or argument that compares Kurin's device to Magnolia's commercial devices or embodiments in its patent specifications.  For example, Kurin's expert opines that

1

the Kurin Lock does not practice claim 1 of the '001 and '483 patents because (according to Kurin) it does not "sequester" in the same manner as "disclosed embodiments in the specification of the '483 patent and the Magnolia products . . ." Ex. 16.1 (Antonsson Rpt.) ¶¶ 281–87, 372–81.  These comparisons to disclosed and commercial embodiments are irrelevant and unfairly prejudicial, particularly given that the Court construed "sequester" as having its plain and ordinary meaning, and *not* any special meaning particular to the patents.  D.I. 75 at 2.  Similarly, Kurin's expert improperly compares Kurin's device to disclosed embodiments when he opines that the Kurin Lock does not have a "vent" because the "hole in the cap of the Kurin device filled by the porous plug does not provide the same <u>function</u> as the vent disclosed in the first embodiment of the '483 Patent." Ex. 16.1 ¶¶ 400–07; *see, e.g., id.* ¶¶ 387–96 (opining that the Kurin Lock's porous plug cannot be a "seal member" because "[t]here is no plug that performs a sealing function in the embodiments disclosed in the '483 Patent"); *see also id.* ¶¶ 140–47, 155, 177, 252–53, 264–67, 322–23, 355–57, 372–81, 442–43, 448–49, 486–89.

Courts regularly exclude comparisons like these because they are irrelevant to the infringement analysis and the "risks of jury confusion and prejudice far outweigh the probative value of such evidence."  *Praxair, Inc. v. ATMI, Inc.*, C.A. No. 03-1158-SLR, 2005 WL 3159054, at *2 (D. Del. Nov. 28, 2005).  For example, in *Praxair*, the defendant sought to introduce an additional requirement

into the asserted claims based on the operation of the plaintiff's commercial embodiment. *Id.* The Court disagreed, noting that the jury's infringement determination "does not require analysis of the [plaintiff's] product," and that allowing such a comparison would violate clear Federal Circuit precedent. *Id.* Similarly, in *ICU Medical, Inc. v. RyMed Technologies, Inc.*, the Court excluded argument or evidence comparing the accused product to the plaintiff's commercial embodiment. 752 F. Supp. 2d 486, 491 (D. Del. 2010); *see also Intellectual Ventures II LLC v. FedEx Corp.*, No. 2:16-cv-0980, 2018 WL 10638138, at *3 (E.D. Tex. Apr. 26, 2018) (holding that "the only proper comparison is between the accused products and the elements of the Asserted Claims" and precluding comparisons of the "accused systems and methods to any commercial embodiments or prototypes of the asserted patents"); *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985-RGA, 2016 WL 775742, at *4 (D. Del. Feb. 25, 2016) (precluding testimony that disclosed or commercial embodiments support expert's view of a term's plain and ordinary meaning, because "[s]uggesting, incorrectly, that literal infringement can be established by comparing accused products with specification or commercial embodiments would risk unfair prejudice").

The Court should thus preclude Kurin from offering any evidence or argument that compares the accused products to disclosed or commercialized embodiments.

3

# EXHIBIT 16.1

# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| KURIN, INC., | ) ) | |
| Defendant. | ) ) ) ) | |

**KURIN'S OPPOSITION TO MAGNOLIA'S MOTION *IN LIMINE* NO. 3: TO EXCLUDE EVIDENCE OR ARGUMENT DEVIATING FROM <u>CLAIM-TO-PRODUCT COMPARISON</u>**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Kurin, Inc.*

May 27, 2022

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple, Inc.* v. *Samsung Elecs. Co.*,
   2014 WL 660857 (N.D. Cal. Feb. 20, 2014) ............................................................3

*ECB USA, Inc.* v. *Savencia, S.A.*,
   2020 WL 5369076 (D. Del. Sept. 8, 2020) ...............................................................3

*EMC Corp.* v. *Pure Storage, Inc.*,
   2016 WL775742 (D. Del. Feb. 25, 2016) ..................................................................3

*Intuitive Surgical, Inc.* v. *Auris Health, Inc.*,
   549 F. Supp. 3d 362 (D. Del. 2021) ..........................................................................3

*IXYS Corp.* v. *Advanced Power Techs., Inc.*,
   321 F. Supp. 2d 1133 (N.D. Cal 2004) .....................................................................2

*SSL Servs., LLC* v. *Citrix Sys., Inc.*,
   940 F. Supp. 2d 480 (E.D. Tex. 2013), *aff'd*, 769 F.3d 1073 (Fed. Cir. 2014) .......3

*Steuben Foods, Inc.* v. *Shubiya Hoppmann Corp.*,
   2021 WL 4775996 (D. Del. Oct. 13, 2021) ...............................................................2

*Vehicular Techs. Corp.* v. *Titan Wheel Int'l*,
   141 F.3d 1084 (Fed. Cir. 1998).................................................................................2

Magnolia's overbroad request to preclude Kurin from doing what Magnolia itself openly plans to do—offering evidence or argument in Phase 1 that compares the accused products to commercial or patent embodiments—should be denied.[1]

First, on commercial embodiments, Magnolia's expert, Dr. Santiago, uses comparisons of the Kurin Lock to Magnolia's commercial embodiment to opine on infringement. *See, e.g.*, Ex. 1 at ¶¶ 260, 336, 355–356.  Likewise, Magnolia's Phase 1 Exhibit List contains at least 24 documents relating to the design of Steripath.  Ex. 2 (*See, e.g.*, PTX-337–PTX-445).  During the parties' pretrial meet and confers Magnolia expressly stated an intent to discuss its products as part of an "invention story" in putting on its direct infringement case.  To the extent Magnolia is permitted during Phase 1 to discuss the design or features of Steripath, including in the context of or in relation to the patents-in-suit, Kurin is entitled to adduce responsive evidence, including regarding differences between Steripath and the Kurin Lock.

Second, Magnolia's request would improperly preclude Kurin's expert Dr. Antonsson from comparing the Kurin Lock to embodiments disclosed in the '001 patent when analyzing "diverter".  "Diverter" was construed to be a means-plus-function limitation.  D.I. 74 at 6, 10–11.  Thus, as matter of basic patent law Kurin

_____

[1] Magnolia's title, introduction and argument focuses exclusively on Phase 1 (infringement), but Magnolia then requests broader relief.  Magnolia makes no argument that the comparisons are not relevant in Phase 2, *e.g.*, damages and willfulness.  Any relief should therefore be limited to Phase 1.

and Dr. Antonsson *must* discuss the disclosed embodiments of the '001 Patent and compare them to the accused device. *Id.* at 4 (citing *Williamson* v. *Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Similarly, Dr. Antonsson's ¶ 404 opinion regarding "vent" that Magnolia quotes is a doctrine-of-equivalents ("DOE") opinion focusing on whether the specific *function* disclosed for that claim element in the specification is performed by the Kurin device. Ex. 16.1 at ¶ 404. Such reference to the specification, including embodiments, is proper DOE analysis regarding claim scope. *Vehicular Techs. Corp.* v. *Titan Wheel Int'l*, 141 F.3d 1084, 1090–91 (Fed. Cir. 1998); *see also IXYS Corp.* v. *Advanced Power Techs., Inc.*, 321 F. Supp. 2d 1133, 1143 (N.D. Cal 2004). Likewise, Dr. Antonsson's noninfringement opinions under reverse DOE require comparison of Kurin Lock's operation to the patent's disclosures in order to determine whether the Kurin Lock performs the same function in a substantially different way. *Steuben Foods, Inc.* v. *Shubiya Hoppmann Corp.*, 2021 WL 4775996, at *4 (D. Del. Oct. 13, 2021).

With respect to other limitations and noninfringement more broadly, Kurin is not going to argue the Kurin lock does not infringe simply because the Kurin Lock is different from commercial or the specifications' preferred embodiments. But Magnolia, rehashing failed Daubert arguments, seeks to preclude what the caselaw *does* allow—an expert's analysis of the plain and ordinary meaning of claim terms and reference to embodiments consistent with such meaning. *See* D.I. 294; D.I. 297;

*Intuitive Surgical, Inc.* v. *Auris Health, Inc.*, 549 F. Supp. 3d 362, 368 (D. Del. 2021) ("[Experts] may rely on portions of a patent to note that the patent uses the terms consistent with their plain and ordinary meaning."); *Apple, Inc.* v. *Samsung Elecs. Co.*, 2014 WL 660857, at 4–5 & n.4 (N.D. Cal. Feb. 20, 2014); *SSL Servs., LLC* v. *Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 492 (E.D. Tex. 2013), *aff'd*, 769 F.3d 1073 (Fed. Cir. 2014).  No Magnolia case supports such overbroad relief.  For example, *EMC Corp.* v. *Pure Storage, Inc.*, 2016 WL 775742, at *4 (D. Del. Feb. 25, 2016) makes clear that whether experts' reference to embodiments is proper should be determined "on an objection by objection basis in the context of the trial."

On "sequester" and "seal member", the only other claim terms Magnolia addressed, Dr. Antonsson states his own understanding of the plain and ordinary meaning of the term and then discusses how the specification (among other evidence, including, *e.g.*, a Magnolia internal document) is consistent with his understanding. *See, e.g.*, Ex. 16.1 at ¶¶ 140, 284–85, 373–380; Ex. 3 at ¶ 387.  This is proper.  *SSL Servs.,* 940 F. Supp. 2d at 492.  Dr. Antonsson's analysis is similarly proper for claim terms addressed in the remaining paragraphs Magnolia cites to without any explanation of how they are allegedly improper.[2]

For the foregoing reasons, the Court should deny Magnolia's motion *in limine.*

---

[2] *ECB USA, Inc.* v. *Savencia, S.A.*, 2020 WL 5369076, at *4 (D. Del. Sept. 8, 2020) ("courts only decide issues that are fairly and fully presented.").

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ngroombridge@paulweiss.com
cnyarady@paulweiss.com
kraman@paulweiss.com
jreich@paulweiss.com
abarel@paulweiss.com


May 27, 2022

RICHARDS,  LAYTON  &  FINGER,
P.A.
*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

               Plaintiff,

   v.

KURIN, INC.,

               Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC
(CJB)

███████████████████

## DECLARATION OF ARIELLA BAREL IN SUPPORT OF
## KURIN, INC.'S OPPOSITION TO MOTION *IN LIMINE* NO. 3:
## TO EXCLUDE EVIDENCE OR ARGUMENT DEVIATING
## FROM CLAIM-TO-PRODUCT COMPARISON

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action. I have been admitted *pro hac vice* for this matter. I respectfully submit this Declaration in support of Kurin's Opposition to Magnolia's Motion *in Limine* No. 3, which is filed herewith.

1.     Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt of the Opening Expert Report of Dr. Juan G. Santiago Regarding Infringement of U.S. Patent Nos. 9,855,001 and 10,039,483, dated January 15, 2021.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt from Magnolia's Trial Exhibit List, served May 20, 2022.

3.      Attached hereto as **Exhibit 3** is a true and correct copy of an excerpt of the Rebuttal Expert Report of Erik K. Antonsson, dated February 18, 2021.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 27, 2022.

*/s/ Ariella Barel*
Ariella Barel

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | |
| Plaintiff, | C.A. No. 19-00097-CFC |
| v. | **CONFIDENTIAL** |
| KURIN, INC., | |
| Defendant. | |

## OPENING EXPERT REPORT OF DR. JUAN G. SANTIAGO REGARDING INFRINGEMENT OF U.S. PATENT NOS. 9,855,001 AND 10,039,483

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



192

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



200

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



201

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



202

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



275

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

276

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



277

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



278

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



296

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



297

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



298

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



299

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



300

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

Respectfully submitted,

Dated:  January 15, 2021

/s/

Juan G. Santiago

540

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 2

| TRIAL EX. | PHASE 1* | DESCRIPTION | BEG BATES | END BATES | DEPO EXS | KURIN'S OBJECTIONS |
|---|---|---|---|---|---|---|
| PTX-0299 | Yes | Kurin Blood Culture Collection Set - PIV M-PIV12 | | | | |
| PTX-0300 | Yes | Kurin Blood Culture Collection Set - PIV 18 Ref M-PIV18 | | | | |
| PTX-0301 | Yes | Kurin Blood Culture Collection Set - S-PIV4 | | | | |
| PTX-0302 | Yes | Kurin Blood Culture Collection Set - S-PIV10 | | | | |
| PTX-0303 | Yes | Kurin T-11223 | | | | |
| PTX-0304 | Yes | Prosecution history of U.S. Provisional Patent Application No. 61/546,954 entitled, | MAG-DEL0002870 | MAG-DEL0002885 | | 402, 403, 602 |
| PTX-0305 | Yes | U.S. Patent Application Publication No. 13/650,554 entitled, "Fluid Diversion Mechanism for | MAG-DEL0452590 | MAG-DEL0452619 | | 402, 403, 602 |
| PTX-0306 | Yes | Prosecution history of U.S. Provisional Patent Application No. 60/870,599 entitled, "System | MAG-DEL0002846 | MAG-DEL0002869 | | 402, 403, 602 |
| PTX-0307 | Yes | Prosecution history of U.S. Patent Application No. 11/955,635 entitled, "Systems and | N/A | N/A | | 402, 403, 602 |
| PTX-0309 | | Presentation entitled, "concept Exploration." | GAW0001976 | GAW0001983 | | 402, 403, 602 |
| PTX-0314 | | Email from M. Heindel to J. Kelly, re: Kurin.com v2 - Updated site with MH's edits | KUR-MAG-DE119842 | KUR-MAG-DE119849 | Kelly 09 | 402, 403, 602, 802, 805, MIL |
| PTX-0315 | Yes | Document entitled, "Kurin - Reshaping Blood Collection." | KUR-MAG-DE295232 | KUR-MAG-DE295235 | Heindel 33 | 402, 403, 602, 802, 805, MIL |
| PTX-0316 | Yes | Email from C. Covington to M. Heindel re: "Updated - Bus Plan" Att: business pan dec 2016_r2.docx | KUR-MAG-DE477524<br>KUR-MAG-DE477525 | KUR-MAG-DE477524<br>KUR-MAG-DE477538 | Covington 17<br>Heindel 11 | 402, 403, 602, 802, 805, MIL |
| PTX-0318 | Yes | Presentation entitled, "Kurin Training" | KUR-MAG-DE043872 | KUR-MAG-DE043893 | Covington 12<br>Heindel 23<br>Lloyd 09 | 402, 403, 602, 802, 805, MIL |
| PTX-0319 | Yes | Presentation entitled, "Establishing the New Standard-of-Care Enabling Sepsis Testing | MAG-DEL0013467 | MAG-DEL0013475 | | 402, 403, 602, 802, 805 |
| PTX-0320 | Yes | Brochure entitled, "Kurin Blood Culture Collection Sets" | KUR-MAG-DE003008 | KUR-MAG-DE003009 | Kelly 22 | 402, 403, 602, 802, 805, MIL |
| PTX-0323 | Yes | Email from D. Lloyd to C. Covington, M. Heindel, and A. Norfleet, re: Rep PP FOR VEGAS and Matt H Atts: Sales Cycle_NSM 1_4_2019.pptx; 2019 Jan Poole KDMC Presentation.pptx; Tom Price Geislinger Holy Spirit presentation 2.pptx; 2019 Nobile Vegas .pptx; HPG MAC JONES.1-2019.pptx; 2019 sales meeting BOB JENEY v2 sales funnel.pptx; VEGAS HEINDELJan 2019.pptx | KUR-MAG-DE003042<br>KUR-MAG-DE003043<br>KUR-MAG-DE003044<br>KUR-MAG-DE003049<br>KUR-MAG-DE003050<br>KUR-MAG-DE003056<br>KUR-MAG-DE003057<br>KUR-MAG-DE003061<br>KUR-MAG-DE003062<br>KUR-MAG-DE003063<br>KUR-MAG-DE003066<br>KUR-MAG-DE003067<br>KUR-MAG-DE003073<br>KUR-MAG-DE003074<br>KUR-MAG-DE003082 | KUR-MAG-DE003042<br>KUR-MAG-DE003043<br>KUR-MAG-DE003048<br>KUR-MAG-DE003049<br>KUR-MAG-DE003055<br>KUR-MAG-DE003056<br>KUR-MAG-DE003061<br>KUR-MAG-DE003062<br>KUR-MAG-DE003065<br>KUR-MAG-DE003066<br>KUR-MAG-DE003072<br>KUR-MAG-DE003073<br>KUR-MAG-DE003081<br>KUR-MAG-DE003082 | Lloyd 10<br>SD Lloyd 11 | 402, 403, 602, 802, 805, MIL |
| PTX-0324 | Yes | Filename: IFU Reconciliation_Redlines_17zweDfew_-LoXQL_1eGVf9SKjTew69Wr.xlsx | KUR-MAG-DE266278 | KUR-MAG-DE266278 | Kelly 18 | 402, 403, 602, 802, 805, MIL |
| PTX-0325 | Yes | Presentation entitled, "Establishing the New Standard of Care in Sepsis Testing Accuracy" | MAG-DEL0664443 | MAG-DEL0664635 | | 402, 403, 602, 802 |
| PTX-0326 | Yes | Email from J. Kelly to E. Enigenburg and C. Covington, re: Voice over/video edit | KUR-MAG-DE094749 | KUR-MAG-DE094750 | Kelly 10 | 402, 403, 602, 802, 805, MIL |
| PTX-0328 | Yes | Document entitled, "Edits to ML-027 Rev D - BBS Home." | KELLY001714 | KELLY001716 | Kelly 23 | 402, 403, 602, 802, 805, MIL |
| PTX-0329 | Yes | Email from J. Kelly to A. Eichelberg, re: ML 014, 015 Atts: ML-014_How it works_RevB_Redlines.pdf; ML-014_How it works_RevC.pdf | KELLY002577<br>KELLY002579<br>KELLY002581 | KELLY002578<br>KELLY002580<br>KELLY002582 | Kelly 24<br>Kelly 25<br>Kelly 26 | 402, 403, 602, 802, 805, MIL |
| PTX-0333 | Yes | Email from J. Kelly to J. Cocca, re: Kurin November '19 Report | KELLY003095 | KELLY003096 | Kelly 05 | 402, 403, 602, 802 |
| PTX-0334 | Yes | Presentation entitled, "Establishing the New Standard of Care in Sepsis Testing Accuracy" | MAG-DEL0820595 | MAG-DEL0820799 | | 402, 403, 602, 802 |
| PTX-0336 | Yes | Richard G. Patton & Timothy Schmitt, Innovation for Reducing Blood Culture | MAG-DEL0000983 | MAG-DEL0000985 | | 402, 403, 602, 802 |
| PTX-0337 | Yes | Filename: ISDT Device Design Requirements 10_5_2011.pdf | MIAZGA0004151 | MIAZGA0004153 | | 402, 403, 602 |
| PTX-0339 | Yes | GAWSDesign on conceptsketches." | MAG-DEL0000996 | MAG-DEL0000996 | | 402, 403, 602 |
| PTX-0340 | Yes | Presentation entitled, "Team Design Review @ NWH, Concept Compilation" | MAG-DEL0001283 | MAG-DEL0001314 | | 402, 403, 602 |
| PTX-0341 | Yes | Presentation entitled, "ISDT Product Concept Refinement: Magnolia Medical Technologies" | MAG-DEL0001155 | MAG-DEL0001163 | | 402, 403, 602, 802, 805 |

* Magnolia provides the marking of evidence by phase herein in reliance on Kurin's May 10, 2022 email confirming that "Magnolia's good-faith disclosures of evidence by phase are binding or preclusive."

| TRIAL EX. | PHASE 1* | DESCRIPTION | BEG BATES | END BATES | DEPO EXS | KURIN'S OBJECTIONS |
|---|---|---|---|---|---|---|
| PTX-0342 | Yes | Presentation entitled, "conceptexploration" | MAG-DEL0001037 | MAG-DEL0001039 | | 402, 403, 602, 802, 805 |
| PTX-0343 | Yes | Presentation entitled, "Final Concept Selection, Designs for Prototyping" | MAG-DEL0001241 | MAG-DEL0001282 | Gaw 08 (GAW00001990) | 402, 403, 602, 802, 805 |
| PTX-0347 | Yes | Presentation entitled, "conceptexploration" | MAG-DEL0001040 | MAG-DEL0001049 | | 402, 403, 602, 802, 805 |
| PTX-0350 | Yes | Presentation entitled, "_____ Concept" | MAG-DEL0001445 | MAG-DEL0001453 | | 402, 403, 602, 802 |
| PTX-0351 | Yes | Presentation entitled, "conceptexploration ISDT kit concepts" | MAG-DEL0001002 | MAG-DEL0001008 | | 402, 403, 602, 802 |
| PTX-0352 | Yes | _____ PDF | MAG-DEL0001050 | MAG-DEL0001062 | | 402, 403, 602, 802 |
| PTX-0353 | Yes | Presentation entitled, "conceptexploration" | MAG-DEL0001009 | MAG-DEL0001015 | | 402, 403, 602, 802 |
| PTX-0355 | Yes | Presentation entitled, "conceptexploration" | MAG-DEL0001016 | MAG-DEL0001022 | | 402, 403, 602, 802 |
| PTX-0356 | Yes | Filename: MMT ISDT Program Schedule 041112a.pdf | MIAZGA0004154 | MIAZGA0004155 | | 402, 403, 602, 802 |
| PTX-0358 | Yes | Presentation entitled, "conceptexploration _____ concepts" | MAG-DEL0001023 | MAG-DEL0001029 | | 402, 403, 602, 802 |
| PTX-0359 | Yes | Document entitled, "Magnolia ISDT Initial Thoughts" | MAG-DEL0000872 | MAG-DEL0000874 | | 402, 403, 602, 802 |
| PTX-0360 | Yes | Email from G. Bullinton to K. Rice re: "User feedback on ergonomics/finger positioning" | MAG-DEL0000940 | MAG-DEL0000941 | | 402, 403, 602, 802 |
| PTX-0437 | Yes | 8305aJ.jpg | GAW000319 | GAW000319 | | 402, 403, 602 |
| PTX-0438 | Yes | 8306aJ.jpg | GAW000320 | GAW000320 | | 402, 403, 602 |
| PTX-0439 | Yes | 8311aJ.jpg | GAW000321 | GAW000321 | | 402, 403, 602 |
| PTX-0440 | Yes | 8315aJ.jpg | GAW000322 | GAW000322 | | 402, 403, 602 |
| PTX-0442 | Yes | 8329aJ.jpg | GAW000324 | GAW000324 | | 402, 403, 602 |
| PTX-0443 | Yes | 8336aJ.jpg | GAW000325 | GAW000325 | | 402, 403, 602 |
| PTX-0444 | Yes | 8357aJ.jpg | GAW000326 | GAW000326 | | 402, 403, 602 |
| PTX-0445 | Yes | 8374aJ.jpg | GAW000327 | GAW000327 | | 402, 403, 602 |
| PTX-0464 | Yes | Email from G. Bullington to J. Maruska re: "Logo / mark / font(s) / color palate" Att: MMT Proto Overview_120607.pdf | MAG-DEL0000916 MAG-DEL0000918 | MAG-DEL0000917 MAG-DEL0000925 | | 402, 403, 602, 802, 805 |
| PTX-0466 | Yes | Email from B. Rogers to D. Lloyd et al, re: Recent News & Events | Magnolia Medical | KUR-MAG-DE524431 | KUR-MAG-DE524432 | | 402, 403, 602, 802, 805, MIL |
| PTX-0467 | | Email from M. Heindel to B. Rogers, D. Lloyd, and G. Kang, re: Clean Connect info | KUR-MAG-DE178107 | KUR-MAG-DE178108 | Heindel 02 Lloyd 01 Rogers 04 Heindel 06 | 402, 403, 602, 802, MIL |
| PTX-0468 | Yes | Email from B. Rogers to M. Heindel, G. Kang, and D. Lloyd, re: diversion amount | KUR-MAG-DE481495 | KUR-MAG-DE481497 | Heindel 07 Rogers 07 | 402, 403, 602, 802, MIL |
| PTX-0469 | | Email from M. Heindel to G. Kang, re: Samples at Your House | KUR-MAG-DE481898 | KUR-MAG-DE481898 | Heindel 09 | 402, 403, 602, 802, MIL |
| PTX-0471 | Yes | Richard G. Patton Blood Culture Contamination Definitions Can Obscure the Extent of | MAG-DEL0001064 | MAG-DEL0001067 | | 402, 403, 602, 802 |
| PTX-0472 | Yes | Document entitled, "Reduction of Blood Culture Contaminations in the Emergency | MAG-DEL0003119 | MAG-DEL0003142 | | 402, 403, 602, 802 |
| PTX-0474 | Yes | E. Skoglund, "Estimated clinical and economic impact through use of a novel blood | MAG-DEL0003133 | MAG-DEL0003142 | | 402, 403, 602, 802 |
| PTX-0476 | Yes | Jay.jpg | MAG-DEL0001068 | MAG-DEL0001068 | | 402, 403, 602, 802 |
| PTX-0481 | Yes | Magnolia Bone Marrow Biopsy - Skin Cells - Keratin Layer.pdf | MAG-DEL0001073 | MAG-DEL0001105 | | 402, 403, 602, 802 |
| PTX-0490 | Yes | U.S. Patent No. 8,647,286 entitled, "Systems and Methods for Parenterally Procuring Bodily- | MAG-DEL0634750 | MAG-DEL0634767 | | 402, 403, 602, 701, 802, MIL |
| PTX-0501 | Yes | Correspondence from G. Bullington to K. Fitzgerald, re: Minutes of Pre-Submission Meeting | MAG-DEL0544868 | MAG-DEL0544899 | | 402, 403, 602, 802 |
| PTX-0503 | Yes | Email from K. Fitzgerald to G. Bullington, re: Q190107/A001 Meeting Minutes Accepted | MAG-DEL0826078 | MAG-DEL0826078 | | 402, 403, 602, 802 |
| PTX-0517 | | K192247 Clearance Letter, Indications for Use, and 510(k) Summary, available at: https://www.accessdata.fda.gov/cdrh_docs/pdf19/K192247.pdf | MAG-DEL0826445 MAG-DEL0546208 MAG-DEL0827239 | MAG-DEL0826461 MAG-DEL0546209 MAG-DEL0827255 | | |
| PTX-0519 | | K200661 Clearance Letter available at: | MAG-DEL0827231 | MAG-DEL0827238 | | 402, 403, 602, 802 |
| PTX-0521 | | Email from B. Rogers to G. Kang re: Magnolia Medical | KUR-MAG-DE504493 | KUR-MAG-DE504493 | Kang 05 Rogers 03 | 402, 403, 602, 701, 802, MIL |
| PTX-0522 | | Document entitled, "Telecon with Matt. Heindel, Dave Lloyd at Bob Rogers home will be | KUR-MAG-DE178083 | KUR-MAG-DE178085 | Rogers 06 | 402, 403, 602, 802, MIL |
| PTX-0523 | | Email from M. Heindel to G. Kang, re: WVU | KUR-MAG-DE482184 | KUR-MAG-DE482184 | Heindel 10 | 402, 403, 602, 802, MIL |
| PTX-0524 | | Email from G. Kang to M. Heindel, re: WVU | KUR-MAG-DE482185 | KUR-MAG-DE482185 | Rogers 09 | 402, 403, 602, 802, MIL |
| PTX-0526 | | Kuin.com Specifications Document | KUR-MAG-DE118243 | KUR-MAG-DE118250 | Rogers 23 | 402, 403, 602, 802, MIL |
| PTX-0526 | | Email from M. Heindel to B. Rogers and D. Lloyd, re: Magnolia | KUR-MAG-DE013908 | KUR-MAG-DE013908 | Heindel 12 | 402, 403, 602, 802, MIL |
| PTX-0527 | | Email from G. Kang to D. Lloyd et al, re: Magnolia Medical: New Funding of SteriPath for | K_PROD011948 | K_PROD011949 | Kang 15 | 402, 403, 602, 802, MIL |
| PTX-0529 | | Email from B. Rogers to T. Krvaric et al., re: FDA Assistance request Atts: K4 MagnoliaSteripath Evaluation_updated20170822A.pdf; memo21 -Aug-2011, | K_PROD013378 | K_PROD013379 | Kang 14 | 402, 403, 602, 802 |

\* **Magnolia provides the marking of evidence by phase herein in reliance on Kurin's May 10, 2022 email confirming that**
"**Kurin will not argue that Magnolia's good-faith disclosures of evidence by phase are binding or preclusive.**"

# EXHIBIT 3

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) | |
| Defendant. | ) ) | |

**EXHIBIT 16**

**MAGNOLIA'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 6:
TO EXCLUDE EVIDENCE OR ARGUMENT
DEVIATING FROM CLAIM-TO-PRODUCT COMPARISON**

Kurin concedes that it cannot argue non-infringement "simply because the Kurin Lock is different from commercial or the specifications' preferred embodiments." Opp'n at 2. But the law requires more. In the infringement analysis, any comparison of the accused device to a commercial or disclosed embodiment is improper because it is irrelevant and invites confusion. Mot. at 2–3.

Kurin's other arguments fare no better. Mere mention of a Magnolia product does not open the door for Kurin to make an improper comparison. And Magnolia's expert will not compare the parties' devices to show infringement.

Moreover, Kurin's brief confirms that its expert will cross the line into improper claim construction testimony, inviting jury confusion. Opp'n at 3; *see, e.g.*, Ex. 16.1 ¶ 140. Kurin and its expert should be "precluded from testifying that specification and commercial embodiments support their views regarding the plain and ordinary meaning of claim terms." *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985-RGA, 2016 WL 775742, at *4 (D. Del. Feb. 25, 2016). Indeed, Kurin concedes it may not "present evidence or argument that any plain-and-ordinary-meaning term should be defined according to a special meaning from the intrinsic record." Ex. 16.2 (Email from Catherine Nyarady to Philip Sheng (May 13, 2022)).

Kurin's DOE cases are similarly inapposite. None refutes the rule that comparisons to embodiments are improper in the infringement analysis. Mot. at 1; *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

# EXHIBIT 16.2

| From: | Sheng, Philip T. |
|---|---|
| Sent: | Friday, May 13, 2022 7:04 PM |
| To: | Nyarady, Catherine |
| Cc: | Groombridge, Nicholas; Reich, Joshua D; Kelly Farnan (farnan@rlf.com); Ramani, Ashok; Smith, Rodger; dpw.service.mmt; Raman, Kripa; Barel, Ariella C; Raucci, Anthony D.; Block, Micah G. |
| Subject: | RE: Magnolia v. Kurin - List of MILs |

Hi Catherine,

We disagree with your characterizations of the call, especially your suggestion that we agreed that experts can use embodiments as examples to demonstrate their understanding of the plain and ordinary meaning of a term.  That is what our MIL seeks to preclude.  It does not sound like we will be able to reach an agreement on any of Magnolia's MILs, and we will proceed accordingly.  With respect to Kurin's MILs, we have discussed internally and cannot agree to any of them, including Kurin's MILs seeking to preclude evidence of its future products and other litigations.

Best,
Phil


**Philip T. Sheng**

**Davis Polk & Wardwell** LLP
+1 650 752 2038 office
+1 805 405 4358 mobile
philip.sheng@davispolk.com

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Friday, May 13, 2022 2:45 PM
**To:** Sheng, Philip T. <philip.sheng@davispolk.com>
**Cc:** Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; Kelly Farnan (farnan@rlf.com) <farnan@rlf.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Smith, Rodger <RSmith@morrisnichols.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>; Raman, Kripa <kraman@paulweiss.com>; Barel, Ariella C <abarel@paulweiss.com>; Raucci, Anthony D. <araucci@morrisnichols.com>; Block, Micah G. <micah.block@davispolk.com>
**Subject:** RE: Magnolia v. Kurin - List of MILs

Phil,

As an initial matter, my concerns on the meet and confer extended beyond the fact that the MIL as drafted would exclude the court's construction.  Indeed, I specifically pointed out that the plain and ordinary meaning of a term is a question for the experts, the experts will have to testify as to what they understand any such term to mean, and that the patent can be discussed if relevant to that understanding.  In response, I understood Micah to be agreeing that the experts can use embodiments as an example to demonstrate the expert's understanding, but that the expert may not use the embodiments or any other part of the specification as defining or limiting the term's meaning.

With respect to your proposal, Kurin already agreed on the meet and confer "not to present evidence or argument that any plain-and-ordinary-meaning term should be defined according to a special meaning from the intrinsic record" and agreed that neither party should argue (or re-argue) claim construction to the jury.

Kurin's position on Antonsson's paragraph 140 has not changed since the Daubert briefing and hearing.  The opinion in that paragraph does not violate the above agreement and is consistent with the legal boundaries, including as articulated by Micah.  We also note that this argument was denied as moot when the Court ruled to allow Antonsson to use the word "isolate."  (*See* D.I. 297 at 13-14 (identifying the same paragraph from Dr. Antonsson's report and citing *Ferring Pharms* in support of its argument); D.I. 347 at 18-19; 2/10/2022 Hearing Transcript at 16:10-12 (denying D.I. 294 as moot).)  Dr. Antonsson provides his understanding of the plain and ordinary meaning of the term "sequester" and then points to the patent's embodiments that he notes are consistent with his understanding.  This is proper expert testimony.  Thus, it appears the parties disagree on the application of the law here and further agreement is unlikely.

Kurin reserves all rights with respect to any other issues raised in your email, including whether any arguments were "abandoned."

During our meet and confer, your team agreed to get back to us on whether we could reach any agreement on Kurin's MILs.  Specifically, we wanted confirmation that Magnolia will not be introducing evidence of Kurin products not in suit.  I also mentioned not having testimony on Kurin ongoing R&D.  We confirmed that we also will not introduce such evidence of Kurin products not in suit.  Please let me know where Magnolia landed on this issue.

Also, I raised the issue of other litigations – both between the parties and against other parties.  It is Kurin's view that such litigations are irrelevant.  Magnolia indicated that it might be able to find a compromise regarding the California case between the parties.  Please let us know if you have a proposal.  Your team also said it would consider the issue of other litigations not between the parties, and that you might not be able to "whitewash [prior litigations] from [Bob's] record" but you agreed to consider it further.  What is Magnolia's final position?

Regards,
Catherine


**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** Sheng, Philip T. <philip.sheng@davispolk.com>
**Sent:** Wednesday, May 11, 2022 6:39 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; Kelly Farnan (farnan@rlf.com) <farnan@rlf.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Smith, Rodger <RSmith@morrisnichols.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>; Raman, Kripa <kraman@paulweiss.com>; Barel, Ariella C <abarel@paulweiss.com>; Raucci, Anthony D. <araucci@morrisnichols.com>; Block, Micah G. <micah.block@davispolk.com>
**Subject:** RE: Magnolia v. Kurin - List of MILs

Hi Catherine,

I write to follow up regarding Magnolia's proposed MIL No. 5 seeking to "exclude presentation of claim-construction evidence or argument to the jury, including without limitation any attempt to define or limit a term's 'plain and ordinary meaning' by reference to a specific embodiment."  We understand your concern from our meet-and-confer that as worded the MIL could exclude presentation of the court's claim-constructions.  As we confirmed to you, that is not our intent.  Rather, as we explained on the call, our intent is to seek to exclude

attempts to argue (or re-argue) claim construction to the jury, including attempts to define or limit a term's plain and ordinary meaning by reference to specific uses in the intrinsic record, such as specific embodiments.

For example, in his non-infringement expert report, Dr. Antonsson opined:

> I understand the claim term "sequester" to be a synonym for the word "isolate". This understanding is **consistent with the embodiments** disclosed in the '001 Patent, all of which feature a "reservoir" that is sealed to isolate or sequester a volume of fluid. **The embodiments disclosed in the '001 Patent all physically isolate** the initial portion of blood withdrawn from the patient in the reservoir from any subsequent blood that flows to the sample collection vessel.

Antonsson Rpt. ¶ 140 (emphases added). This is an improper argument that the plain and ordinary meaning of "sequester" is defined or limited according to a particular physical isolation in disclosed embodiments. *See also* Antonsson Rpt. ¶ 252 (similar improper claim construction argument with respect to "initial volume" and "subsequent volume," now abandoned per Feb. 10, 2022 Hr'g Tr. at 9:22-10:16).

Any such opinion or testimony is improper. *E.g., Ferring Pharms. Inc. v. PAR Pharm., Inc.*, C.A. No. 15-173-RGA, 2016 WL 6471246, at *1 (D. Del. Oct. 28, 2016) ("Expert testimony about the plain and ordinary meaning of claim terms supported by reference to specification and prosecution history would constitute impermissible claim construction.").

Will Kurin agree not to present evidence or argument that any plain-and-ordinary-meaning term should be defined according to a special meaning from the intrinsic record, and specifically not to present "expert testimony about the plain and ordinary meaning of claim terms supported by reference to specification and prosecution history"?

Best,
Phil

**Philip T. Sheng**

**Davis Polk & Wardwell** LLP
+1 650 752 2038 office
+1 805 405 4358 mobile
philip.sheng@davispolk.com

---

**From:** Sheng, Philip T.
**Sent:** Wednesday, May 4, 2022 3:00 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; Kelly Farnan (farnan@rlf.com) <farnan@rlf.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Smith, Rodger <RSmith@morrisnichols.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>; Raman, Kripa <kraman@paulweiss.com>; Barel, Ariella C <abarel@paulweiss.com>; Raucci, Anthony D. <araucci@morrisnichols.com>; Block, Micah G. <micah.block@davispolk.com>
**Subject:** Magnolia v. Kurin - List of MILs

Hi Catherine,

Magnolia identifies the following motions *in limine* it may raise with the Court:

    i.   Magnolia seeks to preclude Kurin from referencing Kurin's own patents
    ii.   Magnolia seeks to exclude evidence or argument that Magnolia drafted its patent claims on Kurin statements and/or products

iii.   Magnolia seeks to exclude evidence or argument comparing the Kurin Lock to any Magnolia product or otherwise deviating from claim-to-product comparison

iv.   █████████████████████████████████████████████████████████████

v.   Magnolia seeks to exclude presentation of claim-construction evidence or argument to the jury, including without limitation any attempt to define or limit a term's "plain and ordinary meaning" by reference to a specific embodiment

Best,
Phil

**Philip T. Sheng**

**Davis Polk & Wardwell** LLP
+1 650 752 2038 office
+1 805 405 4358 mobile
philip.sheng@davispolk.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

## **EXHIBIT 17**

## **KURIN'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE OR ARGUMENT RELYING ON DR. SANTIAGO'S NEW DEFINITION OF RESEVOIR**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

                Plaintiff,

    v.

KURIN, INC.,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC (CJB)

███████████

## KURIN'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE OR ARGUMENT RELYING ON DR. SANTIAGO'S NEW DEFINITION OF RESERVOIR

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

May 17, 2022

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ASUS Comp. Int'l* v. *Round Rock Rsch., LLC*,
   2014 WL 1463609 (N.D. Cal. Apr. 11, 2014) ...................................................................2

*Finjan, Inc.* v. *Rapid7, Inc.*,
   2020 WL 5798545 (D. Del. Sept. 29, 2020) ...................................................................2

*Intellectual Ventures I* v. *AT&T Mobility LLC*,
   2017 WL 658469 (D. Del. Feb. 14, 2017) ...................................................................3

*Pharmacyclics LLC* v. *Cipla Ltd.*,
   2020 WL 6581643 (D. Del. Nov. 10, 2020) ...............................................................1, 3

*TQ Delta, LLC* v. *ADTRAN, Inc.*,
   2019 WL 4346530 (D. Del. Sept. 12, 2019) ...................................................................2

*Trading Techs. Int'l, Inc.* v. *CQG, Inc.*,
   2014 WL 4477932 (N.D. Ill. Sept. 10, 2014) .................................................................2

*Viatech Techs., Inc.* v. *Microsoft Corp.*,
   2021 WL 663057 (D. Del. Feb. 19, 2021) ..............................................................1, 2, 3

**Other Authorities**

Fed. R. Civ. P. 26(a) ............................................................................................................1, 2

Fed. R. Civ. P. 37(c)(1) ........................................................................................................1, 2

Kurin respectfully moves to preclude Magnolia from presenting at trial an untimely infringement theory on the claim term "reservoir" that was disclosed only in its technical expert's opening expert report and deposition.[1]

A patentee must timely disclose its infringement contentions during fact discovery.  *See* Fed. R. Civ. P. 26(a), 37(c)(1); D.I. 24 at 1–2.  Infringement theories disclosed instead for the first time in expert discovery are excluded as untimely. *Viatech Techs., Inc.* v. *Microsoft Corp.*, 2021 WL 663057, at *2 (D. Del. Feb. 19, 2021); *see also Pharmacyclics LLC* v. *Cipla Ltd.*, 2020 WL 6581643, at *3 (D. Del. Nov. 10, 2020); Ex. 2 at 25:2–26:2.

Each of Magnolia's ***three sets*** of infringement contentions identified the ***entire*** U-shaped side channel of the Kurin Lock as the alleged "reservoir".  Ex. 3 at 4–5; Ex. 4 at 5–6; Ex. 5 at 5–6, 10.   In response, during fact discovery, Kurin engaged a third-party to design and test whether blood in this alleged "reservoir" was "sequestered".  *See* Ex. 6 at 6–12, 14–16; Ex. 7 ¶¶ 0091–0119, App. 1. Magnolia expert Dr. Santiago performed similar tests.  Both learned that the blood in the U-shaped channel is **__not__** "sequestered" because there is mixing.  *See id.*; Ex. 8 ¶¶ 82–92.  In response, Magnolia introduced an entirely new theory ***after*** the

---

[1] Because this untimely "reservoir" theory was never disclosed in Magnolia's contentions, Kurin requested agreement that Magnolia would not present this theory at trial.  *See* Ex. 1.  Magnolia responded that it does intend to present this theory without amending its contentions.  Kurin brings this motion to resolve this dispute outside the jury's presence and before trial.

close of fact discovery and **only** in Dr. Santiago's Opening Expert Report: the "reservoir" is only ***the small, oval-shaped region of the inner leg of the U-shaped side channel***. Ex. 8 ¶ 136.  Dr. Santiago changed the scope of the new theory even further at deposition to include additional possible "reservoirs".  *See* Ex. 9 at 186:3–211:9.  Magnolia never moved to amend its contentions to add this theory, and cannot because it lacks good cause.  D.I. 24 at 1–2, 6–7.

Magnolia failed to comply with its Rule 26 obligations.  *TQ Delta*, *LLC* v. *ADTRAN, Inc.*, 2019 WL 4346530, at *2 (D. Del. Sept. 12, 2019); *Finjan, Inc.* v. *Rapid7, Inc.*, 2020 WL 5798545, at *3–4 (D. Del. Sept. 29, 2020); *ASUS Comp. Int'l* v. *Round Rock Rsch., LLC*, 2014 WL 1463609, at *1 (N.D. Cal. Apr. 11, 2014); *Trading Techs. Int'l, Inc.* v. *CQG, Inc.*, 2014 WL 4477932, at *1 (N.D. Ill. Sept. 10, 2014).   Thus, it may not present the theory at trial "unless the failure was substantially justified or his harmless." Fed. R. Civ. P. 37(c)(1).  Here, all the factors of the governing *Pennypack* Rule 37 analysis favor exclusion. *Viatech Techs.*, 2021 WL 663057, at *1.

**Prejudice to Kurin and the possibility of cure (factors 1–3):**  Kurin relied on Magnolia's contentions during fact discovery to develop its testing and evidence in support of its non-infringement defense.  These tests targeted and refuted Magnolia's original "reservoir" theory and took significant time, effort and money to design and implement.  *See* Ex. 6 at 6–12, 14–16, 34; Ex. 7 ¶¶ 0091–0119, App.

1.  Kurin did not, and could not reasonably be expected to, redo such testing to target a new and different "reservoir" theory that was evolving still further as expert discovery progressed.  Magnolia's untimely post-fact discovery about face thus deprived Kurin of the ability to properly address Magnolia's new infringement theory head on.  Only exclusion can cure this late-stage prejudice. *See Viatech Techs.*, 2021 WL 663057, at *2; *see also Pharmacyclics*, 2020 WL 6581643, at *2.

**Magnolia's bad faith (factor 4)**:[2]  Prior to the close of fact discovery Magnolia was aware Kurin relied on, and adduced noninfringement evidence rebutting, Magnolia's original, disclosed, "reservoir" theory. *See* Ex. 6 at 6–12, 14–16, 34.  In spite of this, and despite ***serving amended infringement contentions shortly before the close of fact discovery***, Magnolia waited until expert discovery to blindside Kurin with a new and different theory.  Even as of today, Magnolia has never sought to amend its contentions.

**Importance of the information to Magnolia (factor 5)**:  Magnolia's counsel has stated that Magnolia has "viable infringement arguments" under its original theory, (Ex. 10 at 31:7–17), making this new untimely theory, at most, an alternate, less important theory, favoring exclusion. *Viatech*, 2021 WL 663057, at *2.

Thus, the Court should preclude Magnolia's untimely theory at trial.

---

[2] The presence of bad faith or willfulness supports but is not required for exclusion. *Intellectual Ventures I* v. *AT&T Mobility LLC*, 2017 WL 658469, at *5–6 (D. Del. Feb. 14, 2017).

RICHARDS, LAYTON & FINGER, P.A.

OF COUNSEL:

Nicholas Groombridge

Catherine Nyarady

Kripa Raman

Joshua D. Reich

Ariella Barel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 Avenue of the Americas

New York, NY 10019-6064

(212) 373-3000

ngroombridge@paulweiss.com

cnyarady@paulweiss.com

kraman@paulweiss.com

jreich@paulweiss.com

abarel@paulweiss.com


*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)

Richards, Layton & Finger, P.A.

920 N. King Street

One Rodney Square

Wilmington, DE 19801

(302) 651-7700

Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

May 17, 2022

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| v. | ) ) | |
| KURIN, INC., | ) ) | ███████████████ |
| Defendant. | ) ) | |

## DECLARATION OF ARIELLA BAREL IN SUPPORT OF KURIN, INC.'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE OR ARGUMENT RELYING ON DR. SANTIAGO'S NEW DEFINITION OF RESERVOIR

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's Motion *in Limine*, which is filed herewith.

1.     Attached hereto as **Exhibit 1** is a true and correct copy of the email from C. Nyarady to M. Block entitled "RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB," dated April 13, 2022.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt of the transcript of August 3, 2021 Hearing in *Koki Holdings Co. Ltd.* v. *Kyocera Senco Industrial Tools, Inc.*, No. 18-313-CFC-CJB.

3.      Attached hereto as **Exhibit 3** is a true and correct copy of an excerpt of Attachment A to Magnolia's Infringement Contentions, dated July 17, 2019.

4.      Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt of the letter from C. Drakulich to K. Boyd entitled "Protective Order, Discovery and Case Management Issues (*Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, No. 19-00097-CFC (USDC-DE)), dated September 24, 2019.

5.      Attached hereto as **Exhibit 5** is a true and correct copy of an excerpt of Attachment A to Magnolia's First Amended Infringement Contentions, dated July 17, 2020.

6.      Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt of Defendant Kurin, Inc.'s Supplemental Responses to Plaintiff Magnolia Medical Technologies, Inc's Interrogatories to Defendant Kurin, Inc. (Nos. 2, 11, 12, and 14), dated August 25, 2020.

7.      Attached hereto as **Exhibit 7** is a true and correct copy of an excerpt of the Rebuttal Expert Report of Erik K. Antonsson, dated February 18, 2021.

8.      Attached hereto as **Exhibit 8** is a true and correct copy of an excerpt of the Opening Expert Report of Dr. Juan G. Santiago Regarding Infringement of U.S. Patent Nos. 9,855,001 and 10,039,483, dated January 15, 2021.

9.      Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt of the transcript of the April 20, 2021 deposition of Dr. Juan G. Santiago.

10.     Attached hereto as **Exhibit 10** is a true and correct copy of an excerpt of the transcript of the February 10, 2022 *Daubert* Hearing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 17, 2022.

*/s/ Ariella Barel*
Ariella Barel

# EXHIBIT 1

**Barel, Ariella C**

| | |
|---|---|
| **From:** | Nyarady, Catherine |
| **Sent:** | Wednesday, April 13, 2022 1:31 PM |
| **To:** | Block, Micah G. |
| **Cc:** | Smith, Rodger; Ramani, Ashok; Lisson, David; Bi, Kathryn; Sheng, Philip T.; serge.voronov@davispolk.com; Farnan, Kelly E.; Pedi, Nicole K.; Groombridge, Nicholas; Reich, Joshua D; dpw.service.mmt; Raman, Kripa; Barel, Ariella C |
| **Subject:** | RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB |

Dear Micah,

On March 1, 2022 Kurin served a supplemental expert report of Dr. Antonsson, limited to a short response to Dr. Santiago's new opinions not previously disclosed in Magnolia's infringement contentions.  During our March 11, 2022 meet and confer, you took the position that theories outside of a party's contentions are not properly in the case, and stated that if Kurin wanted to serve a supplemental expert report it needed to move to amend its contentions and seek permission for a supplemental expert report.  Per your email below, it appears that Magnolia intends to take that position at trial.  We write to advise you that, consistent with Magnolia's position taken during the meet and confer, Kurin will be moving to exclude Dr. Santiago's "reservoir" theory of infringement, which was not disclosed in Magnolia's infringement contentions and is thus not properly in the case according to Magnolia.  This "reservoir" theory was untimely and disclosed for the first time in Dr. Santiago's Opening Report and substantively elaborated on at his subsequent deposition.  Magnolia never moved for permission to add to the case these new infringement theories not disclosed in its contentions.

Regards,
Catherine

**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** Block, Micah G. <micah.block@davispolk.com>
**Sent:** Wednesday, March 23, 2022 1:09 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; serge.voronov@davispolk.com; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Dear Catherine,

Following up on our recent discussions, as you know we believe the Antonsson supplement is untimely and improper, particularly given that it was served in violation of the Court's schedule and without leave of the Court.  If Kurin wished to expand Dr. Antonsson's disclosures, it should have sought leave to do so.

Magnolia reserves all rights and objections with respect to the supplement and the issues and opinions it purports to raise, including without limitation waiver arguments and objections to admissibility.

Best,
Micah

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Friday, March 18, 2022 1:01 PM
**To:** Block, Micah G. <micah.block@davispolk.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; Voronov, Serge A. <serge.voronov@davispolk.com>; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

That works. Thanks, and have a good weekend!

**Catherine Nyarady | Partner**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** Block, Micah G. <micah.block@davispolk.com>
**Date:** Friday, Mar 18, 2022, 3:59 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>, Ramani, Ashok <ashok.ramani@davispolk.com>, Lisson, David <david.lisson@davispolk.com>, Bi, Kathryn <kathryn.bi@davispolk.com>, Sheng, Philip T. <philip.sheng@davispolk.com>, serge.voronov@davispolk.com <serge.voronov@davispolk.com>, Farnan, Kelly E. <Farnan@RLF.com>, Pedi, Nicole K. <Pedi@rlf.com>, Groombridge, Nicholas <ngroombridge@paulweiss.com>, Reich, Joshua D <jreich@paulweiss.com>, dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Thanks Catherine.  8:30am PT on Monday works for me.  I'll call you then at your direct number below (unless you prefer something different, in which case just let me know).   Have a good weekend.

Best,
Micah

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Friday, March 18, 2022 12:57 PM
**To:** Block, Micah G. <micah.block@davispolk.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; Voronov, Serge A. <serge.voronov@davispolk.com>; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Hi Micah,

Apologies but I am tied up the rest of the day. I am free 8:30-9:30 PT if you want to talk first thing Monday. If that time doesn't work just let me know when is good for you.

Thanks,
Catherine

**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** Block, Micah G. <micah.block@davispolk.com>
**Date:** Friday, Mar 18, 2022, 3:14 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>, Ramani, Ashok <ashok.ramani@davispolk.com>, Lisson, David <david.lisson@davispolk.com>, Bi, Kathryn <kathryn.bi@davispolk.com>, Sheng, Philip T. <philip.sheng@davispolk.com>, serge.voronov@davispolk.com <serge.voronov@davispolk.com>, Farnan, Kelly E. <Farnan@RLF.com>, Pedi, Nicole K. <Pedi@rlf.com>, Groombridge, Nicholas <ngroombridge@paulweiss.com>, Reich, Joshua D <jreich@paulweiss.com>, dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Hi Catherine –

With apologies for the Friday afternoon email, do you have time for a short call today?  I'm quite flexible this afternoon.  I wanted to follow up on a couple of our recent discussions.  We can look to Monday or later next week if that's better for you.

Thanks,
Micah

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Wednesday, March 9, 2022 11:01 AM
**To:** Block, Micah G. <micah.block@davispolk.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; Voronov, Serge A. <serge.voronov@davispolk.com>; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

We can do Friday at 4:00 ET.

**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

---

**From:** Block, Micah G. <micah.block@davispolk.com>
**Sent:** Wednesday, March 9, 2022 1:41 PM
**To:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T.

<philip.sheng@davispolk.com>; serge.voronov@davispolk.com; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>; dpw.service.mmt <dpw.service.mmt@davispolk.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Thanks Catherine.  Do you have time to confer this Friday at 11am or after 4pm ET?

Also please note the service email address for the Davis Polk team, copied here – dpw.service.mmt@davispolk.com.  We'd appreciate it if you could include that address generally for case correspondence going forward.

Best,
Micah

**Micah G. Block**

**Davis Polk & Wardwell** LLP
+1 650 752 2023 office
+1 650 353 6257 mobile
micah.block@davispolk.com

---

**From:** Nyarady, Catherine <cnyarady@paulweiss.com>
**Sent:** Monday, March 7, 2022 2:58 PM
**To:** Block, Micah G. <micah.block@davispolk.com>
**Cc:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; Voronov, Serge A. <serge.voronov@davispolk.com>; Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Dear Micah,

Magnolia has been on notice of Dr. Antonsson's opinions on indefiniteness since his rebuttal report was served on February 18, 2021 and the bases of those opinions available to him at the time of that report.  Specifically, Magnolia has been aware that it was Dr. Antonsson's opinion that Dr. Santiago's new, previously undisclosed position in his opening expert report as to what constituted the "reservoir" in Kurin's device rendered the claims indefinite.  Magnolia has also been aware since at least May 27, 2021 of Kurin's position that Dr. Santiago should be precluded from testifying as to his new, previously undisclosed position, which materially departed from Magnolia's infringement contentions.  (D.I. 288.)  In view of the Court's February 10, 2022 ruling denying Kurin's Daubert motion seeking to preclude Dr. Santiago's testimony, Dr. Antonsson's Supplemental Report was served to address additional bases for his opinions that were unavailable to him at the time of his rebuttal report.  Kurin and Dr. Antonsson made every effort to serve promptly Dr. Antonsson's Supplemental Report, doing so the day after the February 10 Hearing Transcript was obtained.  We are happy to meet and confer, if needed, at your convenience.

Regards,
Catherine

**Catherine Nyarady** | Partner
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
212 373 3532 (Direct Phone) | 212 492 0532 (Direct Fax)
cnyarady@paulweiss.com | www.paulweiss.com

**From:** Block, Micah G. <micah.block@davispolk.com>
**Sent:** Friday, March 4, 2022 8:13 PM
**To:** Farnan, Kelly E. <Farnan@RLF.com>; Pedi, Nicole K. <Pedi@rlf.com>; Groombridge, Nicholas <ngroombridge@paulweiss.com>; Nyarady, Catherine <cnyarady@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>
**Cc:** dpw.service.mmt <dpw.service.mmt@davispolk.com>; Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; serge.voronov@davispolk.com
**Subject:** RE: Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Dear Counsel –

We have received the expert report that was attached to the email below.  We're not aware of any prior notice, nor any request for leave to submit this report, which as you know comes long after the Court's deadlines for expert disclosures, close of discovery, Daubert motions, etc.  To the extent Kurin contends that this document is timely, or that there is justification for its untimeliness, would you please explain the basis for that contention?

Plaintiff reserves all rights and will consider next steps in light of Kurin's position.

Thanks,
Micah
**Micah G. Block**

**Davis Polk & Wardwell** LLP
+1 650 752 2023 office
+1 650 353 6257 mobile
micah.block@davispolk.com

**From:** Farnan, Kelly E. <Farnan@RLF.com>
**Sent:** Tuesday, March 1, 2022 1:30 PM
**To:** Smith, Rodger <RSmith@morrisnichols.com>; Ramani, Ashok <ashok.ramani@davispolk.com>; Lisson, David <david.lisson@davispolk.com>; Bi, Kathryn <kathryn.bi@davispolk.com>; Block, Micah G. <micah.block@davispolk.com>; Sheng, Philip T. <philip.sheng@davispolk.com>; Voronov, Serge A. <serge.voronov@davispolk.com>
**Cc:** Pedi, Nicole K. <Pedi@rlf.com>; ngroombridge@paulweiss.com; Nyarady, Catherine <cnyarady@paulweiss.com>; Reich, Joshua D <jreich@paulweiss.com>
**Subject:** Magnolia Medical v. Kurin, C.A. No. 19-097-CFC-CJB

Attached please fine a service copy of the Supplement to Opening Expert Report of Erik K. Antonsson and the corresponding Notice of Service.

Kelly E. Farnan
Richards, Layton & Finger, P.A.
920 North King St.
Wilmington, DE 19801
Direct Dial:    (302) 651-7705
E-Mail:        farnan@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of

this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# EXHIBIT 2

```
1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                               - - -

4
     KOKI HOLDINGS CO. LTD.,         :   CIVIL ACTION
5                                    :
                     Plaintiff,      :
6                                    :
          vs.                        :
7                                    :
     KYOCERA SENCO INDUSTRIAL        :
8    TOOLS, INC.,                    :
                                     :
9                    Defendant.      :   NO. 18-313-CFC-CJB

10

11                                 - - -

                                   Wilmington,Delaware
12                                 Tuesday, August 3, 2021
                                   2:50 o'clock, p.m.
13                                 - - -

14
     BEFORE:  HONORABLE COLM F. CONNOLLY, Chief Judge
15                                 - - -

16
     APPEARANCES:
17

18             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  KAREN JACOBS, ESQ.
19

20                       -and-

21

22

23
                                   Valerie J. Gunning
24                                 Official Court Reporter

25
```

1    APPEARANCES (Continued):

2

3                    McDERMOTT WILL & EMERY LLP
                     BY:  AMOL A. PARIKH, ESQ. and
                          (Chicago, Illinois)

4

5                            -and-

6

7                    McDERMOTT WILL & EMERY LLP
                     BY:  PAUL DEVINSKY, ESQ.
                          (Washington, D.C.)

8

9                        Counsel for Plaintiff

10

11                   RICHARDS, LAYTON & FINGER, P.A.
                     BY:  KELLY E. FARNAN, ESQ.

12

13                           -and-

14

15                    VEDDER PRICE P.C.
                      BY:  ROBERT S. RIGG, ESQ.,
                           DANIEL SHULMAN, ESQ. and

16                         JOHN K. BURKE, ESQ.
                           (Chicago, Illinois)

17

18                       Counsel for Defendant

19                           -   -   -

20

21

22

23

24

25

```
 1                    MR. RIGG:  Thank you, Your Honor.

 2                    THE COURT:  All right.  How do you want to

 3       proceed?  Do you want to do the motions in limine or do you

 4       have issues you want to raise first.

 5                    MR. PARIKH:  We're fine with proceeding with the

 6       motions in limine.

 7                    THE COURT:  Okay.  All right.  Let's start.

 8                    Okay.  So the first is the defendant's motion,

 9       right, to exclude -- wait.  Sorry.  The first is the

10       plaintiff's motion to exclude the untimely or allegedly

11       untimely invalidity defenses.  All right.

12                    Actually, before you get started, because I will

13       forget this.  You got the jury checklist from my deputy

14       clerk?

15                    MR. PARIKH:  Yes.

16                    MS. JACOBS:  Yes.

17                    THE COURT:  Any questions about that?

18                    MS. FARNAN:  No.

19                    THE COURT:  This screen here.  If you need to

20       replace it, just call chambers and make arrangements for

21       that.  We're in trial the week before you all are, so you

22       might want to call up next week and get that arranged and

23       maybe come in.  If you want to test it, do it next week

24       would be my suggestion.

25                    All right.  Sorry.  Just one more issue.  Okay.
```

1    Go ahead.

2              MR. PARIKH:   Okay.   Your Honor, the first motion

3    in limine or plaintiff's motion in limine one relates to an

4    untimely obviousness theory that Kyocera is putting forth.

5              There's no dispute that the obviousness theory

6    is untimely.  It was not provided during discovery.  The

7    first time it was provided was in the pretrial order.

8    Understanding that the test for whether this new theory

9    should come in or whether the failure to disclose it earlier

10   was justified or it's not harmless, neither of those factors

11   are probative for the reasons that we outlined in our

12   motion.

13             First it was -- you know, the obviousness theory

14   was known, throughout all the discovery of the product it

15   was known, and it's the only theory of invalidity relating

16   to the SN325-Plus were that it was anticipated, or

17   anticipated the asserted claim and that it was -- the

18   obviousness theory was an Ishizawa reference, a patent

19   reference, that would have been modified based on the

20   SN325-Plus, which is a prior art product.

21             But there was never a theory that you would

22   actually take that prior art product and modify that prior

23   art product, and because that theory was not disclosed,

24   there was certain evidence that we didn't go into or look

25   into to see whether one of skill in the art would have

1    actually modified that prior art that way Kyocera is now

2    alleging, whether it would have been feasible and whether

3    they would have been motivated to make those changes.

4              THE COURT:  Okay.  Anything else?

5              MR. PARIKH:  I'm happy to run through those if

6    you would like or answer any questions that the Court may

7    have.

8              THE COURT:  Well, I will listen to the other

9    side.

10             MR. SHULMAN:  Thank you, Your Honor.  So the

11   genesis of this was it argued that the SN325-Plus was

12   anticipated because those four holes could be read --

13             THE COURT:  Wait.  It was anticipated or it

14   anticipated?

15             MR. PARIKH:  It anticipated, sorry, the claims

16   because those four holes could be combined to be read as the

17   first channel.  On summary judgment, Your Honor said no,

18   it's one channel only, and so now what we essentially argue,

19   or what we are arguing is that all along we said those four

20   channels are no different than the one channel.  That was

21   the basis for the anticipation argument.

22             So if the Court is going to look at

23   justification for not raising it earlier, all of the

24   elements, all of the factors, all the facts were already

25   there.  It was only after that new claim construction or the

1   claim construction that came forth from the Court after the

2   supplemented further claim construction where we said, no,

3   we're only looking at that one channel.  You are not going

4   to look at all four.

5         When that happened, opposing counsel said are

6   you going to withdraw the SN325?  We said no, we think we

7   can still make an obviousness argument.

8         We admit we did not amend the contentions at

9   that point.  We just said, no, we think we could still make

10  an obviousness argument because all of the testimony was

11  still there.

12        On the prejudice point, I do want to point out

13  that counsel did ask our expert, Mr. Miller, at his

14  deposition specifically about the things he said he didn't

15  get a chance to ask.  So this was on page 116 of

16  Mr. Miller's deposition and talking about the channel.

17        THE COURT:  Hold on, please.

18        MR. PARIKH:  Yes.  And I don't know if this is

19  in the record, Your Honor.

20        THE COURT:  I didn't see that.

21        MR. PARIKH:  No.  This is in response to now the

22  argument that they didn't get a chance to -- that they

23  raised in their reply, that they didn't get a chance to

24  question the witness about it.  On page 116, line 5 of

25  Mr. Miller's deposition, there's a question:

1          "Is there a limit on the number of channels that

2     can be used to determine the cross-sectional area of a first

3     channel?

4          "Answer:  Is there a limit?  No.  In this patent

5     are not putting a limit on it, no.

6          "Question.  Let's say hypothetically that a

7     prior art patent had ten cross over holes with smaller

8     diameters.  Would you be able to combine in your opinion the

9     cross-sectional area of all of those cross over homes to

10    obtain the cross-section of a first channel?

11         "Answer:  Yes.

12         "Question:  If there were 100 crossover holes,

13    you could combine the cross-sectional area of 100 of those

14    cross over holes?  If there are holes, I would agree that

15    you could combine them, yes.  If there were a thousand

16    crossover holes?

17         "Answer:  I don't think that's practical."

18         Later in the deposition on page 136:

19         "Question:  It says line 12, but don't you agree

20    that a person of ordinary skill would analyze flow

21    characteristics in determining whether to modify the SN325

22    plus to have a single hole instead of four holes?

23         "Answer:  I mean, it's obvious that the

24    designers didn't want a single hole.  They wanted four

25    holes, so they obviously would do that.  Any designer which

1    found out how much flow area is needed for the design and

2    the 325 designers calculated they needed four."

3              Followup question:  "And a person of ordinary

4    skill would also analyze flow characteristics in determining

5    whether to modify the cross-sectional area of the main valve

6    control area.  Right?

7              "Answer:  By adding or removing a whole to the

8    cross-sectional area, the further area.  Further questions

9    about enlarging the holes were made."

10             So they clearly understood this idea that the

11   four holes versus one hole was always an issue.  They asked

12   about motivation to go from four holes to one hole.  All of

13   the facts that the experts are going to testify to on

14   obviousness are already in the record and so we don't think

15   that there's any prejudice, and as far as justification,

16   again, it was because the theory changed when the Court

17   decided this additional claim construction limitation that

18   we had to go from then, was essentially the same argument

19   under anticipation to obviousness, Your Honor.

20             THE COURT:  Okay.  Do you want to come forward?

21             MR. PARIKH:  Yes.

22             THE COURT:  I am having a hard time with how

23   you're really prejudiced.

24             MR. PARIKH:  So maybe I can take a step back.

25   The argument before, there was an Ishizawa reference that

1    had one channel and a fairly long channel, and Kyocera's

2    argument was he would -- and it doesn't define the

3    cross-sectional area, and they have the SN325 product that

4    has four channels.  You take the combined ratio of the four

5    channels in this prior art product, which are very short,

6    and you modify the Ishizawa reference to have that ratio.

7              That's the -- that was their argument before.

8    And all the questions Mr. Shulman was discussing, it was in

9    the context or in the abstract of going from four channels

10   to ten channels to a hundred channels.  It wasn't looking at

11   a specific piece of prior art and saying what would happen

12   if I took those four channels in the SN325-Plus and I

13   combined that into one channel?  Instead it was what if I

14   took that ratio from that prior art reference and I modify

15   it to this other reference over here?  That's the analysis

16   of our expert.  It was you wouldn't modify Ishizawa with

17   this ratio because it wouldn't work or it's not feasible to

18   make that modification.

19             So the prejudice, now what they are saying is

20   get rid of this reference over here and you take the SN325

21   plus and it has four holes and you're combining that into

22   one hole.  The analysis that was never done and the heart of

23   the obviousness inquiry, is, one, is it feasible to take

24   those four holes and change them into one hole and what is

25   the impact on the tool?

1    These are power tools where if you make a change
2    in one area, it's going to affect the operation of the tool
3    in another area.  So the question Mr. Shulman was asking or
4    that he said I asked about airflow, if you change from four
5    holes to one hole, that affects the airflow of the tool.
6    Now, one, how does that airflow change?  We have
7    not been able to explore.  Because you're now increasing the
8    size of a hole, that may increase the size of a tool and
9    these are tools that are compact and if you need to increase
10   the size of a tool, that may be a reason that one of
11   ordinary skill in the art would not make that change.
12   THE COURT:  But does he have any -- in his
13   report, he doesn't -- he doesn't have those calculations.
14   MR. PARIKH:  Our expert, Dr. Valley?
15   THE COURT:  Well, yours doesn't.  I know that.
16   MR. PARIKH:  He does not, correct.
17   THE COURT:  But does he have those calculations
18   in a report?
19   MR. PARIKH:  No, they don't have the -- they did
20   not explain why one of skill in the art, or what impact
21   changing the four holes into one hole would have on a tool.
22   Their position is, these are four holes.  You just change it
23   into one.  But our position is that's not how these tools
24   operate.  It's not just a design choice.  Maybe it is a
25   design choice, but there are other impacts or effects on the

1    tool that we should have been able to explain.

2              THE COURT:  Right.  You're going to show that he

3    didn't do any of those.  He gave no due consideration to

4    those facts.  Right?

5              MR. PARIKH:  That is -- yes.

6              THE COURT:  In other words, he has got -- you

7    say did not disclose the theory until the pretrial order.

8    Okay.  Where in the pretrial order is it?  I'm looking at

9    your motion.

10              MR. PARIKH:  It's in Exhibit 3 and, again, this

11    is -- this was a discussion that we had with Kyocera and

12    they agree they just say --

13              THE COURT:  Hold on.  Hold on, please.

14              MR. PARIKH:  Yes.

15              THE COURT:  I mean, I'm just curious, and I just

16    say this because just going forward.  Looking at your

17    motion, I think the only description you have of what you

18    are trying to preclude from coming into evidence is just

19    your summary of what he said.  Right?  And I just want to

20    make sure.

21              And I don't know what he said is what I'm

22    getting at, so that's what we're walking through now.  You

23    are saying in the pretrial order, so then we're on Exhibit

24    3.

25              MR. PARIKH:  Two places.  Exhibit 3, which is

```
 1    defendant's statement of facts where they --

 2                THE COURT:  Yes.

 3                MR. PARIKH:  And Exhibit 5.

 4                THE COURT:  Let's go through them individually.

 5    Okay.

 6                MR. PARIKH:  Okay.

 7                THE COURT:  So where in Exhibit 3?

 8                MR. PARIKH:  Well, Exhibit 3 I'm setting up.  So

 9    on page 2.

10                THE COURT:  Okay.  Where?

11                MR. PARIKH:  So Section 1A-1 and 2.

12                THE COURT:  All right.  Well, hold on.  1A-1.

13    1A-1 just reads those are the contents of the prior art.

14                MR. PARIKH:  Correct, yes.

15                THE COURT:  Okay.  And then where else is it?

16                MR. PARIKH:  And then in Exhibit 5 on page 2.

17                THE COURT:  Are you looking at the same thing?

18    I'm looking at Exhibit 3, which is defendant's statement of

19    facts.  All it says on page 2 under 1A -- where are you

20    looking?  1A-1?

21                MR. PARIKH:  Maybe I could direct you.  It's

22    more specific in Exhibit 5, Your Honor, which is the

23    statement of law.

24                THE COURT:  Okay.  All right.  So where are we

25    in 5?
```

```
 1                    MR. PARIKH:  So on page 2 of Exhibit 5.

 2                    THE COURT:  Okay.

 3                    MR. PARIKH:  There's Roman Numeral I and then

 4       invalidity, subpart A and then subpart 1.

 5                    THE COURT:  Okay.

 6                    MR. PARIKH:  And the issue -- the keyword is the

 7       or and --

 8                    THE COURT:  Got you.  Okay.

 9                    MR. PARIKH:  So --

10                    THE COURT:  So they've injected the or.

11                    MR. PARIKH:  That's correct.

12                    THE COURT:  All right.  Now, this is all they've

13       said.  How do you even know what they are going to say?

14                    MR. PARIKH:  Well, it's based on their expert

15       report and in their -- their expert is limited under the

16       Federal Rules.  He has to disclose his opinions and in his

17       expert report, the opinions were --

18                    THE COURT:  Wait.  Time out.  I want to go back

19       to, you say in your motion that this defense was first

20       disclosed in the pretrial order to you.  Right?

21                    MR. PARIKH:  Correct.

22                    THE COURT:  All right.  And now I'm walking

23       through the pretrial order and you're showing me where it

24       was disclosed.  All right.

25                    So and you had no knowledge, you're saying, of
```

1    this defense prior to the issuance of the pretrial order.

2    Right?  So you were given the pretrial order.

3                   MR. PARIKH:  Correct.

4                   THE COURT:  Okay.  So how do you know what

5    they're going to say?

6                   MR. PARIKH:  Because we asked them about it

7    during the meet and confer.  Mr. Shulman just says that they

8    are.  We saw the or and we wanted to know what were their

9    invalidity arguments going to be.

10                  THE COURT:  Right.  And you never heard about

11   that until the meet and confer, which occurred after the

12   filing of the pretrial report.  You didn't have any detail

13   on how they are going to show that claim 1 of the '021

14   patent is invalid for obviousness based on and only on the

15   SN325.  Right?  That was the first you ever heard of it?

16                  MR. PARIKH:  That's correct.

17                  THE COURT:  Okay.

18                  MR. PARIKH:  And just so we're clear, I don't

19   mean to correct Your Honor, but it was during the exchange

20   of the exhibits to the pretrial order and the meet and

21   confer occurred a few days after the exchange of these

22   documents.

23                  THE COURT:  Okay.

24                  MR. PARIKH:  And at that point we raised the

25   issue and we were informed by Kyocera that they did intend

1    to argue at trial that the claims of the '012 and the '647

2    patent are invalid as obviousness based on the SN3245-Plus

3    alone and that's the proffer of the motion in limine.

4                    THE COURT:  Now, you said it's in their expert

5    report I think is what you said?

6                    MR. PARIKH:  The opinions in the expert report,

7    and I apologize, Your Honor.  I have hard copies.  That was

8    another exhibit which was not included by mistake in our

9    pretrial order, but I can just provide the Court with

10   copies.

11                   In the expert report, Kyocera's expert alleged

12   that the claims were anticipated by the SN3245-Plus and then

13   obvious based on Ishizawa.

14                   THE COURT:  Combined?

15                   MR. PARIKH:  Combined with --

16                   THE COURT:  I get that, right.  But you've

17   never seen an expert report where their expert explains how

18   claim 1 would be invalid for obviousness based solely on the

19   SN325.

20                   MR. PARIKH:  We have not.

21                   THE COURT:  So the only thing you know that

22   describes their theory is what you learned through meet and

23   confers or a meet and confer that occurred after you were

24   provided a draft of the pretrial order?

25                   MR. PARIKH:  That's correct.

1      THE COURT:  Okay.  And when was that?

2      MR. PARIKH:  It would have been I believe

3  July -- the first week of July.

4      THE COURT:  July -- in other words, less than a

5  full month ago?

6      MR. PARIKH:  That's correct.

7      THE COURT:  Okay.  And when did I issue my

8  Markman opinion where I -- and incidentally, I didn't change

9  the construction of the claim issue.  Right?  I just decided

10  to construe it?

11      MR. PARIKH:  We thought the construction was

12  clear on its face.

13      THE COURT:  Right.

14      MR. PARIKH:  It was a request for supplemental

15  construction, but the parties have --

16      THE COURT:  And who made the request?

17      MR. PARIKH:  Koki made the request.

18      THE COURT:  Okay.

19      MR. PARIKH:  Because we thought Kyocera was

20  construing the term in a way that based on prior art that

21  had come into the case late.

22      THE COURT:  All right.  And then I granted that

23  request and I construed it.  Do you know the date I

24  construed it?

25      MS. JACOBS:  March 26th, Your Honor.

 1              THE COURT:  Of this year?

 2              MS. JACOBS:  Of this year.

 3              THE COURT:  All right.  So I construed it on

 4     March 26th.  And then the next you heard was sometime in

 5     July.  Right?

 6              MR. PARIKH:  That's correct, Your Honor.

 7              THE COURT:  More than three months later?

 8              MR. PARIKH:  That's correct, Your Honor.

 9              THE COURT:  Okay.

10              MR. PARIKH:  And I would also point out that we

11     had disclosed our proposed construction, or the parties had

12     exchanged proposed constructions in February or March of 202

13     it was.

14              THE COURT:  Okay.  All right.  Thank you.  All

15     right.  Anything else the defense wants to say?

16              MR. SHULMAN:  Yes, Your Honor.  Maybe my friend

17     had forgotten.  After Your Honor issued the summary judgment

18     in March, in April and May there was a dialogue about

19     whether or not you're withdrawing 325 and we notified

20     counsel via e-mail back in May that, no, we think all of the

21     obligations for obviousness are still, still in all of the

22     expert reports and still in the case, and so they would have

23     known at least a month-and-a-half before we started

24     exchanging the pretrial order that --

25              THE COURT:  Are any of these in the motions in

1    limine?

2                    MR. SHULMAN:  They're not because we didn't know

3    that they were going to raise them.  They didn't know about

4    it frankly, Your Honor.  What I just heard today is the

5    first that they didn't know about it.

6                    I do want to point out though, Your Honor, one

7    other thing, and because this is -- this is the

8    inconsistency in their argument, is that they want to

9    preclude it, but they understand that everything is already

10   in the expert report and the experts can't go beyond the

11   expert report, which suggests that there's no prejudice.

12                   THE COURT:  Well, wait.  Are you telling me that

13   they're -- just show it to me then.  Is it somewhere

14   disclosed in the expert report that they solely on the

15   SN325-Plus that an artisan of skill would have made

16   modifications to make the accused product?

17                   MR. SHULMAN:  So we cited a number of

18   paragraphs.

19                   THE COURT:  Okay.  Hold on.  Hold on.

20                   MR. SHULMAN:  In our motion in limine we cited a

21   number of paragraphs both in our report, their expert's

22   response and our expert's response.

23                   THE COURT:  Can you slow down for a second?

24                   MR. SHULMAN:  Yes.  Sorry, Your Honor.  It's

25   page 2 of our response to their motion in limine.  And I

1    would want to point out to Your Honor --

2              THE COURT:  Okay.

3              MR. SHULMAN:  Mr. Parikh made a comment --

4              THE COURT:  Can you wait a minute so I can

5    think?

6              MR. SHULMAN:  Yes.

7              THE COURT:  You know, my question was where is

8    it?  You might have said it, but where is the exhibit?

9    Exhibit 2, rebuttal report of Glenn Valley.  Where is it?

10             MR. SHULMAN:  I have it with me.  I can hand it

11   up, Your Honor.

12             THE COURT:  I have the pretrial order.  I don't

13   have it.  I tried to prepare to come in here.  I don't have

14   it.

15             MR. SHULMAN:  I apologize, Your Honor.  There

16   must have been a miscommunication between the parties

17   filing, filing the exhibits to the motions in limine, so I

18   apologize for that.

19             I'm happy to hand it up.  We will submit it

20   afterwards.  I can point though you directly to Mr. Parikh's

21   comments about, well, there was no discussion of airflow,

22   because that was his primary argument about why four is not

23   one.

24             In paragraph 193 of Mr. Miller's reply report,

25   which we cited to, he specifically says, I disagree with Dr.

 1    Valley's opinion that the airflow from the main valve

 2    chamber in the SN325 is far more complex than of Ishizawa as

 3    the flow path in 325-Plus is shorter and simpler.

 4    Nevertheless, this opinion, Dr. Valley's opinion that the

 5    Ishizawa design has an elongated first channel and much more

 6    compact trigger valve, which undoubtedly results in

 7    different flow characteristics, are irrelevant.

 8            Again, he cites to the fact that none of the

 9    claims talk about flow characteristics, so they were on

10    notice that our expert considered those flow

11    characteristics.

12            THE COURT:  The question is were they on notice

13    you were going to argue obviousness based solely on that

14    reference.  Is that disclosed in your report anywhere?

15            MR. SHULMAN:  The fact -- no, we did not

16    disclose prior to letting him know the e-mail in May that we

17    were going to use the SN325 as obviousness.

18            Our position, Your Honor, is that all of the

19    facts that we will use to support obviousness are already in

20    the record.

21            THE COURT:  I got that.

22            MR. SHULMAN:  Okay.

23            THE COURT:  I got that.  But, you know,

24    disclosing the facts and disclosing the theory are two

25    different things.  You didn't seek to amend your contention

1    interrogatories?

2              MR. SHULMAN:   We did not, Your Honor.   After we

3    put them on notice in May, we did not then additional seek

4    to amend.   Right or wrong, we thought we had put them on

5    notice.

6              THE COURT:   Well, you were wrong.   I'm going to

7    grant the motion.   I can't run trials like this and try to

8    go through, you know, what the facts are, the other expert

9    reports that isn't even attached to the pleading that I'm

10   supposed to review.

11             What I am convinced about is there was ample

12   time to seek Court intervention if you couldn't get an

13   agreement to formally move as our rules require for an

14   amendment and I'm not even sure good cause exists.   I don't

15   have enough material before me to make that decision and so

16   I just think on the eve of trial, you can't do it.   You have

17   not persuaded me, since I don't even have the report and

18   it's way too complicated on the issue of prejudice, but I do

19   think regardless, I mean, you guys inundated me with

20   motions.

21             So I'm going to find that it's a credible

22   allegation of prejudice and that there is a clear failure to

23   seek an amendment as required, and therefore I'm not going

24   to at this late date -- and by the way, it's also undisputed

25   that the experts never said they disclosed in the report

1    that there was an obviousness theory based solely on the

2    325N.  All right.  So that motion is granted.

3                  Let's go to defendant's motion in limine number

4    one to exclude the testimony of commercial success.

5                  MR. SHULMAN:  So, Your Honor, this is a narrow

6    issue.  In order to prove that there was commercial success

7    of facts related to nonobviousness, there must be a nexus

8    that exists that is more than as the Court has said, at

9    least one Court has said, do more than just say the product

10   incorporates the claimed invention, the product is

11   successful.  Therefore, the invention must have caused the

12   commercial success, which is all that Dr. Valley does, and

13   they have not pointed to any other evidence besides Dr.

14   Valley's very, very general claims of commercial success for

15   which he is not being admitted as an expert.

16                  The --

17                  THE COURT:  What do you mean by he's not being

18   admitted as an expert?

19                  MR. SHULMAN:  He's a technical expert, Your

20   Honor.

21                  THE COURT:  Well, if your beef is with his

22   qualifications, it seems to me that should have been a

23   Daubert motion.  You had a deadline that has kind of come

24   and gone.

25                  Now, so were the opinions disclosed?

# EXHIBIT 3

**Attachment A - Infringement of U.S. Patent No. 9,855,001**

This chart applies the claims of Magnolia's U.S. Patent No. 9,855,001 ("the '001 patent") against Kurin's blood culture collection sets numbered K-11221, K11223, K-11225, D-11221, D-21221, D-11223, D-21223, M-11221, M-21221, M-11223, M-21223, T-11221, T-21221, T-11223, T-21223, D-PIV12, D-PIV18, M-PIV12, M-PIV18, T-PIV12, T-PIV18, S-PIV4, and S-PIV10, (collectively, "the Accused Products").

The Accused Products are substantially similar to one another.  For example, each of the Accused Products includes a Kurin Lock apparatus. *See, e.g.*, MAG-DEL0000688–693 (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture."). Based on the information presently available to Magnolia, the Kurin Lock apparatus in Accused Products D-11221, D-21221, D-11223, D-21223, M-11221, M-21221, M-11223, M-21223, T-11221, T-21221, T-11223, T-21223, D-PIV12, D-PIV18, M-PIV12, M-PIV18, T-PIV12, T-PIV18, S-PIV4, and S-PIV10 is identical and is described and illustrated in, for example, Kurin Drawing Numbers KUR-2005 (Top Housing) [KUR-MAG-DE001623-24], KUR-2006 (Bottom Housing) [KUR-MAG-DE001625-26], KUR-2007 (Cap) [KUR-MAG-DE001627], KUR-6010 (Hydrophobic Self-Sealing Plug) [KUR-MAG-DE001655], KUR-6011 (Umbrella Valve) [KUR-MAG-DE001656], and KUR-8036 (Assembly) [KUR-MAG-DE001659], MiniValve Part Number UM 053.002 SD (Umbrella Valve and seating suggestion) [KUR-MAG-DE003703]; Manufacturing Procedure MP-016 [KUR-MAG-DE000104-124] and the duplicates of these drawings produced throughout KUR-MAG-DE000138-2362.  On information and belief, based on the limited information Kurin has provided to date and representations made by counsel for Kurin, Accused Products K-11221, K11223, K-11225 are substantially similar to the other Accused Products.

As such, Magnolia contends that, for purposes of the infringement analysis, the Accused Products are identical except where otherwise indicated below.  Magnolia reserves its right to amend these contentions as additional information becomes available and in view of claim construction.

| Claim 1 | Accused Products |
|---|---|
| 1. An apparatus for obtaining a bodily fluid sample from a patient with reduced contamination, the apparatus comprising: | To the extent the preamble of claim 1 is a limitation, each of the Accused Products is an apparatus for obtaining a bodily fluid sample from a patient with reduced contamination. *See, e.g.,* <br><br> MAG-DEL0000684–687 (https://www.kurin.com/kurin-lock-specimen-diversion-device/) at 684 ("Each Kurin® blood culture collection set features |

1

Attachment A

industry-leading butterfly needles and is compatible with all major blood culture bottles. The Kurin blood culture set is enhanced by a Kurin Lock® specimen diversion device enabling clinicians to automatically divert the initial aliquot of blood, which many contain skin microbes, from every draw.")

MAG-DEL0000688–693 (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture.")

MAG-DEL0000680–681 (Kurin Brochure) at 680:



kurin®

Blood Culture Collection Sets

Traditional blood culture collection methods provide skin microbes a direct line to the culture.

Kurin technology diverts the initial aliquot of blood which may contain skin contaminants. Roughly 20% of the microbes present in skin reside deep in the dermis! With venipuncture, contaminants may be dislodged and drawn into blood culture samples leading to high rates of seemingly unavoidable false positives.

Standing guard between the venipuncture site and the culture bottle, the Kurin Lock® specimen diversion device corrals blood from the venipuncture site while the clinically relevant blood sample flows into the blood culture bottle.

*Id.* ("Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful device that automatically diverts the initial aliquot of blood during the routine process of drawing a blood culture. . . .Any contaminants residing in the initial ~0.15ml volume of blood (35x a standard 21G needle) are captured in the u-shaped Kurin Lock®. When the collection bottle is attached, blood flows directly from the vein into the culture bottle through a separate channel.")

2

Attachment A

*Id.*:



*Id.* at 681:

MAG-DEL000663–670 (K162233 Summary) at 666:

3

Attachment A

**J.   Device Description**

The Kurin device is a sterile, single use blood culture collection set.  The Kurin includes a winged needle with flexible tubing and an attached vial adapter intended for venipuncture to obtain blood culture samples. Kurin is identical in every way to existing sets used to collect blood culture samples except for the insertion into the tubing of the Kurin blood capture chamber. The Kurin blood capture device sequesters the initial draw of blood upon initial venipuncture. The set is provided with a safety shield for covering the used needle prior to disposal. The amount of blood diverted is very small, estimated at a fraction of 1 ml.

Below is a table with the three models and sizes of the subject device's that intend to be marketed.

| Model | Measurement (mm) | | | Weight (g) | Tubing | Gauge |
|-------|---|---|---|---|---|---|
| | H | D | W | | | |
| K-11221 | 31mm | 13mm | 6.45mm | 15.7g | 12 In | 21 Gauge |
| K-11223 | 31mm | 13mm | 6.45mm | 15.7g | 12 In | 23 Gauge |
| K-11225 | 31mm | 13mm | 6.45mm | 15.7g | 12 In | 25 Gauge |

---

| a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient; and | Each of the Accused Products includes a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient. *See, e.g.,* |
| | |

MAG-DEL0000838 (Kurin Video) ("Kurin is a device designed to contain the initial volume of blood from the venipuncture site so that resident contaminants within the skin are not transferred into the blood culture sample.")



*Id.* at 0:44:

4

Attachment A

| | |
|---|---|
| | KUR-MAG-DE001632 (IFU_Kurin Blood Culture Collection Set with Kurin Lock™ Technology) ("The Kurin set is a sterile, single-use blood culture collection set. Kurin includes a winged needle with flexible tubing and an attached blood culture bottle holder intended for venipuncture to obtain blood culture samples. The Kurin Lock blood capture device sequesters the initial draw of blood upon venipuncture.");

KUR-MAG-DE002283 (IFU_Kurin PIV12 Blood Culture Collection Set with Kurin® Lock Technology) ("The Kurin PVV12 series of Kurin sets are sterile, single-use blood culture collection sets that include the Kurin Lock, flexible tubing, an attached blood culture bottle holder, and a male luer intended for direct connection to a freshly placed peripheral IV (PIV) catheter to obtain blood culture samples. The Kurin Lock sequesters the initial draw of blood upon first access to the peripheral catheter.")

To the extent the Accused Products do not literally contain a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient, the Accused Products meet this limitation under the doctrine of equivalents because the structures depicted above are equivalent structures that perform a substantially similar function—that is, receiving an initial volume of bodily fluid withdrawn from the patient—in a substantially similar way to achieve a substantially similar result—that is, reducing contamination in the subsequent volume of bodily fluid withdrawn from the patient—as the claimed reservoir. |
| a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient,

the diverter operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and | Each of the Accused Products includes a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient. *See, e.g.,*

MAG-DEL000838 (Kurin Video) at 0:02: |

5

# EXHIBIT 4



Fish & Richardson P.C.
1180 Peachtree Street NE, 21st Floor
Atlanta, GA 30309
404 892 5005 main
404 892 5002 fax

September 24, 2019

**Corrin Drakulich**
Principal
drakulich@fr.com
404 724 2821 direct

*VIA EMAIL*

Karen Boyd
Turner Boyd LLP
702 Marshall Street, Suite 640
Redwood City, California 94063

Re:     Protective Order, Discovery and Case Management Issues (*Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, No. 19-00097-CFC (USDC-DE))

Dear Karen:

I write in response to your letter of September 13, 2019, regarding protective order, discovery and case management issues, and following the parties' discussion of these issues at the September 18, 2019 meet and confer.

## I.     Protective Order

As you know, Magnolia has been working since July to resolve the asymmetrical nature of the protective order as it pertains to IPR proceedings. The asymmetry *permits* Kurin's counsel in this case to prepare, file and prosecute IPR proceedings against Magnolia's asserted patents and *prevents* Magnolia's counsel in this case from defending those same proceedings. Assuming Kurin files IPR proceedings, the asymmetry would force Magnolia to retain and educate a second set of lawyers to defend the IPR proceedings. Magnolia's IPR lawyers would develop and make the same (or very similar) validity arguments in the IPR proceedings as Fish (Magnolia's litigation counsel) will make in the district court litigation. The financial burden on Magnolia would be substantial.

Kurin's sole basis for maintaining the asymmetry was a concern Magnolia may try to amend its claims in the IPR proceedings (thus invoking patent prosecution concerns). To eliminate Kurin's concern, Magnolia offered to stipulate that it will ***not*** amend claims of the asserted patents during any IPR proceedings. Magnolia's stipulation resolves Kurin's sole concern. Nonetheless, Kurin has not accepted Magnolia's offer to stipulate, leaving the parties at an impasse.

## II.     Reduction of Asserted Claims

Magnolia is under no obligation to reduce the number of asserted claims at this early stage of the litigation. The parties have not yet exchanged claim terms for construction, let alone proposed constructions, and resolution on claim construction issues is still months away. As such, the



**Karen Boyd**
September 24, 2019
Page 2

scope of the asserted claims is subject to change.  Moreover, Kurin's failure to provide invalidity contentions that meaningfully disclose Kurin's contentions regarding obviousness and alleged § 112 deficiencies, as explained in our letter of September 5, 2019, has prevented Magnolia from being able to assess the relative strengths and weaknesses of the presently asserted claims.

Nonetheless, in the interest of compromise, Magnolia will drop a substantial number of asserted claims (38 claims) as follows:

- U.S. Pat. No. 9,855,001:  Claims 2, 3, 7, and 25

- U.S. Pat. No. 10,028,689:  Claims 5, 10, 14, 18, 19, 20, 21, 24, 25, 26, 27, 28

- U.S. Pat. No. 10,039,483:  Claims 2, 3, 4, 10, 11, 12, 15, 20, 25, 26, 27

- U.S. Pat. No. 10,220,139:  Claims 2, 3, 5, 6, 7, 8, 9, 10, 15, 20, 28

This leaves the following claims as asserted:

- U.S. Pat. No. 9,855,001:  Claims 1, 4, 21-23, 26-28

- U.S. Pat. No. 10,028,689: Claims 1-4, 6, 8-9, 11-13, 15, 17, 23

- U.S. Pat. No. 10,039,483: Claims 1, 6, 8-9, 16-19, 21-22, 24

- U.S. Pat. No. 10,220,139: Claims 1, 13-14, 16, 18-19, 21, 23-24, 26-27, 29

We expect that this significant reduction addresses and resolves Kurin's alleged burden and allows it to meaningfully disclose its contentions regarding invalidity.

For example, we expect Kurin to disclose the specific prior art combinations it is relying on for its obviousness contentions, as well as an explanation of why those references would be combined and how said combination would render the claimed invention obvious.  *See* Scheduling Order (D.I. 24 at 5) (requiring Kurin to provide in its invalidity contentions "an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness"); *Cephalon, Inc. v. Watson Pharm., Inc.*, 769 F. Supp. 2d 761, 782 (D. Del. 2011) ("[A] defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed." (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007))); *see also Ironworks Patents LLC v. Samsung Elecs. Co.*, 2017 WL 4573366, at *1-*3 (N.D. Cal. 2017) (striking with leave to amend invalidity contentions that did not set forth the specific combination of prior art references relied on to show obviousness).



**Karen Boyd**
September 24, 2019
Page 3

Similarly, we expect Kurin to disclose the basis for its contentions regarding § 112. As at least one court has explained, "[w]hile the requirements for asserting a written description theory are not as detailed as for a claim of obviousness, it still must meet this threshold of giving the other party sufficient notice for it to engage in meaningful discovery and preparation of its case." *MediaTek, Inc. v. Freescale Semiconductor, Inc.*, Case No. 11-cv-5341 YGR, 2014 WL 690161, at *6 (N.D. Cal. Feb. 21, 2014) (citing, among other cases, *O2 Micro Intern'l, Ltd. v. Monolithic Power Systems, Inc.*, 467 F.3d 1355 (Fed. Cir. 2006)).  Simply stating that a theory of indefiniteness, written description, or enablement is asserted as to a term—as Kurin has done—is plainly insufficient, as it fails to explain—even in the most basic terms—why Kurin contends the term is indefinite or lacking written description or enablement.  *See id.* at *6-7.[1]

Finally, we cannot agree to the proposal in your September 20, 2019 letter, under which the claim construction process would be delayed by several months.  The only basis Kurin offers in support of the delay is its desire for "fulsome" contentions.  Magnolia provided Kurin with fulsome contentions on July 17, 2019, the date set forth in the scheduling order.  Additionally, Magnolia quickly and repeatedly responded to Kurin's requests for additional information and detail, including providing additional detail in the attached Exhibit A (*see* discussion below).

### III.    Magnolia's Infringement Contentions

In your letter of September 13, 2019, you took issue with the specificity of the location of numerous structural elements identified in Magnolia's infringement contentions, many of which you challenged for the first time.  Magnolia's contentions more than suffice to put Kurin on notice of Magnolia's infringement positions.  As we have explained, the line drawing exercise Kurin seems to be demanding is premature and unproductive at this early stage of the litigation. As you know, in less than two weeks the parties will be exchanging claim terms and proposed constructions, at which point each side will have a clearer understanding of the other side's positions regarding the scope of the claims.  There has also been limited fact discovery, no expert discovery, and no claim construction order, all of which may impact Magnolia's infringement contentions.  Magnolia will, of course, supplement its contentions accordingly as it is required to do.

---

[1] We also note that, at the September 18, 2019 meet and confer, counsel for Kurin took the position that Kurin could inject new and undisclosed theories of invalidity and prior art references into this litigation at any time by presenting those new theories and/or references to the PTO, because Kurin had put Magnolia on notice in its invalidity contentions of the possibility of such future proceedings.  This position is meritless, and Magnolia will oppose any attempt by Kurin to proceed on previously undisclosed arguments or prior art references under such a theory.



**Karen Boyd**
September 24, 2019
Page 4


If, by continuing to dispute the adequacy of Magnolia's contentions and demanding that Magnolia commit to the hand-drawn lines, color fill, and annotations in your September 13 letter, Kurin is trying to get Magnolia to prematurely commit to positions so that Kurin can develop its claim construction positions around Magnolia's infringement positions, doing so is improper.  Claims are to be construed based on the ***intrinsic record***—not the accused device—as the Federal Circuit has explained:

> A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device. . . . It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed are applied to the accused device to determine infringement.

*SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original); *see also NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device.").

Nonetheless, in an attempt to resolve this dispute without the Court's assistance, in Exhibit A to this letter we have attempted to provide even more specificity regarding how the structures in the accused products correspond to the claim terms identified in your September 13, 2019 letter.  We trust that this resolves the issue.


Very truly yours,


Corrin Drakulich



**Karen Boyd**
September 24, 2019
Page 5

## EXHIBIT A

Your September 13, 2019 letter included a number of statements and annotations that you described as laying out your understanding of Magnolia's Infringement Contentions.  As we explained at the September 18, 2019 meet and confer, these statements and annotations do not reflect Magnolia's infringement contentions, and Kurin should not "rely on this understanding regarding Magnolia's infringement contentions going forward in this case."  Instead, our contentions are fully laid out in Magnolia's infringement contentions and the four exhibits attached thereto, along with the further detail we have attempted to provide below in a good faith effort to resolve this dispute.

That said, this litigation is still in its early stages.  The annotations below are based on Magnolia's current understanding of the scope of the claim terms and the operation of the Kurin device.  To the extent fact discovery, expert discovery, the parties' proposed constructions, or the Court's claim construction order affects this understanding, Magnolia will supplement its contentions accordingly.

**"reservoir," "contaminant reservoir," "fluid reservoir," "internal reservoir," and "internal fluid reservoir"**

Independent claims 1 and 21 of the '001 patent, claim 23 of the '689 patent, and claim 18 of the '483 patent recite a "reservoir."  As we explained at the September 18, 2019 meet and confer, this reservoir corresponds to at least the "U-shaped side channel" structure, shown in the below annotation.  (Magnolia's Infringement Claim Chart, Att. A, at 27-28; *see also id*. at 4-5.)



(MAG-DEL0000838 (Kurin Video) at 0:44.)  This "U-shaped side channel" structure also satisfies the "contaminant reservoir" limitation from claims 1, 8, and 17 of the '689 patent, the "fluid reservoir" limitation from claim 1 and 9 of the '483 patent, and the "internal fluid reservoir" limitation from the independent claims of the '139 patent.

At the September 18, 2019 meet and confer, you asked whether these limitations could be grouped together.  If you are asking whether these terms should have the same construction, the



**Karen Boyd**
September 24, 2019
Page 6

fact that Magnolia has identified the same portion of the Kurin device does not mean these terms are identical in scope.  However, we agree that there is significant overlap in these terms and, as such, it may make sense to group them together for the claim construction process, with any differences in claim scope to be addressed individually.

**"diverter"**

Claims 1, 7, 21, 25, and 28 of the '001 patent and claims 23 and 25-27 of U.S. Pat. No. 10,028,689 (the '689 patent) recite a "diverter."  As shown in Claim Chart A of Magnolia's Infringement Contentions, Magnolia has identified the Kurin housing in its fully assembled form as satisfying the diverter limitations.  For example, at page 33 of Chart A, Magnolia identified the top and bottom housing components, as assembled with the umbrella valve, and the white porous seal, as satisfying the requirement that the diverter "transition from the first operating mode to the second operating mode as a result of the initial volume of bodily fluid flowing from the patient and substantial pressure equalization" (*id.* at 9 (discussing claim 1 of the '001 patent)) and "divert the flow of bodily fluid to the second fluid flow path as a result of receiving the initial volume of bodily fluid from the patient and substantial pressure equalization," (*id.* at 30-33 (discussing claim 21 of the '001 patent)). (Magnolia's Infringement Claim Chart, Att. A, at 33.)

**"a diverter having an <u>inlet</u>, a <u>first outlet</u> . . . , and a <u>second outlet</u>"**

Claim 1 of the '001 patent recites "a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet."  The portions of the accused Kurin devices identified below satisfy the inlet, first outlet, and second outlet limitations, respectively.




(MAG-DEL0000838 (Kurin Video) at 0:44; 0:48.)

We disagree with your characterization of claim 23 of the '689 patent as reciting a diverter having an "inlet," "first outlet," and "second outlet."  Instead, as you correctly note on page 8 of your September 13, 2019 letter, this claim recites a "junction including an inlet fluidically

# EXHIBIT 5

# ATTACHMENT A

## CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

# Attachment A - Infringement of U.S. Patent No. 9,855,001

This chart applies the claims of Magnolia's U.S. Patent No. 9,855,001 ("the '001 patent") against Kurin's blood culture collection sets numbered K-11221, K-11223, K-11225, D-11221, D-21221, D-21223, M-11221, M-21221, M-11223, M-21223, T-11221, T-21221, T-11223, T-21223, D-PIV18, D-PIV12, M-PIV18, M-PIV12, T-PIV18, S-PIV4, and S-PIV10, (collectively, "the Accused Products").[1]

Based on the information Kurin has provided to date, it is Magnolia's understand that Accused Products K-11221, K-11223, K-11225 are models submitted to the FDA for approval. March 22, 2016 Email Re Kurin Numbering System [KUR-MAG-DE294038]. It is also Magnolia's understanding that one or more of these "K" versions of the Kurin Lock did not include the umbrella valve that is present in the Kurin Lock device that is commercially available today, however, in all other respects those earlier "K" versions that did not include the umbrella valve were the same or substantially similar to the current, commercially available Kurin Lock device.

The Accused Products are substantially similar to one another. D.I. 59 at 4 (Kurin stating that "Magnolia asserted 82 claims – later reduced to 44 – targeting a single Kurin device."). Each of the Accused Products includes a Kurin Lock device. *See, e.g.*, MAG-DEL0000688–693 (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture."). Kurin's website includes a "How it Works" page that includes a single animation that purports to describe and depict the operation of the Kurin Blood Collection Set that includes the Kurin Lock device. (https://www.kurin.com/skin-contaminant-discard/). The listing of Accused Products is intended to be a list of all commercially available versions of Kurin's blood culture collection sets.

Based on the information presently available to Magnolia, the Kurin Lock device consists of five (5) individual parts. *See* Dkt. 94, Declaration of Jonathan Hangartner in Support of Kurin's Samples of the Accused Product; 2020-07-01 Motion for Leave Hearing Transcript. As described in the Hangartner Declaration, those five components are a top plate, a cap, an umbrella valve and a porous plug. *Id. See also* Kurin Drawing Numbers KUR-2005 (Top Housing) [KUR-MAG-DE001623-24], KUR-2006 (Bottom Housing) [KUR-MAG-DE001625-26], KUR-2007 (Cap) [KUR-MAG-DE001627], KUR-6010 (Hydrophobic Self-Sealing Plug) [KUR-MAG-DE001655], KUR-6011 (Umbrella Valve) [KUR-MAG-DE001656], and KUR-8036 (Assembly) [KUR-MAG-DE001659], MiniValve Part Number UM 053.002 SD (Umbrella Valve and seating suggestion) [KUR-MAG-DE003703];

---

[1] To the extent Kurin is selling other blood culture collection sets that use the Kurin Lock device, Magnolia accuses those versions as well and the analysis in this chart applies to those versions.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

Manufacturing Procedure MP-016 [KUR-MAG-DE000104-124] and the duplicates of these drawings produced throughout KUR-MAG-DE000138-2362.  A table (shown below) produced along with Kurin's engineering drawings shows that the same set of engineering drawings is for the Kurin Lock device found in every version of the Accused Product:

| top level | D-11221 | D-11223 | D-21221 | D-21223 | D-PIV12 | D-PIV18 | M-11221 | M-11223 | M-21221 | M-21223 | M-PIV12 | M-PIV18 | T-11221 | T-11223 | T-21221 | T-21223 | T-PIV12 | T-PIV18 | S-PIV12 | S-PIV18 | S-PIV10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IFU | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4071 | KUR-4071 | KUR-4071 | KUR-4090 | KUR-4091 |
| lower box label | KUR-4090 | KUR-4010 | KUR-4016 | KUR-4021 | KUR-4111 | KUR-4076 | KUR-4117 | KUR-4026 | KUR-4024 | KUR-4027 | KUR-4028 | KUR-4042 | KUR-4042 | KUR-4079 | KUR-4040 | KUR-4055 | KUR-4046 | KUR-4084 | KUR-4085 | KUR-4096 | KUR-4098 |
| Shipper box label | KUR-4013 | KUR-4014 | KUR-4019 | KUR-4022 | KUR-4040 | KUR-4077 | KUR-4215 | KUR-4016 | KUR-4025 | KUR-4028 | KUR-4043 | KUR-4043 | KUR-4051 | KUR-4061 | KUR-4056 | KUR-4047 | KUR-4087 | KUR-4089 | KUR-4089 |  |  |
| tape | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 |
| inner carton | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5021 | KUR-5040 | KUR-5040 |
| shipper box | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5022 | KUR-5041 | KUR-5041 |
| label | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5043 | KUR-5043 |
| packaged device | KUR-8022 | KUR-8023 | KUR-8024 | KUR-8025 | KUR-8028 | KUR-8038 | KUR-8020 | KUR-8021 | KUR-8026 | KUR-8027 | KUR-8029 | KUR-8037 | KUR-8031 | KUR-8031 | KUR-8013 | KUR-8034 | KUR-8030 | KUR-8039 | KUR-8040 | KUR-8041 |  |
| adhesive | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 |
| pnod label | KUR-4006 | KUR-4007 | KUR-4017 | KUR-4075 | KUR-4075 | KUR-4077 | KUR-4073 | KUR-4073 | KUR-4008 | KUR-4073 | KUR-4076 | KUR-4041 | KUR-4041 | KUR-4078 | KUR-4046 | KUR-4051 | KUR-4045 | KUR-4081 | KUR-4081 | KUR-4084 | KUR-4097 |
| tray/pouch | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5017 | KUR-5036 | KUR-5036 |
| lot stock | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | 5037 label | 5037 label |
| collection adapter | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 |  |  |  |
| collection set | KUR-6009 | KUR-6009 | KUR-6012 | KUR-6013 | KUR-6013 |  |  |  | KUR-6009 | KUR-6009 | KUR-6005 | KUR-6008 | KUR-6009 | KUR-6009 | KUR-6012 | KUR-6012 | KUR-6013 | KUR-6013 |  | KUR-6025 |  |
| luer adapter |  |  |  | KUR-6007 | KUR-6007 |  |  |  |  |  | KUR-6007 | KUR-6007 |  |  |  |  |  |  |  | KUR-6028 |  |
| male luer |  |  |  | KUR-6020 | KUR-6020 |  |  |  |  |  | KUR-6020 | KUR-6020 |  |  |  | KUR-6020 | KUR-6020 | KUR-6020 | KUR-6020 | KUR-6020 | KUR-6020 |
| female luer |  |  |  | KUR-6021 | KUR-6021 |  |  |  |  |  | KUR-6021 | KUR-6021 |  |  |  | KUR-6021 | KUR-6021 | KUR-6021 | KUR-6021 | KUR-6021 | KUR-6021 |
| vented cap for male luer |  |  |  | KUR-6022 | KUR-6022 |  |  |  |  |  | KUR-6022 | KUR-6022 |  |  |  | KUR-6022 | KUR-6022 |  | KUR-6022 |  |  |
| tubing |  |  |  | KUR-6023-1 | KUR-6023-1 |  |  |  | KUR-6023-1 | KUR-6023-1 |  |  |  | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 |  |  |  |
| tubing |  |  |  | KUR-6023-9 | KUR-6023-9 |  |  |  | KUR-6023-9 | KUR-6023-9 |  |  |  | KUR-6023-9 | KUR-6023-9 | KUR-6023-9 | KUR-6023-9 | KUR-6023-9 |  |  |  |
| lubricant |  |  |  |  | KUR-6025 |  |  |  |  |  |  | KUR-6025 |  |  |  | KUR-6025 | KUR-6025 |  |  |  |  |
| extension set |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | KUR-6025 |  |  |
| cap for female luer |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | KUR-6028 |  |  |
| lock | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 |
| top housing | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 |
| trim housing | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 |
| cap | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 |
| adhesive | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 |
| lubricant | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 |
| plug | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 |
| valve | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 |

KUR-MAG-DE001621 (boxed to show the Kurin Lock device schematics are the same for all Accused Products).

As such, Magnolia contends that, for purposes of the infringement analysis, the Accused Products are identical except where otherwise indicated below.  Magnolia reserves its right to amend these contentions as additional information becomes available.

In addition to the exemplary documents provided in the chart, Magnolia also relies on and/or reserves the right to rely on the 510(k) submissions for the Accused Products produced by Kurin at KUR-MAG-DE000137 through KUR-MAG-DE001620, the engineering drawings for the Accused Products produced by Kurin at KUR-MAG-DE001621 through KUR-MAG-DE001869, and Kurin's patent applications describing the Accused Products, including U.S. Patent Appl. Pub. 2018/0271425 [MAG-DEL0000720].

| Claim 1 | Accused Products |
|---|---|
| 1. An apparatus for obtaining a bodily fluid sample from a | Each of the Accused Products is an apparatus for obtaining a bodily fluid sample from a patient with reduced contamination. *See, e.g.*, |

Attachment A

| patient with reduced contamination, the apparatus comprising: | MAG-DEL0000684–687 (https://www.kurin.com/kurin-lock-specimen-diversion-device/) at 684 ("Each Kurin® blood culture collection set features industry-leading butterfly needles and is compatible with all major blood culture bottles. The Kurin blood culture set is enhanced by a Kurin Lock® specimen diversion device enabling clinicians to automatically divert the initial aliquot of blood, which many contain skin microbes, from every draw.") |
| --- | --- |
| | MAG-DEL0000688–693 (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture.") |
| | MAG-DEL0000680–681 (Kurin Brochure) at 680:  |
| | *Id.* ("Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful device that automatically diverts the initial aliquot of blood during the routine process of drawing a blood culture….Any contaminants residing in the initial ~0.15ml volume of blood (35x a standard 21G needle) are captured in the u-shaped Kurin Lock®. When the collection bottle is attached, blood flows directly from the vein into the culture bottle through a separate channel.") |

Attachment A

*Id.*:



## How does it work?

Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful device that automatically diverts the initial aliquot of blood during the routine process of drawing a blood culture.

Serves as a flush chamber to provide visual confirmation of proper needle placement in the vein.

Any contaminants residing in the initial ~0.15ml volume of blood (35x a standard 21G needle) are captured in the u-shaped Kurin Lock®

When the collection bottle is attached, blood flows directly from the vein into the culture bottle through a separate channel.

*Id.* at 681:



**Don't give contamination a pass — STICK with Kurin®**

When Kurin was used, even hospitals below the 3% benchmark reduced blood culture contamination (BCC) rates by up to 90%[*] with significant cost savings.

MAG-DEL0000663–670 (K162233 Summary) at 666:

4

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

| | |
|---|---|
| a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient; and | **J.   Device Description**<br>The Kurin device is a sterile, single use blood culture collection set.  The Kurin includes a winged needle with flexible tubing and an attached vial adapter intended for venipuncture to obtain blood culture samples. Kurin is identical in every way to existing sets used to collect blood culture samples except for the insertion into the tubing of the Kurin blood culture chamber. The Kurin blood capture device sequesters the initial draw of blood upon initial venipuncture. The set is provided with a safety shield for covering the used needle prior to disposal. The amount of blood diverted is very small, estimated at a fraction of 1 ml.<br><br>Below is a table with the three models and sizes of the subject device's that intend to be marketed. |

Device table:

| Model | Measurement (mm) H | D | W | Weight (g) | Tubing | Gauge |
|---|---|---|---|---|---|---|
| K-11221 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 21 Gauge |
| K-11223 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 23 Gauge |
| K-11225 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 25 Gauge |

Each of the Accused Products includes a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient. *See, e.g.,*

The Court construed the term "initial volume" (D.I. 75 at 2):

| "initial volume" | "the initial portion of blood removed from the patient and sequestered" |
|---|---|
| #001 Patent: claims 1, 4, 21-23 | |
| #483 Patent: claims 1, 8, 9, 24 | |
| #139 Patent: claims 1, 13, 19, 23, 27 | |

MAG-DEL0000838 (Kurin Video) ("Kurin is a device designed to contain the initial volume of blood from the venipuncture site so that resident contaminants within the skin are not transferred into the blood culture sample.")

*Id.* at 0:44 (annotated):

Attachment A



reservoir

KUR-MAG-DE001632 (IFU_Kurin Blood Culture Collection Set with Kurin Lock™ Technology) ("The Kurin set is a sterile, single-use blood culture collection set. Kurin includes a winged needle with flexible tubing and an attached blood culture bottle holder intended for venipuncture to obtain blood culture samples. The Kurin Lock blood capture device sequesters the initial draw of blood upon venipuncture.");

KUR-MAG-DE002283 (IFU_Kurin PIV12 Blood Culture Collection Set with Kurin® Lock Technology) ("The Kurin PVV12 series of Kurin sets are sterile, single-use blood culture collection sets that include the Kurin Lock, flexible tubing, an attached blood culture bottle holder, and a male luer intended for direct connection to a freshly placed peripheral IV (PIV) catheter to obtain blood culture samples. The Kurin Lock sequesters the initial draw of blood upon first access to the peripheral catheter.")

KUR-MAG-DE450383 (emails between John Detloff, Lonnie Pogue, Bob Rogers, and Gino Kang) ("Also, we need to come up with a maximum reservoir diameter which will still give us laminar flow all the way to the filter.")

To the extent the Accused Products do not literally contain a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient, the Accused Products meet this limitation under the doctrine of equivalents because the structures depicted above are equivalent structures that perform a substantially similar function—that is, receiving an initial volume of

6

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

| | |
|---|---|
| a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient, the diverter operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and a second operating mode in which a subsequent volume of bodily fluid can flow from the inlet to the second outlet, and b) the initial volume of bodily fluid is prevented from flowing to the second outlet, | bodily fluid withdrawn from the patient—in a substantially similar way to achieve a substantially similar result—that is, reducing contamination in the subsequent volume of bodily fluid withdrawn from the patient—as the claimed reservoir. Any purported differences between the Accused Products and the claim limitation are insubstantial, and thus the Accused Products are equivalent and therefore infringe.<br><br>Each of the Accused Products includes a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient, the diverter operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and a second operating mode in which: a) a subsequent volume of bodily fluid can flow from the inlet to the second outlet, and b) the initial volume of bodily fluid is prevented from flowing to the second outlet. *See, e.g.,*<br><br>The Court construed the term "diverter" to be a means-plus-function term (D.I. 75 at 2): |

| "diverter" | Means-plus-function |
|---|---|
| #001 Patent: claims 1, 21, 28 | <u>Function</u>: to divert (or direct) fluid flow from one fluid flow path to a second fluid flow path<br><br><u>Structure</u>: an inlet, at least two outlets, and either a switchable valve or flow control blocks |

The Kurin Lock device literally infringes this limitation because it performs the identical function using identical structures. Alternatively, the Kurin Lock device literally infringes this limitation because it performs the identical function using equivalent structures.

*Function*

The Kurin Lock device diverts (or directs) fluid from one fluid flow path to a second fluid flow path as shown by at least the following:

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

8

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



9

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

10

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

        Plaintiff,

    v.

KURIN, INC.,

        Defendant.

C.A. No. 19-00097-CFC

**CONFIDENTIAL**

## OPENING EXPERT REPORT OF DR. JUAN G. SANTIAGO REGARDING INFRINGEMENT OF U.S. PATENT NOS. 9,855,001 AND 10,039,483

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



**2.    My Own Testing**

75.    In September 2020, I performed my own tests on the accused Kurin Lock devices.

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

### a.      Testing Setup

76.      I performed a series of tests visualizing fluid flow and mixing in

Kurin Lock devices.  The working fluid in my tests was a blood analog solution

██████████████████████████████████████████████████

██████████████████████████████████████████  This blood analog

liquid consisted of 600 g of water, 400 g of glycerin, and 0.4 g of xanthan gum.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

██████████████████████.

77.      From this stock, I aliquoted about 400 g of this solution and mixed

this aliquot with red food dye to enable visualization of mixing between the clear

and dyed blood analog liquids.  The tests used two elevated reservoirs connected to

flexible polymer tubing to drive flow through various Kurin devices.

78.      Images of my test setup are shown below:

50

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

 

MAG-DEL0826809; MAG-DEL0826811.  I secured the devices to a plate with

tape and used valves to control the introduction of liquid into the device:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER




MAG-DEL0826812; MAG-DEL0826813.  I used a microscope camera to record videos of the devices in operation:



MAG-DEL0826808.  I turned out the room lights and used the microscope light to reduce glare and ambient light wash out:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



MAG-DEL0826810.

79.     A first reservoir was used to supply the main flow rate through the Kurin device and had a free surface elevated by about 90 cm.  The second reservoir supplied the initial very small volume of liquid (to the sequestration reservoir) and had a free-surface elevation of 70 cm.  The 90 cm height of the main reservoir was selected to provide a hydrostatic head consistent with about 43 g/min flow rate of water through the setup.  The blood analog flow rate with this setup was about 20 g/min.  These flow rates are therefore ███████████████████████:



53

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

80.     The outlet tubing of one reservoir passed through a quarter-turn shut off valve and then connected to one of two inputs of a three-way valve.  The outlet tubing of the second reservoir connected directly to the second input of the three-way valve.  The settings of these two valves allowed connection of one reservoir at a time and allowed shutting off of flow from both reservoirs.  The input of each Kurin device was connected to the output of the three-way valve. In turn, the output of the Kurin device was connected to outlet tubing which emptied into a lab sink.

81.     The output of each Kurin device was attached to one of three types of outlet tubing.  The first outlet tubing length was about 32 cm with a tube inner diameter of about 4 mm.  The second outlet tubing had an inner diameter of 1.5 mm and was 40 cm long.  The third outlet tubing had an inner diameter of about 1.5 mm and was 10 cm long.  The three configurations resulted in what I will here define as small, medium, and large output tubing air volumes.  These outlet tubing lengths were typically sealed during the initial filling of the Kurin device (i.e. the initial filling of simulated "contaminated" blood analog).  For the large downstream air space, the downstream air volume was sufficiently compressed by the initial liquid fill such that liquid filled the sequestration reservoir, the outlet channel of the Kurin device, and part of the output tubing.  That is, for sufficiently

54

large downstream volume, the entire internal volume of channels of the Kurin device was filled during the initial filling step even when the downstream tubing was sealed.  For the medium downstream air space, the Kurin sequestration reservoir filled with liquid and also filled most of the device (i.e. the meniscus stopped near the exit of the device).  For the smallest volume, the initial liquid flow filled the Kurin sequestration reservoir and the outlet liquid filled only some fraction of the outlet channel within the device (so that some air remained in the device output channel).

82.     In most tests, I first flowed dyed blood analog (filling the sequestration reservoir) and then flowed clear blood analog.  In all but one test, the output tubing was sealed during the initial flow of liquid into the Kurin device.  For the latter cases, I then switched the valve positions to seal off the initial liquid reservoir, switched to the second liquid reservoir, and then opened the downstream seal to allow flow and mixing.  I typically visualized mixing for multiple minutes before ending the testing.

83.     The clear and dyed blood analog liquids show qualitatively the degree of mixing between the sequestered liquid in the reservoir and the subsequent liquid injected into the device.  These two volumes of liquid show a minimal degree of mixing in the region near the Y-junction.  This is observable in the videos.  This region of mixing is limited to within about 6 mm from the Y-junction for the first 3

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

minutes of each run.  The spatial extent of the mixing region grows very slowly.

For example, for runs in excess of 9 minutes (e.g. consistent with a total of about

180 mL$^2$ of blood analog transferred through and collected from the Kurin device)

the mixing region is less than about 9 mm from the Y-junction.  The majority of

the volume of liquid and solute species in the reservoir remain sequestered.

84.    Movies were captured using a microscope integrated with an LED

array light source and a color CMOS camera (Plugable USB2-MICRO-250X) and

a ThinkPad Windows 10 laptop.  Movies were saved as .AVI files and were not

edited.  A few images of the experimental setup were obtained using a Galaxy S10

phone.

### b.    Testing Videos

85.    I performed five tests using the accused Kurin Lock device as

intended (i.e., with the downstream volume initially sealed), and these are

identified in the table below:

| Test Video | Color Flow Order | Downstream Volume | Flow Rate |
|---|---|---|---|
| #1 (MAG-DEL0826804) | Clear/red | Tubing: ⌀ = 1.5 mm, length = 10 cm (small) | ~20 g/min |

---

[2] This amount is more than what Kurin uses as a best practice for sample blood collection, which is approximately 32-40 mL of blood in total from the patient. ██████████████████████████████████████████ This means that the tests were run much longer than the device would be used in practice, ensuring that the maximum of mixing was observed in testing.

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

| #2 (MAG-DEL0826803) | Red/clear | Tubing: ⌀ = 1.5 mm, length = 40 cm (medium) | ~20 g/min |
|---|---|---|---|
| #3 (MAG-DEL0826805) | Clear/red | Tubing: ⌀ = 4 mm, length = 32 cm (large) | ~20 g/min |
| #4 (MAG-DEL0826806) | Clear/red/clear | Tubing: ⌀ = 1.5 mm, length = 10 cm (small) | ~20 g/min |
| #5 (MAG-DEL0826807) | Clear/red | Tubing: ⌀ = 1.5 mm, length = 10 cm (small) | ~ < 1 g/min |

86.   **Test #1** – The U-shaped diversion chamber was primed with clear blood analog.  After substantial pressure equalization in the U-shaped diversion chamber, ensuing clear blood analog advanced a certain distance down the sample channel:



Test #1 – 30.79s (annotated).  Due to the relatively small downstream volume, the clear blood analog advanced only a short distance along the sample channel and until pressure equalized in the sample channel.  At approximately 59 seconds into

57

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

the video, the downstream seal was opened, red blood analog was introduced, and the red blood analog began to flow down the sample path to exit the device:



Test #1 – 59.63s (annotated); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Note that the concave-downward curve (blue circle) of the red blood interface does not necessarily indicate mixing and is determined in large part by the shape of streamlines of the flow (i.e. fluid flow paths) within this highly three-dimensional region. After more than 7 minutes of recording, a small amount of the red dye has flowed and diffused into the U-shaped diversion chamber. However, the vast majority of the clear blood analog has remained sequestered in the U-shaped diversion chamber, including the initial volume of clear blood analog:

58

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #1 – 7min, 41.79s (annotated).

87.     **Test #2** – The U-shaped diversion chamber was first primed with red blood analog. After substantial pressure equalization in the U-shaped diversion chamber, the red blood analog advanced a certain distance down the sample channel:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #2 – 32.96s (annotated).  This test was performed with a medium downstream volume, and red blood analog advanced a distance down the sample channel until pressure approximately equalized in the sample channel.  The meniscus stops near the outlet of the Kurin device.  At approximately 1 minute into the video, the downstream seal was opened, clear blood analog was introduced, and the clear blood analog flowed down the sample path and to the exit of the device.  After more than 2 minutes of recording, a small amount of the clear blood analog can be observed within the U-shaped diversion chamber (and near the Y-junction).  However, the vast majority of the red blood analog has remained sequestered within the U-shaped diversion chamber, including an initial volume of red blood analog:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #2 – 2min, 34.52s (annotated).

88.     **Test #3** – In this test, the U-shaped diversion chamber was primed

with clear blood analog.  After substantial pressure equalization in the U-shaped

diversion chamber, clear blood analog advanced down the sample channel:



61

Test #3 – 18.96s (annotated).  Consistent with the relatively large downstream volume used in this test, the clear blood analog advanced down the sample channel until pressure equalized within the downstream volume.  At approximately 1 minute, 31 seconds into the video, the downstream seal was opened, red blood analog was introduced, and the red blood analog flowed down the sample path to exit the device:



Test #3 – 1min, 31.72s (annotated).  After more than 6 minutes of recording, a small amount of the red dye has diffused and flowed into the U-shaped diversion chamber.  However, the vast majority of the clear blood analog has remained sequestered in the U-shaped diversion chamber, including the initial volume of clear blood analog:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #3 – 6min, 01.79s (annotated).

89.    **Test #4** – Here, the U-shaped diversion chamber was primed with clear blood analog.  After pressure equalization in the U-shaped diversion chamber, clear blood analog advanced down the sample channel:



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

Test #4 – 55.68s (annotated).  Consistent with the relatively small downstream volume used here, the clear blood analog advanced a short distance down the sample channel until pressure approximately equalized in the sample channel.  At approximately 1 minute, 8 seconds into the video, the downstream seal was opened, red blood analog was introduced, and the red blood analog flowed down the sample path to exit the device:



Test #4 – 1min, 36.59s (annotated).  Note that, in this test, there are (inadvertent) air bubbles trapped within the U-shaped diversion chamber.   These air bubbles are not displaced by or entrained into the red blood analog flow; nor are these air bubbles displaced toward the umbrella valve structure.  Instead, they remain sequestered within the U-shaped diversion chamber.  At approximately 3 minutes,

64

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

15 seconds, clear blood analog was reintroduced, and the clear blood analog flowed down the sample path to exit the device:



Test #4 – 4min, 10.34s (annotated).  After these events, a small amount of red dye (consistent with the presence of red blood analog) remains within the sideline channel.  However, the volume of dye-containing liquid is small compared to the volume of clear sequestered blood analog.  Also, this dye-containing liquid has negligible effect on the volume of (clear) blood analog which subsequently enters the Kurin Lock bypassing the sequestered blood and exiting the device.

90.  **Test #5** – This test was similar to Test #1 but with a slower flow rate. The U-shaped diversion chamber was primed with clear blood analog.  After substantial pressure equalization in the U-shaped diversion chamber, clear blood analog advanced a certain distance down the sample channel:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #5 – 1min, 24.91s (annotated).  Consistent with this test's relatively small downstream volume, the clear blood analog advanced a short distance down the sample channel until pressure approximately equalized in the sample channel.  At approximately 1 minute, 40 seconds into the video, the downstream seal was opened, red blood analog was introduced, and the red blood analog flowed down the sample path to exit the device.  After more than 8 minutes of recording, a very small amount of the red blood dye has flowed and diffused into the U-shaped diversion chamber.  However, the vast majority of the clear blood analog has remained sequestered in the U-shaped diversion chamber, including the initial volume of clear blood analog:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Test #5 – 1min, 42.90s (left, annotated); Test #5 – 8min, 15.47s (right, annotated).

91.    Although my tests show that some of the subsequent, differently colored blood analog enters the diversion chamber, it does not change the fact that there is a subsequent volume of blood analog that completely bypasses the diversion chamber.  It also does not change the fact that there is an initial volume of blood analog that stays completely sequestered within the diversion chamber.

92.    The Accused Products sequester an initial volume of blood in the U-shaped diversion chamber and a subsequent volume of bypasses the U-shaped diversion chamber into the sample channel to be collected in a sample bottle.  To the extent that some mixing occurs in the proximity of the Y-junction, there is nonetheless an initial volume of blood that remains sequestered within the U-shaped diversion chamber and a subsequent volume of blood that bypasses this initial volume sequestered in the diversion chamber.

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

4      Q.   And you said that one of the reasons
5   you wanted them was you wanted to see what the
6   product is supposed to do.
7         What was your understanding, once
8   you educated yourself, of what the Kurin Lock is
9   supposed to do?
10        MR. HANGARTNER:  Objection.  You can
11   go ahead and answer.
12        THE WITNESS:  So, the device is
13   intended for blood collection.  The goal is
14   to reduce contamination in blood collection.
15        And it achieves that by, my
16   understanding is it is sort of a waste tube
17   process.
18        It collects the first volume of
19   blood that may have contaminants in one
20   portion, and then allows the rest of the
21   collection to go into the collection vial, to
22   reduce potential contaminations in a vial.

                           Page 41

1   BY MS. BROOKS:
2      Q.   And I'm sorry, you cut out again on
3   that last part.  You said reduce contaminations
4   in?
5      A.   In the collected sample.

2020-08-20 Nason Dep. Tr. at 40:4-41:5.

> **b.     1[a]: a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient; and**

133.     The Court construed the term "initial volume" (D.I. 75 at 2):

| "initial volume" | "the initial portion of blood removed from the patient and sequestered" |
|---|---|
| #001 Patent: claims 1, 4, 21-23 | |
| #483 Patent: claims 1, 8, 9, 24 | |
| #139 Patent: claims 1, 13, 19, 23, 27 | |

100

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

134.    Each of the Accused Products includes a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient.  *See, e.g.*,

MAG-DEL0000838 (Kurin Video 07/09/2019) ("Kurin is a device designed to contain the initial volume of blood from the venipuncture site so that resident contaminants within the skin are not transferred into the blood culture sample."); MAG-DEL0826802 (Kurin Video 01/2021) ("The Kurin Lock® with Flash Technology sidelines the initial flash of blood from an accessed vein to reduce skin contaminants that enter into the blood culture sample.")

MAG-DEL0000838 at 0:44:          MAG-DEL0826802 at 0:22:




KUR-MAG-DE001632 (IFU_Kurin Blood Culture Collection Set with Kurin Lock™ Technology) ("The Kurin set is a sterile, single-use blood culture collection set. Kurin includes a winged needle with flexible tubing and an attached blood culture bottle holder intended for venipuncture to obtain blood culture samples. The Kurin Lock blood capture device sequesters the initial draw of blood upon venipuncture.");

KUR-MAG-DE002283 (IFU_Kurin PIV12 Blood Culture Collection Set with Kurin® Lock Technology) ("The Kurin PVV12 series of Kurin sets are sterile, single-use blood culture collection sets that include the Kurin Lock, flexible tubing, an attached blood culture bottle holder, and a male luer intended for direct connection to a freshly placed peripheral IV (PIV) catheter to obtain blood culture samples. The Kurin Lock sequesters the initial draw of blood upon first access to the peripheral catheter.")

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

135.   The initial volume of blood does not have to be the entire volume of blood contained in the U-shaped diversion chamber.  In my opinion, the initial volume of blood is the volume of blood that is actually sequestered in the U-shaped diversion chamber.  As shown in the testing videos, a small portion of blood near the junction may (and is expected to) escape the region bounded by the U-shaped diversion chamber.  However, the testing videos show that there is a large portion of blood that remains sequestered in the U-shaped diversion chamber. The latter is the initial volume of blood from the patient described by the patents.

136.   The U-shaped diversion chamber includes a reservoir that receives the initial volume of blood from the patient:

MAG-DEL0000838 (Kurin Video 07/09/2019) (annotated):



*See also* MAG-DEL0826802 (Kurin Video 01/2021)

KUR-MAG-DE000147 (Description of Blood Diversion):

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



KUR-MAG-DE424575 (How Kurin Works):



KUR-MAG-DE450383 ███████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████

137.   Bob Rogers admitted that the initial volume of blood is received in the reservoir of the U-shaped diversion chamber (also known as the side channel) of the Accused Products:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

10    Q   Well, so the side channel is where the
11    first initial volume of blood goes. Is that fair?
12        MR. HANGARTNER:  Objection.  Calls for a
13    legal conclusion.
14        THE WITNESS:  If the nurse allows, if
15    they insert a needle into the patient and the
16    patient's blood pressure is sufficient, yes, the
17    first amount of blood will go into where there is
18    an air leak, and that's the side channel.

2020-08-18 Rogers Dep. Tr. at 404:10-18.

138.   Kevin Nason admitted the same:

17    Q.   And why is it important to try to
18    fill that side channel before the blood then
19    starts flowing down the sample path into the
20    collection chamber -- collection device?
21        MR. HANGARTNER:  Objection.
22        THE WITNESS:  Well, the function of

Page  59

1    that is to collect the initial volume of
2    blood in there that potentially has
3    contaminants.

2020-08-20 Nason Dep. Tr. at 58:17-59:3.

c.    **1[b]: a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient, the diverter operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and a second operating mode in which: a) a subsequent volume of bodily fluid can flow from the inlet to the second outlet, and b) the initial volume of bodily fluid is prevented from flowing to the second outlet,**

139.   The Court construed the term "diverter" to be a means-plus-function term (D.I. 75 at 2):

104

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 9

Videotaped Deposition of

**Juan Gabriel Santiago, Ph.D.**

April 20, 2021

Magnolia Medical Technologies, Inc.

vs.

Kurin, Inc.

**Highly Confidential - Attorneys' Eyes Only**



www.aptusCR.com | 866.999.8310

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 162 of 371 PageID #: 22242

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3                    --oOo--
4   MAGNOLIA MEDICAL TECHNOLOGIES,
    INC.,
5
           Plaintiff,
6                          Case No.
         vs.         2:19-CV-00097-CFC
7
    KURIN, INC.,
8
           Defendant.
9   _____/
10
11
12
13
14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15       VIDEOTAPED REMOTE DEPOSITION OF
16         JUAN GABRIEL SANTIAGO, Ph.D.
17   _____
18          April 20, 2021
19
20
21
22   REPORTED BY:
23   DELAINE HALL, Sonoma, California
24   CSR 10164
25   JOB NO. 10080972
```

Page 2

```
1      BE IT REMEMBERED that, pursuant to Notice, and
2   on Tuesday, April 20, 2021, commencing at 9:03 a.m.,
3   thereof, at Stanford, California, before me, DELAINE
4   HALL, a Certified Shorthand Reporter, remotely
5   appeared
6         JUAN GABRIEL SANTIAGO, Ph.D.
7   _____
8   called as a witness by the Defendant, who having
9   been first duly sworn, was examined and testified as
10  follows:
11              --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            A P P E A R A N C E S
2      (All participants appearing remotely.)
3
4   FOR THE PLAINTIFF:
5
       DAVIS POLK & WARDWELL, LLP
6       1600 El Camino Real
        Menlo Park, California 94025
7       BY:  MICAH G. BLOCK, Attorney at Law
        (650) 752-2023
8       micah.block@davispolk.com
9
10  FOR THE DEFENDANTS:
11
12      X-PATENTS, APC
        5670 La Jolla Boulevard
13      La Jolla, California 92037
        BY:  JONATHAN HANGARTNER, Attorney at Law
14      (858) 454-4313
        jon@x-patents.com
15
16      TURNER BOYD, LLP
        702 Marshall Street, Suite 640
17      Redwood City, California 94063
        BY:  KAREN I. BOYD, Attorney at Law
18      (650) 521-5930
        boyd@turnerboyd.com
19
20  ALSO PRESENT:  ANGELA QUACH, Davis Polk
        GABRIEL ARROWWOOD, Videographer
21      ERIK ANTONSSON
22
23
24
25
```

Page 4

```
1              I N D E X
2   EXAMINATION BY:               PAGE
3   MR. HANGARTNER:                6
4      EXHIBITS MARKED FOR IDENTIFICATION
5   NUMBER   DESCRIPTION          PAGE
6   Exhibit 1   Opening Expert Report of    12
            Dr. Juan G. Santiago
7
    Exhibit 2   Rebuttal Expert Report of   13
8           Dr. Juan G. Santiago
9   Exhibit 3   Annotated Excerpt from      25
            KUR-MAG-DE001623, first
10          page, lower left top view
11  Exhibit 4   Page 32 from February 18,   54
            2021 Rebuttal Expert Report
12          of Erik Antonsson
13  Exhibit 5   Rebuttal Expert Report of   113
            Erik Antonsson, Ph.D., P.E.
14
    Exhibit 6   Page 36 from February 18,   139
15          2021 Rebuttal Expert Report
            of Erik Antonsson
16
    Exhibit 7   Paragraph 36 from January 15,   186
17          2021 Opening Expert Report
            of Juan G. Santiago
18
19
20
21
22
23
24
25
```

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 163 of 371 PageID #: 42464

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 185

1  the Kurin device that's relevant here?
2     A.  No.  With respect to the Kurin device, the
3  main body fluid of interest is blood.
4     Q.   So I'm going to ask you to go to -- page
5  number here for you.
6     A.  Before you ask the next question, is it
7  okay if we take a five-minute break?
8     Q.  Absolutely.  Why don't we take ten if
9  that's okay.  I don't want to push you too late
10  tonight, so if you want it shorter, that's fine.
11  Ten minutes might be nice for everybody.  Is that
12  okay with you?
13     A.  It's fine with me, yeah.
14        MR. BLOCK:  I was going to say let's go
15  off the record and figure it out.
16        VIDEO OPERATOR:  Time is 3:25 p.m.  Off
17  the record.
18           (Recess taken.)
19        VIDEO OPERATOR:  The time is 3:36 p.m.  On
20  the record.
21        MR. HANGARTNER:  Gabriel, I'm going to ask
22  you to mark tab H as Exhibit 7.  It's just an
23  excerpt of paragraph 136, the portion of that
24  paragraph that's on page 102 of Dr. Santiago's
25  January 15, 2021 expert report.

Page 186

1        (Exhibit 7 was marked for identification.)
2  BY MR. HANGARTNER:
3     Q.  Dr. Santiago, I'm going to ask you to take
4  a look at that image that's included there.  Did you
5  create that dotted yellow oval line on this image?
6     A.  Yes.
7     Q.  Okay.  And -- and you indicate here that
8  that is the reservoir receiving initial volume of
9  blood, correct?
10     A.  So this region is the structure that meets
11  the limitation of the reservoir.
12     Q.  Okay.  And that's in your opinion the
13  structure that meets the limitation of reservoir for
14  all of the asserted claims, correct?
15     A.  So you're talking about '001 patent?
16     Q.  I'm talking about all of the asserted
17  claims that require a reservoir.  I want to make
18  sure it's your opinion that this dotted line
19  reflects what you believe is the reservoir.
20        MR. BLOCK:  Object to form.
21        THE WITNESS:  So what I said is that that
22  dotted line represents a region that meets the
23  reservoir limitations of, for example, claim 1 of
24  the '001.
25           ////

Page 187

1  BY MR. HANGARTNER:
2     Q.  Okay.  Is it your opinion that there's
3  some other reservoir in the Kurin device that meets
4  the claim requirements other than this?
5     A.  Yes.
6     Q.  Okay.  Let's go -- why did you choose that
7  dotted yellow line as the reservoir in the Kurin
8  device?
9     A.  It's one salient example of a reservoir
10  that's configured to receive an initial volume of
11  bodily fluid withdrawn from the patient.
12     Q.  And how did you choose that specific area
13  to encircle with that dotted yellow line?
14     A.  Well, it's very consistent with the
15  cartoon picture on which it's drawn.
16     Q.  What does that mean?
17     A.  So the -- it's drawn on top of a cartoon
18  schematic -- or let's call it a schematic of the
19  Kurin system.  And in that system they depict -- or
20  in that drawing they depict contaminants with little
21  black spots.  I don't know if you can see those.
22  You can see them more clearly in the original movie.
23     Q.  Okay.  So this is a still frame from a
24  Kurin promotional video, right?
25     A.  So I remember the MAG.  The MAG means that

Page 188

1  Magnolia produced the document, but I think the
2  original video was a Kurin video.
3     Q.  Okay.  And did you choose this still frame
4  to make an image from?
5     A.  I did.  And I show here one example
6  structure region that meets the limitation of
7  reservoir receiving initial volume.
8     Q.  Okay.  And why does this region meet those
9  requirements?
10     A.  Because it meets the requirements.  It's a
11  structure.  It's a reservoir.  It receives initial
12  volume.  Blood in that region and contaminants in
13  that region are sequestered.  So I'm good for all
14  those reasons.
15     Q.  And it's your understanding that those are
16  the requirements for a reservoir --
17        MR. BLOCK:  Object to form.  I didn't mean
18  to interrupt you, Jon.  Sorry.  I thought your
19  question was over.  Objection to form.
20        MR. HANGARTNER:  No problem.
21        COURT REPORTER:  Counsel, I didn't hear
22  the very, very last few words of your question.
23  BY MR. HANGARTNER:
24     Q.  As claimed in the asserted patents.
25     A.  Those are not the only requirements.

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 164 of 371 PageID #: 14257

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 189

1    Q.   What other requirements are there?
2    A.   Well, for example, claim 1 of the '001,
3  reservoir to receive an initial volume of bodily
4  fluid withdrawn from the patient.
5    Q.   Okay.  And that's what you said this is on
6  the picture reservoir receiving initial volume of
7  blood, correct?
8    A.   That's what is written on the picture.
9    Q.   Okay.
10    A.   But the claim also recites reservoir
11  again.  So it says a diverter having an inlet.
12  First outlet include communication with the
13  reservoir.  So there's another requirement that I
14  didn't state previously, and you had asked me if
15  those were the exclusively only definitions of
16  reservoir.  If you like, I can go through every
17  mention of reservoir and tell you then what are the
18  limitations for reservoir.
19    Q.   That's okay.  Thank you, though.
20        This particular yellow circle, I think
21  it's the only opinion you have offered as to the
22  reservoir in your report, correct?
23    A.   There are other places in my report where
24  I discuss reservoir, so I'm not sure that's a fair
25  characterization.

Page 190

1    Q.   Okay.  Well, as you sit here now do you
2  recall defining some other space in the Kurin Lock
3  as the reservoir for purposes of the claims?
4    A.   Yes, I recall other uses of reservoir.
5    Q.   That's a different question.  So -- well,
6  maybe it's not.  So any time you identify something
7  as the reservoir in your report you're saying that
8  that satisfies the requirements of the claims with
9  respect to the reservoir?
10    A.   What is "that" in that sentence?
11    Q.   The reference to reservoir, whatever it's
12  referring to.
13    A.   Your question seems either circular or
14  vague.  You seem to be asking does reservoir satisfy
15  reservoir?  Do you mean to ask if the word
16  "reservoir" as it appears every single place in my
17  report specifically map on to this particular claim
18  in this picture?  What is the question?
19    Q.   All right.  In your report did you express
20  the opinion that some volume other than the one
21  identified in paragraph 136 satisfies the claim
22  requirement for reservoir?
23    A.   So just to make it clear, that picture in
24  136 is a rough schematic.  It does not mean to
25  delineate what I think is or is not the only

Page 191

1  definition of reservoir or any uniqueness.  It
2  doesn't imply any uniqueness.  In fact, it's very
3  difficult to delineate a three-dimensional space
4  using a -- an ellipse.
5    Q.   Dr. Santiago, did someone tell you you had
6  to present your discussion of reservoir as you have
7  in paragraph 136?
8    A.   Are you saying did someone use me as a
9  mouthpiece to speak their words through my mouth?
10  The answer is no.
11    Q.   Okay.  So -- so you chose to represent the
12  reservoir as it is in paragraph 136, correct?
13    A.   I said that that figure and that schematic
14  is a schematic showing a region.  And it's one
15  reasonable location or rough approximation of a
16  location that certainly meets the limitation of a
17  reservoir receiving initial volume.
18    Q.   Is there any reason you couldn't have been
19  more clear about this?
20        MR. BLOCK:  Object to form.
21        THE WITNESS:  I've been as clear as I can
22  on this when you just asked me.  Would you like me
23  to repeat it?
24  BY MR. HANGARTNER:
25    Q.   No, I mean in your expert report.  Is

Page 192

1  there somewhere in your expert report where you more
2  clearly define what you believe is the reservoir?
3  If so, please point it to me.  This seemed to be the
4  place where you say this is the reservoir receiving
5  the initial volume of blood.
6    A.   So this region here, let's call it from
7  the dual valve assembly to about to halfway to the
8  180-degree turn.  That region is one example region
9  that meets the limitations.  So this region is a
10  structure that meets the reservoir requirement.  I
11  gave you a second one very clearly earlier in this
12  deposition.
13    Q.   No, you didn't.  I never heard you say
14  this is the reservoir.  So if you're offering new
15  opinions, I'd like to be very clear about that.  If
16  you -- we talked about this earlier.  You've stated
17  all the opinions you had sitting here this morning
18  in your report.  If you have new opinions, please
19  tell me that.
20        MR. BLOCK:  Object to form.  It's
21  mischaracterizing.  It's argumentative.
22  BY MR. HANGARTNER:
23    Q.   As you sit here right now do you have some
24  new opinion that was not presented in your report as
25  to what is a reservoir in the Kurin Lock?

Case 1:19-cv-00097-CFC-CJB  Document 418  Filed 06/16/22  Page 165 of 371 PageID #:
16297

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 193

1      MR. BLOCK: Object to form.
2      THE WITNESS: So earlier we spoke about
3  sequester and sequestering. And that is related to
4  this reservoir and so I mentioned earlier reservoir.
5  If you like, I can say it again.
6  BY MR. HANGARTNER:
7      Q. I would like you to offer any other
8  opinions you have as to what is the reservoir in
9  Kurin Lock in addition to what's shown here in
10  figure 136.
11      A. Okay. So the region in the U tube from
12  the porous plug to the top of the 180-degree turn
13  section, that is a region and a structure that meets
14  the reservoir requirement.
15      Q. That's a different region and structure
16  than what's identified in paragraph 136, correct?
17      MR. BLOCK: Object to form.
18      THE WITNESS: It's a larger region that
19  includes the region depicted in 136.
20  BY MR. HANGARTNER:
21      Q. Okay. So how do I know which one is the
22  reservoir in the Kurin Lock?
23      A. Well, this structure meets the limitation
24  of reservoir of the claims.
25      Q. You're referring to 136?

Page 194

1      A. The 136, that's right. And the larger one
2  I gave you also meets the limitation.
3      Q. How about if I pick another part of that
4  inner leg of the U-shaped side channel, say, from a
5  quarter of the way up the inner leg to
6  three-quarters of the way up the inner leg, is that
7  a reservoir? In your opinion is that a reservoir
8  that satisfies the requirements of claim 1?
9      A. The reservoirs that I've opined on include
10  the region near the porous plug, and you, I think,
11  purposely excluded that region.
12      Q. I did. And I'm asking if the region I
13  identified is in your opinion a reservoir that would
14  satisfy the requirements of claim 1?
15      A. It's not one of the regions I've opined
16  on.
17      Q. Do you have an opinion on that?
18      A. I would say that the reservoir that you
19  described, the structure that you described, meets
20  the limitations of claim 1.
21      Q. Okay. And so you could have just as well
22  offered the opinion that the structure, the area
23  that I described, is the reservoir in the Kurin Lock
24  as what you've done here.
25      A. I could have. I don't understand. I

Page 195

1  either did or did not, and I gave my opinion now
2  very clearly. So I don't understand "you could
3  have." I don't understand that.
4      Q. When you go to trial what opinion will you
5  offer as to the boundaries of the reservoir in the
6  Kurin Lock?
7      A. So one opinion is depicted here in this
8  136.
9      Q. Okay.
10      A. Let's call it from the porous plug region
11  until, say, two-thirds of the way up to the
12  180-degree turn. That is definitely a structure
13  that meets the limitations. A second structure --
14  so the Kurin Lock meets these limitations in several
15  ways. Another way that it meets the limitations is
16  defining the reservoir or the structure -- or the
17  structure starting from the porous plug to the top
18  of the 180-degree turn.
19      Q. Any others?
20      A. I would say from the porous plug to
21  halfway to the 180-degree turn.
22      Q. So is it fair to say it's your opinion
23  that if we draw the boundaries starting at the
24  porous plug and extending any of the distance down
25  to the 180-degree turn, we can pick any spot in

Page 196

1  there and say that's the reservoir?
2      A. I'm saying that the Kurin Lock meets the
3  limitation in at least several ways, and these
4  reservoirs meet the limitation.
5      Q. That's not my question. Could I start at
6  the porous plug and go into the U-shaped channel
7  beyond the porous plug any distance all the way to
8  the 180-degree turn, just pick a spot, draw a line,
9  and call that the reservoir?
10      MR. BLOCK: Object to form.
11      THE WITNESS: I think it's most useful to
12  identify specific structures. And for those reasons
13  I said either two-thirds of the way or one-half of
14  the way since these are easy fractions to identify.
15  Also, from the porous plug to the top of the
16  180-degree. Those three examples I gave you are
17  structures in the Kurin Lock which meet the
18  limitation of reservoir.
19  BY MR. HANGARTNER:
20      Q. How about if I extended it from the porous
21  plug to your line at the apex of the 180-degree
22  turn, and then I went four more millimeters around
23  the corner and drew a line there? Would that --
24  would that be the reservoir in the Kurin Lock?
25      A. So four more millimeters in which

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 166 of 371 PageID #: 14595

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 197

1  direction?

2      Q.  Around toward the outer leg of the

3  U-shaped channel.

4      A.  So I didn't offer that opinion.

5      Q.  And I'm asking you would that be a

6  reservoir in the -- in the Kurin Lock?

7      A.  So I'm -- I don't have an opinion about

8  that today or in my report.

9      Q.  Do you have an opinion about that today?

10     A.  No.

11     Q.  How about I took it from the porous plug

12  and went halfway around so that I was halfway up the

13  outer leg of the U-shaped channel and I drew my line

14  there?  Would that be a reservoir?

15     A.  I don't have an opinion about that today.

16     Q.  And you haven't offered one in your

17  report, have you?

18     A.  No.

19     Q.  Is there -- is there any other reservoir

20  in the Kurin Lock other than the ones you've

21  already -- you just talked about?

22     A.  I've talked about three possible ones at

23  least.  Are you saying are there other regions?

24  Like, for example, the sample channel is not a

25  reservoir.  Is not the reservoir.

Page 198

1      Q.  Okay.  I was asking if there's any other

2  region.  So in your opinion once it crosses a

3  vertical line at the apex of the turn from the inner

4  leg of the U channel to the outer leg, once we cross

5  that line, in your opinion it's no longer the

6  reservoir?

7      MR. BLOCK:  Object to form.

8      THE WITNESS:  No, that's not what I said.

9  BY MR. HANGARTNER:

10     Q.  You have no opinion as to whether it's the

11  reservoir once you cross that line?

12     A.  That's right.  It could be and may or may

13  not be a reservoir.

14     Q.  And how would I determine whether it's a

15  reservoir or not?

16     A.  Well, if -- what's the important question

17  is does it meet the limitations.

18     Q.  Okay.  And what changes as you come around

19  that corner that would alter whether it meets the

20  limitations?

21     A.  Nothing might change immediately as you go

22  around the corner.

23     Q.  Okay.  Or as you go further around the

24  corner, what changes?

25     A.  The location of where you are.  What I'm

Page 199

1  pointing to is a very definite structure with

2  definite bounds which meets the limitation, and it's

3  a structure in the Kurin device.

4      Q.  And that definite bound is the dotted line

5  that you have shown there?

6      A.  No.  I was talking about the largest

7  reservoir that I described to you.

8      Q.  The new opinion that you just offered

9  today?

10     A.  Actually, I think there's good support in

11  my report for the -- I wouldn't call it a new

12  opinion.  There's good support in my report for that

13  180-degree line.

14     Q.  Even though here you have a picture -- do

15  you have another picture that shows a mark at the

16  180-degree line saying that's the reservoir?

17     A.  I have other very good language, very

18  clear.

19     Q.  I want to point you to paragraph 50 of

20  your report.  It's on page 25.  And this is talking

21  about the background on the Kurin device.  And it

22  refers to figure 2, which is a photograph that I

23  think you took below, correct?

24     A.  Yes, I took that photograph.

25     Q.  Okay.  Now, in this you describe the

Page 200

1  device as including an inlet and a Y junction with

2  two outlets.  And you indicate that at the Y

3  junction you say that is where the single inlet

4  channel bifurcates into two daughter channels.

5      Do you see that at about a third -- you

6  know, few sentences down in paragraph 50?

7      A.  The inlet channel leads to a geometry that

8  could be roughly described as a Y junction where the

9  single inlet channel bifurcates into two daughter

10  channels.

11     Q.  Okay.  So then -- I'm going to skip the

12  next sentence because it's about the capillary burst

13  tube.  You say the Y junction is not easily visible

14  in the image of figure 2, but can be described as

15  follows.  And you have a detailed description of the

16  Y -- of the geometry, correct?

17     A.  I have a description of the geometry with

18  some detail, but it's hard to put three-dimensional

19  geometries into either two-dimensional images or

20  words.

21     Q.  But this is the best you could come up

22  with, right?

23     MR. BLOCK:  Object to form.

24     THE WITNESS:  I don't know if it's the

25  best that I've ever done, but it's my description I

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 167 of 371 PageID #: 14256

Juan Gabriel Santiago, Ph.D.

Highly Confidential –
Attorneys' Eyes Only

Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 201

1 put in my report.
2 BY MR. HANGARTNER:
3    Q.  You wrote it, right?
4    A.  I wrote it, yes.
5    Q.  And at the time you were trying to do a
6 good job, right?  You weren't trying to make this
7 confusing, right?
8    A.  No.
9    Q.  Your goal was clarity, correct?
10    A.  Yeah, clarity and being accurate.  I
11 wanted to be accurate.
12    Q.  Okay.  So the next sentence in the
13 description goes like this:  The three-dimensional
14 structure of this junction is such that the first of
15 these daughter channels rapidly transition into a
16 channel with a significantly larger cross-sectional
17 area than either the inlet channel or the second
18 daughter channel.  This large cross-sectional area
19 first daughter channel (also known as a U-shaped
20 diversion chamber) extends throughout most of the
21 length of the device, and then bends at a U-turn as
22 shown in figure 2.
23       So this description is talking very
24 specifically about the U-shaped side channel from
25 the point where it diverges from the inlet, correct?

Page 202

1       MR. BLOCK:  Object to form.
2       THE WITNESS:  That part about the from the
3 point is something you have imported into the text.
4 BY MR. HANGARTNER:
5    Q.  No.  It's actually what it says right
6 there.  It says this -- it's referring to this
7 daughter channel as a daughter channel from the
8 inlet.  It starts at the inlet itself and defines
9 this as a daughter channel of the inlet, correct?
10       MR. BLOCK:  Object to form.
11       THE WITNESS:  So what I say is that the
12 first of the two daughter channels rapidly
13 transitions into a channel with significantly larger
14 cross-sectional area.  You seem to have forgotten
15 that part about rapidly transitioning into the
16 channel.
17 BY MR. HANGARTNER:
18    Q.  That occurs immediately in the Y junction
19 area, doesn't it?
20    A.  What do you call immediately?
21    Q.  Does the rapid transition you described
22 here occur in the area of Y junction?
23    A.  It's near -- it's near the junction --
24 near the Y junction, yes.  In the vicinity of the Y
25 junction.

Page 203

1    Q.  Okay, okay.  So you're telling me that the
2 transition in the cross-section doesn't happen until
3 you are past what you call the Y junction?
4       MR. BLOCK:  Object to form.
5       THE WITNESS:  I'm saying that my analyses
6 and opinions regarding infringement don't depend on
7 the exact delineation between the inlet channel and
8 the exact transition to the U-shaped chamber.
9 BY MR. HANGARTNER:
10    Q.  No.  You're answering not the question I'm
11 asking in any way.  And I'd appreciate it if you'd
12 answer my question.
13       MR. BLOCK:  Object to form.
14 BY MR. HANGARTNER:
15    Q.  Does the -- you have previously indicated
16 that certain things, such as mixing, occur within
17 and slightly without the Y-shaped junction area,
18 correct?
19    A.  That's not exactly how I said it, but I
20 said that the mixing regions are near the Y
21 junction.
22    Q.  Okay.  The Y junction area, does it extend
23 to the point where the daughter, the first daughter,
24 channel expands in cross-section?
25    A.  There is some transition between the

Page 204

1 immediate bifurcation and the expanded
2 cross-sectional area.  In this text I don't
3 necessarily attribute that to the Y junction or the
4 daughter channel.  I just describe it as a
5 transitional area between the two.
6    Q.  Okay.  So the structure you are talking
7 about in this paragraph is the U-shaped side
8 channel, correct?
9    A.  I'm speaking of more than that.
10    Q.  All right.  Look, the large
11 cross-sectional area.  So let's start at that
12 boundary.  You agree that this -- you called it the
13 first daughter channel, so I'm going to call it
14 that.  The first daughter channel from the inlet
15 after bifurcation has -- it changes to a larger
16 cross-sectional area.  That is what this says,
17 correct?
18    A.  No.
19    Q.  Okay.  Tell me what this says.  Actually,
20 no, don't do that.  You're going to -- you're going
21 to change it.  Here's what it says.  There's a large
22 cross-sectional area.  That's referring to the area
23 that begins where the cross-section becomes bigger,
24 right?
25    A.  The increase of the cross-sectional area

Page 205

1   refers to the larger cross-sectional of the larger
2   channel, yes.
3       Q.   And that begins at or very close to the Y
4   junction, correct?
5       A.   I speak of a transition between them.
6       Q.   Yes.  And so you're saying that the Y
7   junction ends, and there's a transition to a larger
8   cross-section daughter channel, correct?
9       A.   Not necessarily.
10      Q.   Okay.  Explain to me the relationship
11  between the Y junction area that you talk about here
12  and the larger cross-section area where this becomes
13  what we've calling the U-shaped side channel.  What
14  is the relationship between those two?
15      A.   Well, there's a region which is a Y
16  junction which includes a single inlet bifurcating
17  into two daughter channels.  One of those two
18  daughter channels -- or the flow traveling through
19  the first of those two daughter channels would
20  experience a transition region where the
21  cross-sectional area increases and eventually would
22  reach the U-shaped channel.
23      Q.   Okay.  And is that transition region
24  within or without the Y shaped junction, the Y
25  junction?

Page 206

1       A.   My analysis didn't need a precise
2   delineation of those two three-dimensional shapes.
3       Q.   The idea of this being a Y junction is
4   yours, correct?  You are the one who uses this term
5   and is using it throughout your report, correct?
6       A.   Yeah, and it's a very reasonable term.
7       Q.   Okay.  I'm asking you where does the Y
8   junction include the area of transition to the
9   larger cross-section?
10      A.   I'm saying that level of precision is
11  difficult because of the three-dimensional nature
12  and is not needed -- was not needed for my opinion.
13      Q.   So as you sit here now do you have any
14  opinion as to where the Y junction ends with respect
15  to that transition?
16      A.   Other than they are near, and I described
17  them as well as I can, but these are
18  three-dimensional regions that are difficult to
19  describe.  It's three-dimensional space and you
20  would like me to -- what would you like?  You would
21  like a three-dimensional surface that divides the
22  several components?  Is that what you would like?
23      Q.   You refer to this large cross-sectional
24  area first daughter channel.  Once the transition
25  eventually, as you said, reached the area of the

Page 207

1   larger cross-section, are we in what you refer to
2   here as the U-shaped diversion chamber?
3       A.   So at some distance from the Y junction
4   you are in there.  And, if you like, we can go to a
5   picture and I can tell you a region where I'm sure
6   you're in the U junction.
7       Q.   Okay, that's great.  Let's try that.
8   Let's look at -- if you have a picture that you
9   think would be helpful, please point it out to me.
10      A.   Yeah.  It is in my report on page 106.
11      Q.   Okay.  And this is again the drawing we
12  were referring to earlier from the Kurin engineering
13  drawings.  Which one of these drawings would you
14  like to refer to?
15      A.   The one on the bottom right that's labeled
16  top housing Kurin Lock.
17      Q.   Okay.  So the very bottom right showing
18  on -- there's two images, and you are referring to
19  the one on the left, correct?
20      A.   No.  Actually I'm talking about the one on
21  the right, the isometric view.
22      Q.   The blue or purple.
23      A.   The blue.  That's right.
24      Q.   Okay.  Go ahead.
25      A.   So I think I've been very reasonable in

Page 208

1   describing this as a highly three-dimensional
2   region.  Keep in mind that the bounded region where
3   there is fluid is bounded by the gray piece on top,
4   and the blue piece on the bottom, and each of those
5   two has three-dimensional surfaces.
6   Three-dimensional curved surfaces.  So -- and you'll
7   also, I think, agree that the U tube chamber has a
8   larger cross-sectional area than, say, the inlet.
9   Inlet is a tube that attaches to the device.
10      Q.   Right, okay.
11      A.   So I would say you're well into the U tube
12  chamber, for example, as you -- as the channel
13  straightens out into the straight portion of the U
14  tube, now you're well -- I'm certain there that are
15  you are in the U tube chamber now.
16      Q.   But, in fact, the cross-section opens --
17  becomes larger earlier than that, doesn't it?
18      A.   Slightly earlier.  But if you look, that
19  ridge, like what you pointed to as point A this
20  morning, is not a point.  It's actually a whole
21  series of edges and three-dimensional curved, convex
22  surfaces.  So they extend into it.  If you look at
23  the top like the gray, you see how there's a whole
24  sort of transition even as you go into the turn.
25      Q.   Right, as you start into the turn.  But

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 169 of 371 PageID #: 42952

Juan Gabriel Santiago, Ph.D.                Highly Confidential –                Magnolia Medical Technologies, Inc. vs.
                                             Attorneys' Eyes Only                                                Kurin, Inc.

Page 209

1  that transition is complete. If you look at the
2  engineering drawing of the four pictures here on the
3  top left, you can see lines indicating that
4  transition region directly. If you follow the point
5  of point A down and to the left, there are lines
6  showing that transition region, correct?
7        MR. BLOCK: Object to form.
8        THE WITNESS: That's a transition between
9  relatively small and relatively large
10 cross-sectional areas. It's not necessarily where
11 you're in the U. It depends on whether you lump the
12 turn into the U or not.
13 BY MR. HANGARTNER:
14    Q. Okay. So let's go back to paragraph 50,
15 because I think you have explained exactly what you
16 mean quite well here. And you said that the large
17 cross-sectional area first daughter channel extends
18 throughout most of the length of the device, and
19 bends at a U turn as shown in figure 2.
20       Now, I'm going to skip over the next
21 sentence. But then I'm going to read the last which
22 says: "The volume of this first daughter channel
23 downstream of the Y junction and up to the valve
24 assembly region acts as a reservoir or so-called
25 flash chamber where an initial of volume of

Page 210

1  contaminated blood is to be sequestered."
2        Is that an accurate statement?
3     A. You read that correctly.
4     Q. Is that an accurate statement of your
5  opinions?
6     A. So I would say the downstream portion of
7  that volume is the reservoir.
8     Q. But the statement in your report at
9  paragraph 50 is correct?
10       MR. BLOCK: Object to form.
11       THE WITNESS: I'm not sure that's true,
12 but I'm happy to explain my opinion.
13 BY MR. HANGARTNER:
14    Q. No, no. I have a very simple question.
15 Is this description of the reservoir accurate?
16    A. So this specifies a volume that is
17 downstream of the Y junction, and the volumes I've
18 been describing are all downstream of the Y
19 junction.
20    Q. So you believe that paragraph 50
21 accurately states your opinions in this case?
22    A. Well, the volumes that I've been
23 describing are downstream. Even that 180-degree
24 turn way at the top is downstream of the junction.
25    Q. When you refer -- okay. I have a really

Page 211

1  simple question. It's yes or no. Is this an
2  accurate statement?
3        MR. BLOCK: Object to form.
4        THE WITNESS: I can see how you might
5  think it's somewhat vague, but I think I'm
6  referring -- well, I am referring to the region
7  downstream. And that's a region -- I didn't mean to
8  write that it's immediately downstream. Maybe
9  that's the confusion.
10 BY MR. HANGARTNER:
11    Q. What's the plain and ordinary -- ordinary
12 meaning of withdraw?
13       MR. BLOCK: Object to form.
14       THE WITNESS: All right. So I want to
15 make sure -- you're changing gears here completely,
16 so let me catch up with you. I'm opening the claim.
17 I think you are talking about with respect to claim
18 '001.
19 BY MR. HANGARTNER:
20    Q. Withdraw is included in claim '001. I'm
21 referring to the plain and ordinary meaning of the
22 claim term withdraw.
23    A. So you're asking me the plain, ordinary
24 meaning of the withdraw in the absence of these
25 patents as if they didn't exist?

Page 212

1     Q. Yeah. I'm just asking for the plain and
2  ordinary meaning of the term "withdraw." It is a
3  term used in the claims. My question to you is what
4  is the plain and ordinary meaning of the term
5  "withdraw"?
6        MR. BLOCK: Object to form.
7        THE WITNESS: And you want me for a second
8  to pretend that these patents don't exist?
9  BY MR. HANGARTNER:
10    Q. No. Patents are understood in accordance
11 with their plain and ordinary meaning, correct?
12       MR. BLOCK: Object to form.
13 BY MR. HANGARTNER:
14    Q. This is -- this is not a trick question.
15 It's not a complicated question. What is withdraw?
16       MR. BLOCK: Same objection.
17       THE WITNESS: So I read the claims and the
18 claim terms in the way that a person of ordinary
19 scale in the art would read them in light of the
20 specification. So I think you're -- now you're
21 asking me to forget these patents; is that right?
22 BY MR. HANGARTNER:
23    Q. No, I'm not.
24    A. Okay.
25    Q. I'm not asking you to forget the patent.

Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 170 of 371 PageID #: 42558

Juan Gabriel Santiago, Ph.D.
Highly Confidential -
Attorneys' Eyes Only
Magnolia Medical Technologies, Inc. vs.
Kurin, Inc.

Page 253

1  question.
2        THE WITNESS: So as I understand in order
3  to be analogous art, it should be --
4  BY MR. HANGARTNER:
5     Q.  I'm sorry.  I'm sorry.  I'm sorry to
6  interrupt you.  Can you tell me what you're looking
7  at right now and where you've gone to in your report
8  to answer this question?
9     A.  So I've looked at a few things.  Right
10 now, if you like, I can -- let's see, first
11 paragraph 28 of my validity report.
12    Q.  Okay.  Thank you.  I'm sorry to interrupt
13 you.
14       MR. BLOCK:  There's no question pending,
15 Jon, if you want to clean up the record.
16       MR. HANGARTNER:  Yeah, sure.
17       Can you read back the last substantive
18 question that I asked?
19       (Record read as follows:  Q.  What
20       criteria would you use to determine
21       whether a particular medical device is
22       analogous art or not?  And refer to your
23       report.  Go at it.  Spend an hour.
24       Whatever you want to do.  Just please
25       actually answer that question for me. )

Page 254

1        MR. BLOCK:  Object to form.
2        THE WITNESS:  Should I go ahead and
3  answer?
4  BY MR. HANGARTNER:
5     Q.  Yeah, please.
6        MR. BLOCK:  Yes, you may answer.
7        THE WITNESS:  So analogous art is
8  either -- refers to a publication, a prior art, that
9  is either in the same field of endeavor, or at least
10 reasonably pertinent to the problem that the
11 inventor was trying to solve.  And further, as you
12 can read in my report, I understand that a reference
13 is only reasonably pertinent when it's logical, when
14 it logically would have commended itself to an
15 inventor's attention in considering the problem.
16 BY MR. HANGARTNER:
17    Q.  Did you write paragraph 28, Dr. Santiago?
18    A.  I would say that particular paragraph was
19 a collaborative effort.
20    Q.  With the lawyers, right?
21    A.  That's right.
22    Q.  And you just read back to me the words in
23 paragraph 28 of your report in answer to my
24 question?
25    A.  No, not exactly.  I changed some of the

Page 255

1  words, and I said it in my own words just now.
2     Q.  All right.  We've done enough.  Excellent.
3  Let's go off the record.  Great job stalling out the
4  last hour.  Somewhat admirable.
5        VIDEO OPERATOR:  The time is 5:43.  Off
6  the record.
7        (Signature having not been waived,
8        the deposition of Juan Santiago was
9        concluded at 5:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 256

1        CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Delaine Hall, Certified Shorthand
4  Reporter, the officer before whom the
5  foregoing proceedings were taken, do hereby
6  certify that the foregoing transcript is a true
7  and correct record of the proceedings; that said
8  proceedings were taken by me stenographically and
9  thereafter reduced to typewriting under my
10 supervision; and that I am neither counsel for,
11 related to, nor employed by any of the parties to
12 this case and have no interest, financial or
13 otherwise, in its outcome.
14       Further, that if the foregoing pertains to
15 the original transcript of a deposition in a federal
16 case, before completion of the proceedings, review of
17 the transcript [X] was [ ] was not requested.
18       IN WITNESS WHEREOF, I have hereunto set
19 my hand and affixed my signature this 4th day of
20 May 2021.
21
22
23
24 _____
25 DELAINE HALL, CSR 10164

# EXHIBIT 10

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

              Plaintiff,

    v.

KURIN, INC.,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 19-97-CFC (CJB)

**EXHIBIT 17**

**MAGNOLIA'S OPPOSITION TO KURIN'S MOTION *IN LIMINE* NO. 1:
TO PRECLUDE EVIDENCE OR ARGUMENT RELYING ON
DR. SANTIAGO'S NEW DEFINITION OF RESERVOIR**

Kurin's Motion *in Limine* No. 1 is an untimely challenge to Dr. Santiago's "reservoir" opinion.  The Court already rejected Kurin's similar request at the *Daubert* stage.  *See* Ex. 17.A (Summary Judgment Hr'g Tr.) at 38:13–40:8, Feb. 10, 2022.  The opinion is not only reliable but also appropriately disclosed, and Kurin has been aware of it for more than a year.  The motion should be denied.

First, the motion is untimely.  Kurin concedes that—at the latest—Magnolia disclosed the pertinent opinion more than a year ago in Dr. Santiago's January 15, 2021 expert report and April 20, 2021 deposition.  Mot. at 2.  But Kurin never moved to strike, choosing instead to raise only an unsuccessful *Daubert* challenge. *See* D.I. 289.  When the Court observed at the February 10, 2022 *Daubert* hearing that the *Daubert* motion was not "the vehicle" to assert purported surprise or prejudice, Ex. 17.A at 41:14–16, Kurin waited a further three months before bringing this motion.  Kurin cannot now complain of purported prejudice that it made no effort to cure.  *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977) (reversing exclusion because "assertion of surprise and prejudice had to be viewed in the context of [movant's] own failure to take any steps to clarify the facts") (abrogated on other grounds).

Moreover, the *Pennypack* factors weigh against the "extreme sanction" of exclusion.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791–92 (3d Cir. 1994).

**(1) Prejudice or surprise.**  As Magnolia has previously explained, there is

no prejudice or surprise because Magnolia provided notice of its contentions and appropriately developed them in expert discovery.  D.I. 337 at 3–4; *see, e.g.*, *TQ Delta v. ADTRAN*, C.A. No. 14-954-RGA, 2021 WL 3633637, at *2 (D. Del. Aug. 17, 2021) (declining to exclude expert disclosures that "expand on" infringement theories of contentions); *Vectura Ltd. v. GlaxoSmithKline, LLC*, C.A. No. 16-638-RGA, 2019 WL 1436296, at *2 (D. Del. Apr. 1, 2019).  Moreover, Kurin had every opportunity to test and respond to the opinions—and did so, in its expert's rebuttal report and in its deposition of Dr. Santiago.  *See* Ex. 17.B (Antonsson Rbtl. Rpt.) ¶¶ 87–88, 148, 411; Mot. Ex. 9 at 185:21–198:13.  This negates any purported prejudice, as Kurin's case law acknowledges.  *TQ Delta*, *LLC* v. *ADTRAN, Inc.*, C.A. No. 14-954-RGA, 2019 WL 4346530, at *3–4 (D. Del. Sept. 12, 2019) (no prejudice where party "had the opportunity to respond to [the challenged] theories and to depose [the expert] on his report"); *see Evolved Wireless, LLC v. Apple Inc.*, C.A. 15-542-JFB-SRE, 2019 WL 1100471, at *2–3 (D. Del. Mar. 7, 2019).

Kurin asserts that it might have conducted different or additional tests of its own device. Mot. at 2–3.  But Kurin's expert's tests are dated weeks *after* Dr. Santiago's January 15, 2021 expert report.  *See* Mot. Ex. 7 at 301 (showing test dates Jan. 28 to Feb. 8, 2021).  Moreover, those tests (in the "Background of the Accused Infringing Kurin Device" section) simply show the operation of the Kurin

Lock. *See* Mot. Ex. 7 at ¶¶ 89–119.[1]  Nothing about them depends on Dr. Santiago's "reservoir" opinion.[2]

    **(2) The possibility of curing the prejudice**.  As noted above, Kurin had Dr. Santiago's opinion in his January 15, 2021 expert report and April 2021 deposition. Had there been unfair prejudice, there was ample time to cure if Kurin acted timely. *See Pennypack*, 559 F.2d at 905.

    **(3) The potential disruption of trial.**  Kurin does not and cannot assert that permitting Dr. Santiago's "reservoir" opinion will disrupt the trial.  Mot. at 2–3.

    **(4) Bad faith or willfulness in failing to disclose the evidence.**  Neither bad faith nor willfulness is present here.  Magnolia timely disclosed its contentions and expert opinions according to the Court's schedule.  *See supra*.

    **(5) The importance of the information withheld.**  Nothing was withheld. However, although Dr. Santiago's "reservoir" opinion is not dispositive, it is important.  If Kurin believed otherwise, it would not be moving to exclude.

---

[1] Kurin cites other tests conducted in fact discovery.  Mot. at 1.  But Dr. Antonsson disclaimed reliance on them.  Ex. 17.C (Antonsson Dep. Tr.) at 43:22–47:2.

[2] Kurin's cases do not apply.  Whereas the "reservoir" theory here was disclosed in Magnolia's contentions and refined in Dr. Santiago's report and deposition, Kurin's cases involved efforts to introduce entirely new DOE allegations for the first time via expert report, *Viatech Techs., Inc. v. Microsoft Corp.*, C.A. No. 17-570-RGA, 2021 WL 663057, at *2 (D. Del. Feb. 19, 2021); *ASUS Comp. Int'l v. Round Rock Rsch., LLC*, C.A. No. 12-2099-JST-NC, 2014 WL 1463609, at *2–3 (N.D. Cal. Apr. 11, 2014), or to introduce new expert theories in the pretrial order. *Pharmacyclics LLC v. Cipla Ltd.*, C.A. No. 18-192-CFC-CJB, 2020 WL 6581643, at *2 & n.2 (D. Del. Nov. 10, 2020).

# EXHIBIT 17.A

```
1                  IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3   MAGNOLIA MEDICAL           )
    TECHNOLOGIES, INC.,         )
4            Plaintiff,         )
                               )   C.A. No.  19-97 (CFC)(CJB)
5   v.                          )
                               )
6   KURIN, INC.,                )
                               )
7            Defendant.         )

8

9                   Thursday, February 10, 2022
                           9:00 a.m.
10                        Motion Hearing

11

12                       844 King Street
                     Wilmington, Delaware
13

14  BEFORE: THE HONORABLE COLM F. CONNOLLY
    United States District Court Judge
15

16

17  APPEARANCES:

18

                RICHARDS, LAYTON & FINGER
19              BY:  KELLY E. FARNAN, ESQ.

20                       --and--

21

                PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
22              BY:  NICHOLAS GROOMBRIDGE, ESQ.
                BY:  CATHERINE NYARADY, ESQ.
23              BY:  JOSHUA REICH, ESQ.

24                   Counsel for the Plaintiff

25
```

1   offering an opinion which is not using functional language.

2   And if they are going to limit themselves to that, then

3   should I not just say, let it go?

4         **MR. GROOMBRIDGE:**  I -- no, Your Honor, for several

5   reasons.

6         First of all, on the structure, it -- I'm holding

7   up a plastic bottle.  If we take the top off, it's open, but

8   we all still agree it's a bottle.  If I say the bottom third

9   or maybe the bottom half of it is what I'm talking about, is

10  that a bottle?  Most people would say no.

11        **THE COURT:**  Yeah, but now we are getting into --

12  let the jury decide that.

13        **MR. GROOMBRIDGE:**  The -- and here we have the

14  testimony that you didn't see in Magnolia's argument where

15  he's being asked:

16        "When it crosses the vertical line, that's the

17  180-degree mark, right?  Is that, in your opinion, is it a

18  reservoir?"

19        And some back and forth here.

20        "You have no opinion?

21        "That's right.  It could be.  It may or may not be

22  a reservoir."

23        And that's what's going on here.  It's a totally

24  moving target, Your Honor, and that this is the problem that

25  we've got.  No one can tell under their theory they do or

1    don't.

2         THE COURT:  So is your contention for

3    indefiniteness?

4         MR. GROOMBRIDGE:  There would have been had this

5    been raised in a timely fashion.

6         THE COURT:  Well, that's where you get into the --

7    that's not a *Daubert* motion, but that's a *Pennypack*.  Let's

8    just deal with *the Daubert* -- this is a *Daubert* motion,

9    right?

10        MR. GROOMBRIDGE:  This is a *Daubert* motion.

11        THE COURT:  So let's deal with the *Daubert* part of

12   it, and -- I mean, you know, again, boy, aren't you going to

13   have fun with their expert on the stand here?  I mean, my

14   goodness.  It is a jury trial, right?

15        MR. GROOMBRIDGE:  It is a jury trial, Your Honor.

16        THE COURT:  You'd have fun with me in front of

17   it --

18        MR. GROOMBRIDGE:  I -- I think -- I think I would,

19   Your Honor.

20        THE COURT:  -- the guy is a moving target.

21        Which I go back to in a way, I sometimes wonder why

22   we are bringing these motions.  But, you know, just limit

23   yourselves to *Daubert*, right?  They've got an opinion.  They

24   say they are going to limit themselves to lines 10 through

25   17, which is structure.

1      All right.  It sounds like maybe I should just deny

2  the motion.  That's what they get to do.

3      **MR. GROOMBRIDGE:**  Well, Your Honor, I think what we

4  would want to be clear on the record is we think that it

5  implicates a claim construction dispute, late-breaking claim

6  construction dispute, about "reservoir."

7      I understand Your Honor may not agree with us, but

8  I just want to be clear.

9      **THE COURT:**  Well, how would you define "reservoir"?

10     **MR. GROOMBRIDGE:**  I would say that it's a -- in the

11 context of these patents when looking -- what the word

12 "reservoir" means in these patents, it is some form of

13 enclosed space that's bounded -- its boundaries can't be

14 defined.  And it can be -- it has an opening for sure,

15 because things have to get into it, but that's what it is.

16 It's boundaries other than the opening, a physical

17 structure.  And that --

18     **THE COURT:**  Right.  Well, I don't think that --

19 just for the record, you know, I don't think that that

20 definition you proffered implicates 02 micron because you

21 are talking about an opening.  Anytime you have an opening,

22 you do not have a physical barrier.

23     Both sides have defined "structure" with having a

24 part, a physical barrier, which is the housing, and -- but

25 both sides right now, including what you've just proffered,

 1    posit a definition of reservoir which would have at least

 2    some portion of the reservoir being undefined by physical

 3    barrier.

 4          So for that reason, it is not 02 micron, and I'm

 5    going to deny the *Daubert* motion because I think they have

 6    actually shown that they have structural definition, which

 7    they stipulated they are going to limit themselves to.  And

 8    if at any point they try to define or justify the opinion by

 9    resort to functionality, I will entertain any motion in

10    limine to strike it, do whatever we have to.

11          I can explain to the jury how they said this is a

12    "means plus function" term and it was not defined in terms

13    of functionality.  They'll pay a price if they did that.

14          Now, as far as the issue of the fairness of it, and

15    was this raised late, it just doesn't seem this is the

16    vehicle by which it should be presented to me.

17          **MR. GROOMBRIDGE:**  I understand, Your Honor, and

18    duly noted.

19          And I was smiling because when Your Honor referred

20    to opening, it made me think if you give a lawyer an

21    opening, they will take it.

22          **THE COURT:**  Yes.

23          All right.  So anything else you want to say,

24    though, in terms of *the Daubert*-based motion?

25          **MR. GROOMBRIDGE:**  No, Your Honor.  We understand

# EXHIBIT 17.B

# FILED UNDER SEAL

# EXHIBIT 17.C

# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

              Plaintiff,

   v.

KURIN, INC.,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC
(CJB)

████████████████████

## KURIN'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE*  NO. 1
## TO PRECLUDE EVIDENCE OR ARGUMENT RELYING ON
## <u>DR. SANTIAGO'S NEW DEFINITION OF RESERVOIR</u>

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Kurin, Inc.*

June 3, 2022

Magnolia cites to nothing contradicting this Court's precedent disallowing presentation of a theory not in its infringement contentions. Magnolia notably offers no support for its footnoted insinuation that the Santiago theory was disclosed in its contentions and only "refined" in his report. Nor do its cases say that a "refinement" that seeks to salvage a failed theory is exempt from the good-cause requirement under the scheduling order. *Magnolia* has the burden to show good cause in adding a new theory. It does not even attempt to do so. It is thus only Magnolia's attempt to assert the theory at trial that is untimely, not Kurin's motion. *Pharmacyclics LLC* v. *Cipla Ltd.*. 2020 WL 6581643, at *3 (D. Del. Nov. 10, 2020). In any case, Kurin brought this motion at the earliest opportunity—promptly after denial of its *Daubert* motion that previewed, and would have obviated, this motion. D.I. 289 at 3–6.

On prejudice, Dr. Antonsson's tests underlying his noninfringement opinions, *see, e.g.*, Ex. 11 ¶ 155, like the prior tests Kurin relies on for noninfringement, *see* Ex. 6, were *designed* prior to Dr. Santiago's report, to rebut Magnolia's contention "reservoir" theory. Dr. Antonsson and Kurin had no time to redesign and redo tests to rebut Santiago's new theory. As Kurin's cases make clear, timely disclosure would have allowed Kurin and Dr. Antonsson *during fact discovery* to design tests targeted to determine whether mixing occurred specifically in Dr. Santiago's narrower "reservoir" as opposed to the contentions' broader "reservoir". And, as Kurin explained, such prejudice cannot be cured before trial. MIL No. 1 at 2–3.

RICHARDS, LAYTON & FINGER, P.A.

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ngroombridge@paulweiss.com
cnyarady@paulweiss.com
kraman@paulweiss.com
jreich@paulweiss.com
abarel@paulweiss.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

June 3, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KURIN, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

C.A. No. 1:19-cv-00097-CFC (CJB)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**DECLARATION OF ARIELLA BAREL IN SUPPORT OF KURIN, INC.'S
REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 1 TO
PRECLUDE EVIDENCE OR ARGUMENT RELYING ON
<u>DR. SANTIAGO'S NEW DEFINITION OF RESERVOIR</u>**

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's reply in support of its Motion *in Limine*, which is filed herewith.

1.     Attached hereto as **Exhibit 11** is a true and correct copy of an excerpt of the Rebuttal Expert Report of Erik K. Antonsson, dated February 18, 2021.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2022.

_/s/ Ariella Barel_
Ariella Barel

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

**EXHIBIT 18**

**KURIN'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE EVIDENCE OR ARGUMENT THAT PRE-PATENT ISSUANCE BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 1:19-cv-00097-CFC (CJB) ) |
| KURIN, INC., | ) ) |
| Defendant. | ) ) ) ) |

**KURIN'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE EVIDENCE OR ARGUMENT THAT PRE-PATENT ISSUANCE BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Kurin, Inc.*

May 17, 2022

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Tech. Ceramics Corp.* v. *Presidio Components, Inc.*,
 2019 WL 2330855 (E.D.N.Y. May 31, 2019) .................................................1, 2, 3

*Bioverativ Inc.* v. *Behring LLC*,
 2020 WL 1332921 (D. Del. Mar. 23, 2020) ....................................................1

*Gustafson, Inc.* v. *Intersys. Indus. Prods., Inc.*,
 897 F.2d 508 (Fed. Cir. 1990)........................................................................1

*Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*,
 579 U.S. 93 (2016)..........................................................................................1

*Insituform Techs., Inc.* v. *Cat Contracting, Inc.*,
 161 F.3d 688 (Fed. Cir. 1998).........................................................................1

*Iron Grip Barbell Co., Inc.* v. *USA Sports, Inc.*,
 392 F.3d 1317 (Fed. Cir. 2004).......................................................................1

*Milgo Elec. Corp.* v. *United Bus. Commc'ns, Inc.*,
 623 F.2d 645 (10th Cir. 1980) .........................................................................2

*Plexxikon Inc.* v. *Novartis Pharms. Corp.*,
 2021 WL 2224267 (N.D. Cal. June 2, 2021) ..................................................3

*Sonos, Inc.* v. *D&M Holdings Inc.*,
 2017 WL 5633204 (D. Del. Nov. 21, 2017) ...................................................2

*Sri Int'l, Inc.* v. *Cisco Sys., Inc.*,
 930 F.3d 1295 (Fed. Cir. 2019).......................................................................1

*State Indus., Inc.* v. *A.O. Smith Corp.*,
 751 F.2d 1226 (Fed. Cir. 1985).................................................................1, 2, 3

**Other Authorities**

Fed. R. Evid. 401 ..................................................................................................1

Fed. R. Evid. 402 ...........................................................................................1, 2, 3

Fed. R. Evid. 403 ...........................................................................................1, 2, 3

Pursuant to Federal Rules of Evidence 401–403, Magnolia should be precluded from introducing any evidence or argument on acts pre-issuance in support of its willfulness claims.[1]  "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Halo Elecs., Inc.* v. *Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016).  "To willfully infringe a *patent*, the patent must exist." *State Indus., Inc.* v. *A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985); *Gustafson, Inc.* v. *Intersys. Indus. Prods., Inc.*, 897 F.2d 508, 510–11 (Fed. Cir. 1990); *Bioverativ Inc.* v. *Behring LLC*, 2020 WL 1332921, *2 (D. Del. Mar. 23, 2020).  Accordingly, the pre-patent issuance evidence here is irrelevant under *Halo* to Kurin's culpability and "may not be offered to prove willful infringement" *Am. Tech. Ceramics Corp.* v. *Presidio Components, Inc.*, 2019 WL 2330855, at *11 (E.D.N.Y. May 31, 2019); *Sri Int'l, Inc.* v. *Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[1] This evidence is also irrelevant to inducement or secondary considerations. *See Insituform Techs., Inc.* v. *Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998); *Iron Grip Barbell Co., Inc.* v. *USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

██████████████████████████████████████████████

████████████████████████████████. Kurin disputes many of these assertions, but even if true they are all irrelevant to whether Kurin willfully infringed *the patents-in-suit*, which issued after this alleged behavior. *Am. Tech.*, 2019 WL 2330855, at *11. Such irrelevant evidence is however, very likely to be unfairly prejudicial to a jury. Thus, Magnolia should be precluded from offering this evidence under FRE 402 and 403.

Magnolia's first two categories of such evidence, ███████████████ ███████████████████████████, are related and fail for the same reasons. First, ████████████████████████████████████ is irrelevant to whether Kurin willfully infringed the specific claims at issue here. *See* Ex. 1, at 46:6–23; *State Indus.*, 751 F.2d at 1235–37.

Second, even assuming, *arguendo*, ███████████████████████ ██████████████████████████████████████ ███████" *Milgo Elec. Corp.* v. *United Bus. Commc'ns, Inc.*, 623 F.2d 645, 666 (10th Cir. 1980); *State Indus.*, 751 F.2d at 1236; *Sonos, Inc.* v. *D&M Holdings Inc.*, 2017 WL 5633204, at *4 (D. Del. Nov. 21, 2017). ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████And, even for the asserted patents, Magnolia

relies on the doctrine of equivalents for key limitations.  *See, e.g.,* Ex. 4 at 6, 20, 50–55; Ex. 5 at 21, 27, 29, 35.  Thus, Kurin successfully developed a product outside the scope of the then-existing Magnolia patent portfolio, exactly what the patent system encourages.  *State Indus.*, 751 F.2d at 1236.

The unfair prejudice Magnolia's "evidence" will cause far outweighs its nonexistent probative value.  *See, e.g., Plexxikon Inc.* v. *Novartis Pharms. Corp.*, 2021 WL 2224267, at *5–6, 8 (N.D. Cal. June 2, 2021) (excluding evidence of alleged copying of related patent applications, which "notably did not result in infringement of the related patents" under FRE 403).

The third category, ██████████████████████████████████████ also has no probative value— ██████████████████████████████████ ████████████████ Ex. 6 at 14–16.  The fourth category, ██████████████ ███████████████████████████████████████████████████████ ███████████████ These ***pre-issuance*** acts have no bearing on patent infringement, and are being offered by Magnolia only in an attempt to unfairly prejudice the jury against Kurin.

This "evidence" has no probative value and is improper evidence that should be excluded under FRE 402 and 403.  *See, e.g., Plexxikon*, 2021 WL 2224267, at *8; *Am. Tech.*, 2019 WL 2330855, at *11.  For the foregoing reasons, the Court should grant this motion *in limine*.

OF COUNSEL:

Nicholas Groombridge

Catherine Nyarady

Kripa Raman

Joshua D. Reich

Ariella Barel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 Avenue of the Americas

New York, NY 10019-6064

(212) 373-3000

ngroombridge@paulweiss.com

cnyarady@paulweiss.com

kraman@paulweiss.com

jreich@paulweiss.com

abarel@paulweiss.com

May 17, 2022

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)

Richards, Layton & Finger, P.A.

920 N. King Street

One Rodney Square

Wilmington, DE 19801

(302) 651-7700

Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAGNOLIA MEDICAL<br>TECHNOLOGIES, INC.,<br><br>            Plaintiff,<br><br>   v.<br><br>KURIN, INC.,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 1:19-cv-00097-CFC<br>(CJB)<br><br>███████████████ |

**DECLARATION OF ARIELLA BAREL IN SUPPORT**
**OF KURIN, INC.'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE**
**EVIDENCE OR ARGUMENT THAT PRE-ISSUANCE**
<u>**BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS**</u>

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First

Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP,

counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro*

*hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's

Motion *in Limine*, which is filed herewith.

1.      Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt of

the transcript of the December 10, 2020 Hearing on Magnolia's Motion to Amend.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of the Kurin

website page entitled "Kurin Lock" as of May 13, 2022.

3.     Attached hereto as **Exhibit 3** is a true and correct copy of an image taken at timestamp 2:09 from the video entitled "SteriPath - Mark Rupp MD FINAL SD.mp4" and bearing Bates number MAG-DEL0003116, dated June 6, 2017.

4.     Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt of Attachment A to Magnolia's First Amended Infringement Contentions, dated July 17, 2020.

5.     Attached hereto as **Exhibit 5** is a true and correct copy of an excerpt of Attachment B to Magnolia's First Amended Infringement Contentions, dated July 17, 2020.

6.     Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt of Magnolia's First Amended Infringement Contentions, dated July 17, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 17, 2022.

*/s/ Ariella Barel*
Ariella Barel

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


MAGNOLIA MEDICAL                )
TECHNOLOGIES, INC.,             )
                  Plaintiff, ) Civil Action No.
                                ) 19-97-CFC-CJB
v.                              )
                                )
KURIN, INC.,                    )
                  Defendant. )


                      Thursday, December 10, 2020
                      3:00 p.m.
                      Teleconference


BEFORE:  THE HONORABLE JENNIFER L. HALL
         United States Magistrate Judge


APPEARANCES:


     FISH & RICHARDSON
     BY:  DOUGLAS E. McCANN, ESQ.
          JUANITA BROOKS, ESQ.

               Counsel for the Plaintiff



APPEARANCES, CONTINUED:


MORRIS JAMES LLP
BY:  CORTLAN S. HITCH, ESQ.

              - and -

TURNER BOYD
BY:  KAREN BOYD, ESQ.

              - and -

X-PATENTS
BY:  JONATHAN HANGARTNER, ESQ.

              Counsel for the Defendant


              - - - - - - -

```
1    in a case that's not going to be tried for

2    another year, until October.

3               And that's one of the reasons we

4    pointed to the Pennypack factors, Your Honor.

5    The Third Circuit, I think generally when

6    you're talking about whether evidence should

7    or should not be excluded from a case, the

8    Third Circuit's Pennypack factors I think send

9    a really strong message the default should be

10   included, and it should be a fairly extreme

11   set of circumstances where a court will throw

12   something out.  And, you know, on the eve of

13   trial, that could be something different, but

14   that's not what we're talking about here.

15               Just briefly, Your Honor, on the

16   other two issues, willfulness and the, quote,

17   other stuff, unquote, with respect to

18   willfulness, Your Honor understands that in

19   order to show willful infringement, you have

20   to prove state of mind; you have to get inside

21   somebody's head.  And that's not the kind of

22   thing that typically can be done with

23   information that's in the public domain.  You

24   have to get discovery.  You have to get the
```

```
 1    internal documents and try to piece together a
 2    story, probably a story based on
 3    circumstantial as opposed to direct evidence,
 4    which is always harder and more complicated to
 5    do.
 6                 Now, we, in one of our elements
 7    to prove willful infringement, we have to
 8    prove knowledge of these specific patents, and
 9    Magnolia has a number of patents, and we need
10    to show these specific two, they were aware of
11    those.  And, of course, we tried to get direct
12    evidence by serving interrogatories saying
13    tell us when you first knew of the two
14    patents.  And the answer for a long time in
15    this case is, we didn't know of them.  And we
16    found that hard to believe, because, really,
17    both these companies sell one product, and
18    both of these companies considered each other
19    to be their main competitor.  And so it was a
20    little -- and they're both small companies and
21    startups.  So it was a little hard for us to
22    believe that Kurin simply had no idea of each
23    Magnolia patent as it issued.
24                 But be that as it may, that was
```

1    the circumstances we were in in July of 2020.

2    So what we did was we drafted contentions

3    based on documents, most of which we've

4    received after May of 2020, to put together a

5    circumstantial case to show the state of mind

6    for willfulness, and that's what the gist of

7    those contentions are, Your Honor.

8              Now, as it happens, after those

9    contentions were served, the ones that are the

10   issue in this motion, Kurin did supplement

11   their interrogatories to say we actually know,

12   we knew, they've admitted now they've known

13   about the one.  I guess the point was with

14   respect to those interrogatories, we had to

15   construct that circumstantial case based on

16   their documents, which is not something we

17   would have had before the case began, and

18   which, as we laid out in the brief, most of

19   which came to us beginning in May of 2020.

20             Then, Your Honor, just the last

21   point, and I've touched on this a little bit

22   already, what I'm calling the other stuff.

23   You know, when you -- everything that was a

24   redline in those contentions became a dispute

1    State of Delaware)
                     )
2    New Castle County)

3

4                    CERTIFICATE OF REPORTER

5

6            I, Jennifer M. Guy, Registered

7    Professional Reporter and Notary Public in the

8    State of Delaware, do hereby certify that the

9    foregoing record, Pages 1 to 120 inclusive, is

10   a true and accurate record of the

11   above-captioned proceedings held on the 10th

12   day of December, 2020, in Wilmington.

13

14

15                 /S/  Jennifer M Guy, RPR
                   Jennifer M. Guy, RPR
16

17

18

19

20

21

22

23

24

# EXHIBIT 2



# Kurin Lock®

## The SIMPLE Solution for Improved Blood Culture Collection

### FDA 510(k) Cleared

The <u>patented</u> Kurin Lock with Flash Technology transforms a regular blood culture collection set into a powerful yet simple way to put skin contaminants on the sideline. Each Kurin® collection set features industry-leading butterfly needles and is compatible with all major blood culture bottles. The integrated Kurin Lock® enables clinicians to sideline the initial flash of blood, which may contain skin microbes, with no change in collection practice.

# Venipuncture

5/13/22, 1:25 PM
Case 1:19-cv-00097-CFC-CJB   Document 418   Filed 06/16/22   Page 209 of 371   PageID #:
22895
Kurin Documents - Technology Better than Conventional Technology of Kurin





Perform standard venipuncture procedure with a butterfly needle.

# Syringe Draws





The detachable bottle holder allows the connection of a syringe for gentle draws on hard to stick patients.

# Freshly-placed PIVs





Per hospital protocol, the male luer connector of the Kurin PIV™ collection set enables draws from freshly placed peripheral catheters.

ML-013 Rev D

Copyright © 2022 Kurin Inc. All rights reserved.

Privacy Policy

We and selected third parties use cookies or similar technologies as specified in our privacy policy. You can consent to the use of such technologies by closing this notice, by interacting with any link or button outside of this notice or by continuing to browse otherwise.

Case 1:19-cv-00097-CFC-CJB Document 418 Filed 06/16/22 Page 212 of 371 PageID #: 22898



How we use cookies

We may request cookies to be set on your device. We use cookies to let us know when you visit our websites, how you interact with us, to enrich your user experience, and to customize your relationship with our website.

Click on the different category headings to find out more. You can also change some of your preferences. Note that blocking some types of cookies may impact your experience on our websites and the services we are able to offer.

Essential Website Cookies

These cookies are strictly necessary to provide you with services available through our website and to use some of its features.

Because these cookies are strictly necessary to deliver the website, refusing them will have impact how our site functions. You always can block or delete cookies by changing your browser settings and force blocking all cookies on this website. But this will always prompt you to accept/refuse cookies when revisiting our site.

We fully respect if you want to refuse cookies but to avoid asking you again and again kindly allow us to store a cookie for that. You are free to opt out any time or opt in for other cookies to get a better experience. If you refuse cookies we will remove all set cookies in our domain.

5/13/22, 12:35 PM    Case 1:19-cv-00097-CFC-CJB  Document 418  Filed 06/16/22  Page 213 of 371  PageID #:
Kurin-lock - The First Antimicrobial Integrated Securement Device for Kurin
22899



modify cookies from other domains. You can check these
in your browser security settings.

Google Analytics Cookies

These cookies collect information that is used either in
aggregate form to help us understand how our website is
being used or how effective our marketing campaigns are,
or to help us customize our website and application for
you in order to enhance your experience.

If you do not want that we track your visit to our site you
can disable tracking in your browser here:

Other external services

We also use different external services like Google
Webfonts, Google Maps, and external Video providers. Since
these providers may collect personal data like your IP
address we allow you to block them here. Please be aware
that this might heavily reduce the functionality and
appearance of our site. Changes will take effect once you
reload the page.

Google Webfont Settings:



Google reCaptcha Settings:

Vimeo and Youtube video embeds:

**Other cookies**

The following cookies are also needed - You can choose if you want to allow them:

**Privacy Policy**

You can read about our cookies and privacy settings in detail on our Privacy Policy Page.

Privacy Policy

Accept settings    Hide notification only

EXHIBIT 3



# EXHIBIT 4

# ATTACHMENT A

## CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

**Attachment A - Infringement of U.S. Patent No. 9,855,001**

This chart applies the claims of Magnolia's U.S. Patent No. 9,855,001 ("the '001 patent") against Kurin's blood culture collection sets numbered K-11221, K-11223, K-11225, D-11221, D-11223, D-21223, M-11221, M-21221, M-11223, M-21223, T-11221, T-21221, T-11223, T-21223, D-PIV12, D-PIV18, M-PIV12, M-PIV18, T-PIV12, T-PIV18, S-PIV4, and S-PIV10, (collectively, "the Accused Products").[1]

Based on the information Kurin has provided to date, it is Magnolia's understand that Accused Products K-11221, K-11223, K-11225 are models submitted to the FDA for approval. March 22, 2016 Email Re Kurin Numbering System [KUR-MAG-DE294038]. It is also Magnolia's understanding that one or more of these "K" versions of the Kurin Lock did not include the umbrella valve that is present in the Kurin Lock device that is commercially available today, however, in all other respects those earlier "K" versions that did not include the umbrella valve were the same or substantially similar to the current, commercially available Kurin Lock device.

The Accused Products are substantially similar to one another. D.I. 59 at 4 (Kurin stating that "Magnolia asserted 82 claims – later reduced to 44 – targeting a single Kurin device."). Each of the Accused Products includes a Kurin Lock device. *See, e.g.*, MAG-DEL0000688–693 (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture."). Kurin's website includes a "How it Works" page that includes a single animation that purports to describe and depict the operation of the Kurin Blood Collection Set that includes the Kurin Lock device. (https://www.kurin.com/skin-contaminant-discard/). The listing of Accused Products is intended to be a list of all commercially available versions of Kurin's blood culture collection sets.

Based on the information presently available to Magnolia, the Kurin Lock device consists of five (5) individual parts. *See* Dkt. 94, Declaration of Jonathan Hangartner in Support of Kurin's Samples of the Accused Product; 2020-07-01 Motion for Leave Hearing Transcript. As described in the Hangartner Declaration, those five components are a top plate, a cap, an umbrella valve and a porous plug. *Id. See also* Kurin Drawing Numbers KUR-2005 (Top Housing) [KUR-MAG-DE001623-24], KUR-2006 (Bottom Housing) [KUR-MAG-DE001625-26], KUR-2007 (Cap) [KUR-MAG-DE001627], KUR-6010 (Hydrophobic Self-Sealing Plug) [KUR-MAG-DE001655], KUR-6011 (Umbrella Valve) [KUR-MAG-DE001656], and KUR-8036 (Assembly) [KUR-MAG-DE001659], MiniValve Part Number UM 053.002 SD (Umbrella Valve and seating suggestion) [KUR-MAG-DE003703];

---

[1] To the extent Kurin is selling other blood culture collection sets that use the Kurin Lock device, Magnolia accuses those versions as well and the analysis in this chart applies to those versions.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

Manufacturing Procedure MP-016 [KUR-MAG-DE000104-124] and the duplicates of these drawings produced throughout KUR-MAG-DE000138-2362.  A table (shown below) produced along with Kurin's engineering drawings shows that the same set of engineering drawings is for the Kurin Lock device found in every version of the Accused Product:

| top level | D-11223 | D-11223 | D-21223 | D-21223 | D-PIV12 | D-PIV18 | M-11221 | M-11223 | M-21223 | M-32123 | M-PIV12 | M-PIV18 | T-11221 | T-11223 | T-21221 | T-21221 | T-PIV12 | T-PIV18 | S-PIV12 | S-PIV18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IFU | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4029 | KUR-4029 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4029 | KUR-4071 | KUR-4071 | KUR-4090 |
| lower box label | KUR-4019 | KUR-4010 | KUR-4020 | KUR-4021 | KUR-4076 | KUR-4194 | KUR-4111 | KUR-4117 | KUR-4024 | KUR-4027 | KUR-4024 | KUR-4042 | KUR-4040 | KUR-4040 | KUR-4040 | KUR-4040 | KUR-4046 | KUR-4082 | KUR-4085 | KUR-4068 |
| shipper box label | KUR-4013 | KUR-4004 | KUR-4022 | KUR-4022 | KUR-4040 | KUR-4047 | KUR-4215 | KUR-4216 | KUR-4025 | KUR-4028 | KUR-4025 | KUR-4043 | KUR-4041 | KUR-4057 | KUR-4095 | KUR-4056 | KUR-4047 | KUR-4087 | KUR-4095 | KUR-4089 |
| tape | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 | KUR-5003 |
| inner carton | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5021 | KUR-5040 | KUR-5040 |
| shipper box | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5022 | KUR-5041 | KUR-5041 |
| label | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 |
| packaged device | KUR-8022 | KUR-8023 | KUR-8024 | KUR-8025 | KUR-8028 | KUR-8038 | KUR-8020 | KUR-8021 | KUR-8026 | KUR-8027 | KUR-8029 | KUR-8037 | KUR-8031 | KUR-8092 | KUR-8013 | KUR-8034 | KUR-8030 | KUR-8039 | KUR-8040 | KUR-8041 |
| adhesive | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 |
| proof label | KUR-4005 | KUR-4005 | KUR-4007 | KUR-4007 | KUR-4075 | KUR-4075 | KUR-4073 | KUR-4073 | KUR-4076 | KUR-4076 | KUR-4041 | KUR-4078 | KUR-4046 | KUR-4051 | KUR-4054 | KUR-4054 | KUR-4045 | KUR-4081 | KUR-4084 | KUR-4097 |
| tray/pouch | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5017 | KUR-5036 | KUR-5036 |
| lot stock | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5018 | 5037 label't | 5037 label't |
| collection adapter | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | | |
| collection set | KUR-6009 | KUR-6012 | KUR-6013 | | | | KUR-6008 | KUR-6008 | KUR-6008 | KUR-6013 | KUR-6005 | | KUR-6009 | KUR-6009 | KUR-6012 | KUR-6013 | KUR-6013 | | | |
| luer adapter | | | | | KUR-6007 | KUR-6007 | | | | | KUR-6007 | KUR-6007 | | | | | | | | |
| male luer | | | | | KUR-6020 | KUR-6020 | | | | | KUR-6020 | KUR-6020 | | | | | KUR-6020 | KUR-6020 | KUR-6020 | KUR-6020 |
| female luer | | | | | KUR-6021 | KUR-6021 | | | | | KUR-6021 | KUR-6021 | | | | | KUR-6021 | KUR-6021 | KUR-6021 | KUR-6021 |
| vented cap for male luer | | | | | KUR-6022 | KUR-6022 | | | | | KUR-6022 | | | | | | KUR-6022 | KUR-6022 | KUR-6022 | |
| tubing | | | | | KUR-6023-1 | KUR-6023-1 | | | | | KUR-6023-1 | KUR-6023-1 | | | | | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 |
| tubing | | | | | KUR-6023-9 | KUR-6023-9 | | | | | KUR-6023-9 | KUR-6023-9 | | | | | KUR-6023-9 | KUR-6023-9 | | |
| cap for female luer | | | | | KUR-6025 | | | | | | | KUR-6025 | | | | | KUR-6025 | KUR-6025 | KUR-6025 | KUR-6028 |
| lock | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 |
| top housing | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 |
| trim housing | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 |
| cap | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 |
| adhesive | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 |
| lubricant | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 |
| plug | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 |
| valve | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 |

KUR-MAG-DE001621 (boxed to show the Kurin Lock device schematics are the same for all Accused Products).

As such, Magnolia contends that, for purposes of the infringement analysis, the Accused Products are identical except where otherwise indicated below.  Magnolia reserves its right to amend these contentions as additional information becomes available.

In addition to the exemplary documents provided in the chart, Magnolia also relies on and/or reserves the right to rely on the 510(k) submissions for the Accused Products produced by Kurin at KUR-MAG-DE000137 through KUR-MAG-DE001620, the engineering drawings for the Accused Products produced by Kurin at KUR-MAG-DE001621 through KUR-MAG-DE001869, and Kurin's patent applications describing the Accused Products, including U.S. Patent Appl. Pub. 2018/0271425 [MAG-DEL0000720].

| Claim 1 | Accused Products |
|---|---|
| 1. An apparatus for obtaining a bodily fluid sample from a | Each of the Accused Products is an apparatus for obtaining a bodily fluid sample from a patient with reduced contamination.  See, e.g., |

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



6

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



51

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



52

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



53

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



55

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

## **EXHIBIT 18**

**MAGNOLIA'S OPPOSITION TO KURIN'S MOTION *IN LIMINE* NO. 2: TO PRECLUDE EVIDENCE OR ARGUMENT THAT PRE-PATENT ISSUANCE BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS**

Kurin's Motion *in Limine* No. 2 makes the same arguments as its Motion for Summary Judgment of No Enhanced Damages that the Court denied.  D.I. 305 at 1–2; D.I. 396.  The Court should deny the present motion as well.

Numerous courts, including the Federal Circuit and this District, have held that pre-issuance conduct may support post-issuance willfulness.  *E.g.*, *Minn. Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992) ("[A]lthough willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to support a finding of willfulness."); *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970, 978–79 (Fed. Cir. 1986) (holding that willfulness is determined based on "the totality of the circumstances" and rejecting argument that "the allegedly improper copying took place before the patent was issued and therefore cannot be considered").  Indeed, in *Sonos, Inc. v. D&M Holdings Inc.*, Judge Bryson surveyed cases addressing this precise question and concluded that evidence of "particularly egregious behavior"—such as Kurin's here—is relevant and admissible.  C.A. No. 14-1330-WCB, 2017 WL 5633204, at *4 (D. Del. Nov. 21, 2017); *see also Idenix Pharms. LLC v. Gilead Scis., Inc.*, C.A. No. 13-1987-LPS, 2016 WL 7380530, at *1 (D. Del. Dec. 4, 2016); *Chimie v. PPG Indus., Inc.*, 218 F.R.D. 416, 422 (D. Del. 2003).

Kurin ignores these cases, and the cases it does cite are inapposite.  Mot. at 1.  For example, the Federal Circuit has rejected the interpretation of *State Industries*

Ex. 18 – Magnolia's Opposition to Kurin's MIL 2

that Kurin proposes.  *Shiley, Inc. v. Bentley Lab'ys, Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986) ("*State* does not, as Bentley contends, hold that a finding of willful infringement can not stand whenever manufacture of an accused device begins prior to the issuance of a patent.  On the contrary, *State* is in harmony with our prior and subsequent case law, which looks to the 'totality of the circumstances presented in the case.'").  Similarly, in *Gustafson*, the Federal Circuit cited many of its own decisions sustaining willfulness based on pre-issuance conduct and held that "[w]hether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from all the circumstances."  *Gustafson, Inc. v. Intersystems Indus. Prod., Inc.*, 897 F.2d 508, 510–11 (Fed. Cir. 1990).

This is not a case where Kurin simply conducted competitive intelligence gathering on an unpatented product, as Kurin suggests in its brief.  Mot. at 2–3; *cf. Bioverativ Inc. v. CSL Behring LLC*, C.A. No. 17-914-RGA, 2020 WL 1332921, at *3 (D. Del. Mar. 23, 2020) (excluding evidence of misappropriation of information regarding an unpatented product before the patents' priority date).  There is no dispute that the patents-in-suit claim priority to applications filed before Kurin was even founded and that Magnolia's Steripath product practices the asserted claims.

As Magnolia explained in its opposition to Kurin's Motion for Summary Judgment, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 18 – Magnolia's Opposition to Kurin's MIL 2

███████████████████████████████   *See* D.I. 344 at 2–7.   ███████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████   D.I. 346, Ex. 1 at 521:6–20.  This entire course of

conduct is relevant to Kurin's knowledge and state of mind when the patents-in-

suit issued and whether Kurin's infringement of them after that date was willful.

While the evidence may be prejudicial to Kurin, there is no *unfair* prejudice,

especially because the Court has bifurcated the issue of willfulness from

infringement.  And the conduct plainly rises to the level that may be presented to

the jury so that it may consider "the totality of the circumstances."  *See* D.I. 344 at

2–7; *Sonos*, 2017 WL 5633204, at *4; *Chimie*, 218 F.R.D. 416, at 422.

Finally, Kurin's pre-issuance conduct is independently relevant to secondary

considerations of non-obviousness.  While Kurin claims in a footnote that it is not,

the case it cites does not support that proposition.  Mot. at 1 n.1 (citing *Iron Grip

Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  To

the contrary, in *Minnesota Mining*, the Federal Circuit relied on pre-issuance

conduct including copying in its discussion of secondary considerations.  976 F.2d

at 1575.  The evidence should be admitted for this reason as well.

Ex. 18 – Magnolia's Opposition to Kurin's MIL 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

              Plaintiff,

    v.

KURIN, INC.,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC
(CJB)

███████████████████

**KURIN'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 2 TO
PRECLUDE EVIDENCE OR ARGUMENT THAT PRE-PATENT
ISSUANCE BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Kurin, Inc.*

June 3, 2022

First, this Court did not review Kurin's Motion for Summary Judgment.  D.I. 396.  Second, courts, including in Magnolia's inapposite cases, consider admitting evidence of pre-patent issuance conduct only when it is "particularly egregious"— under fact patterns entirely different from our case.[1]  Not a single one of those cases involved these facts—asserted claims drafted exclusively *after* the defendant's product was publicly available.  Unsurprisingly then, Magnolia is unable to credibly explain how even a single piece of pre-issuance evidence it seeks to rely on could show "egregious" conduct ████████████████████████████.  Third, on secondary considerations, Magnolia alleges pre-issuance conduct is relevant only to

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ *Iron*

*Grip Barbell Co. Inc.* v. *USA sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). █

███████████████████████████████████████████████████

██████████████████████████████████████████████ *See,*

*e.g.* Ex. 7; Ex. 8 (entirely different types of structures identified for, *e.g.*, reservoir).

---

[1] In *Sonos*, the factual allegations were not before Judge Bryson, and he ordered the plaintiff to provide a detailed account of "any such evidence or argument" before offering it.  2017 WL 5633204, at *4.  In *3M*, the defendant stole and attempted to patent trade secrets while plaintiff's patents were pending and faithfully copied other products.  *Kaufman* also involved a faithful copy.  In *Idenix* the court only ruled that pre-patent conduct was not "absolutely preclude[d]."  2016 WL 7380530, at *1.  *Chimie* was an order to log pre-patent communications.

RICHARDS, LAYTON & FINGER, P.A.

OF COUNSEL:

/s/ Kelly E. Farnan

Nicholas Groombridge

Kelly E. Farnan (#4395)

Catherine Nyarady

Richards, Layton & Finger, P.A.

Kripa Raman

920 N. King Street

Joshua D. Reich

One Rodney Square

Ariella Barel

Wilmington, DE 19801

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

(302) 651-7700

1285 Avenue of the Americas

Farnan@rlf.com

New York, NY 10019-6064

(212) 373-3000

Attorneys for Defendant Kurin, Inc.

ngroombridge@paulweiss.com

cnyarady@paulweiss.com

kraman@paulweiss.com

jreich@paulweiss.com

abarel@paulweiss.com

June 3, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

                      Plaintiff,

       v.

KURIN, INC.,

                   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC
(CJB)

███████████████████

## DECLARATION OF ARIELLA BAREL IN SUPPORT
## OF KURIN, INC.'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE*
## NO. 2 TO PRECLUDE EVIDENCE OR ARGUMENT THAT PRE-
## ISSUANCE BEHAVIOR SUPPORTS A FINDING OF WILLFULNESS

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action. I have been admitted *pro hac vice* for this matter. I respectfully submit this Declaration in support of Kurin's reply in support of its Motion *in Limine*, which is filed herewith.

1.     Attached hereto as **Exhibit 7** is a true and correct copy of an excerpt of Attachment B to Magnolia's First Amended Infringement Contentions, dated July 17, 2020.

2.      Attached hereto as **Exhibit 8** is a true and correct copy of an excerpt of Plaintiff Magnolia Medical Technologies, Inc.'s Amended Supplemental Objections and Responses to Defendant Kurin, Inc.'s Fourth Set of Interrogatories (No. 11), dated December 1, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2022.

*/s/ Ariella Barel*
Ariella Barel

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) | |
| Defendant. | ) ) ) | |

## **EXHIBIT 19**

**KURIN'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR REGULATORY DOCUMENTS IS EVIDENCE OF INFRINGEMENT**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| KURIN, INC., | ) ) | ██████████████ |
| Defendant. | ) ) ) ) | |

**KURIN'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR REGULATORY DOCUMENTS IS EVIDENCE OF INFRINGEMENT**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Kurin, Inc.*

May 17, 2022

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ferring Pharms. Inc.* v. *Par Pharm., Inc.*,
  267 F. Supp. 3d 501 (D. Del. 2017) ....................................................................1, 2

*Intel. Corp.* v. *Tela Innovations, Inc.*,
  2021 WL 1222622 (N.D. Cal. Feb. 11, 2021) .........................................................2

*Plastic Omnium Advanced Innovation & Rsch.* v. *Donghee Am., Inc.*,
  943 F.3d 929 (Fed. Cir. 2019).............................................................................2, 3

**Other Authorities**

Fed. R. Evid. 401 .............................................................................................................1

Fed. R. Evid. 402 .............................................................................................................1

Fed. R. Evid. 403 .............................................................................................................1

Pursuant to Federal Rules of Evidence 401–403, Magnolia should be precluded from introducing evidence or argument that ███████████████

████████████████████████████████████████████████████

███████████ is evidence of infringement.  Infringement requires the fact-finder to **compare the construed claims to the device at issue**.  *Ferring Pharms. Inc.* v. *Par Pharm., Inc.*, 267 F. Supp. 3d 501, 503 (D. Del. 2017).  Magnolia and its expert, Dr. Santiago, have had ample opportunity to study and test the device's functionality, and compare this to the claim limitations.  They should not be allowed to rely instead on descriptions untethered to the Court's claim construction or the patents-in-suit, as infringement evidence.  Such descriptions are irrelevant and unfairly prejudicial.

Magnolia and its expert have conducted testing and other direct analysis of how the Kurin device functions for purposes of analyzing infringement, including particularly the "diverter" and "sequester" claim limitations of the patents-in-suit. Because this most probative, direct evidence undermines Magnolia's case, Magnolia and Dr. Santiago have sought to prop up their case improperly by pointing to Kurin's descriptions of its product, many of which are public and antedate the filing of the claims in suit such that Magnolia could refer to them in drafting such claims.

**Diverter:**  Magnolia's infringement contentions and Dr. Santiago's infringement report rely heavily on ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Ex. 1 ¶¶ 147–155.

But in this case, the term "diverter" was construed to be a means-plus-function limitation with a very specific meaning.  D.I. 75 at 2.  Unlike the testing evidence or other actual technical analysis of the accused product that reveals whether the accused product actually functions as such a "diverter", Kurin's ***descriptions*** of the device are irrelevant to whether it falls within the specific and narrow meaning accorded to this claim term.  *Plastic Omnium Advanced Innovation & Rsch.* v. *Donghee Am., Inc.*, 943 F.3d 929, 935–36 (Fed. Cir. 2019) (defendant's product literature using the term 'parison' could not establish whether construed claim term 'extruded parison' was met); *Ferring Pharms.*, 267 F. Supp. 3d at 507 ("The word defendant uses to characterize its own process is neither dispositive, nor even persuasive in the face of substantial evidence that its process employs [a different approach]."); *Intel. Corp.* v. *Tela Innovations, Inc.*, 2021 WL 1222622, at *4–5 (N.D. Cal. Feb. 11, 2021) ("[Defendant's] internal nomenclature cannot change… its [process] or the agreed construction.").

████████████████████████████████████████

████████████████████████████████████ and this evidence should not be presented to the jury.  Any probative value is marginal at best, and would be far outweighed by the certainty of prejudice and confusion this evidence will cause—the jury will improperly treat Kurin's descriptions as

admissions.  Introduction of this evidence and testimony will taint the entire case.

**Sequester:**  The same analysis applies to "sequester."  Magnolia and Dr. Santiago again rely on ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████" *See* Ex. 1 ¶¶ 180–183, *see also* ¶¶ 103, 107–118; Ex. 2 at 19, 27.  But, the proper analysis is not how Kurin or its employees describe its device.  *Plastic Omnium*, 943 F.3d at 935–36. Magnolia must demonstrate how the device satisfies the limitation.  Inundating the jury with documents and testimony describing the device—as opposed to the readily available testing and other evidence that exists demonstrating whether the device actually "sequesters" as the claims require—is prejudicial for the same reasons as described  above.  ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

Rather than demonstrate how the device satisfies the limitations ***within the meaning of the asserted claims***, it appears that Magnolia and Dr. Santiago will rely on ███████████████████ to convince the jury that Kurin admitted its product diverts and sequesters to disguise the holes in its case.  This approach is improper and highly prejudicial.

For the foregoing reasons, the Court should grant this motion *in limine*.

RICHARDS, LAYTON & FINGER, P.A.

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ngroombridge@paulweiss.com
cnyarady@paulweiss.com
kraman@paulweiss.com
jreich@paulweiss.com
abarel@paulweiss.com

*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

May 17, 2022

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

                      Plaintiff,

    v.

KURIN, INC.,

                     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC (CJB)

███████████████████

## DECLARATION OF ARIELLA BAREL IN SUPPORT OF KURIN, INC.'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR <u>REGULATORY DOCUMENTS IS EVIDENCE OF INFRINGEMENT</u>

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's Motion *in Limine*, which is filed herewith.

1.      Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt of the Opening Expert Report of Dr. Juan G. Santiago Regarding Infringement of U.S. Patent Nos. 9,855,001 and 10,039,483, dated January 15, 2021.

2.      Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt of

Attachment A to Magnolia's Infringement Contentions, dated July 17, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2022.

*/s/ Ariella Barel*
Ariella Barel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

                Plaintiff,

    v.

KURIN, INC.,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 1:19-cv-00097-CFC (CJB)

███████████████████

### DECLARATION OF ARIELLA BAREL IN SUPPORT OF
### KURIN, INC.'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE
### OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR
### REGULATORY DOCUMENTS IS EVIDENCE OF INFRINGEMENT

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action. I have been admitted *pro hac vice* for this matter. I respectfully submit this Declaration in support of Kurin's Motion *in Limine*, which is filed herewith.

1.    Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt of the Opening Expert Report of Dr. Juan G. Santiago Regarding Infringement of U.S. Patent Nos. 9,855,001 and 10,039,483, dated January 15, 2021.

2.     Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt of Attachment A to Magnolia's Infringement Contentions, dated July 17, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 17, 2022.

*/s/ Ariella Barel*
Ariella Barel

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAGNOLIA MEDICAL
TECHNOLOGIES, INC.,

Plaintiff,

v.

KURIN, INC.,

Defendant.

C.A. No. 19-00097-CFC

**CONFIDENTIAL**

## OPENING EXPERT REPORT OF DR. JUAN G. SANTIAGO REGARDING INFRINGEMENT OF U.S. PATENT NOS. 9,855,001 AND 10,039,483

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



74

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



75

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



76

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



78

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



79

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



80

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



81

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



82

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



83

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



84

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



86

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



87

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



88

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



89

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



90

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

and that such "[f]alse positive results from microbial tests can cause a patient to be

unnecessarily subjected to one or more anti-microbial therapies…which may cause

anguish and inconvenience to the patient, as well as produce an unnecessary

burden and expense to the health care system." '001 patent at 1:63-2:5.[4]   To

tackle this problem, Dr. Patton invented various systems and methods to reduce

contamination.  Among his core inventive concepts were "divert[ing] the flow of

bodily fluids from a patient" such that "an initial volume of withdrawn bodily fluid

is placed in one or more pre-sample reservoirs and is not used for the incubation in

culture media." *Id.* at 7:49-50, Abstract.  These concepts permeate each of the

embodiments described and claimed in the '001 patent.

121.   For example, as shown in Figures 3A/3B, one way of diverting an

initial blood volume is through use of a single blood flow path. *Id.* at 5:20-47.

Initially the blood (and the majority of the foreign contaminants) flow through the

---

[4] Along with dermally residing microbes, IV lines may also contain contaminants. In a study "comparing bacterial colonization of BCs [blood cultures] drawn either through venipuncture routes or from intravascular catheters," some "studies reported higher BCC [blood culture contamination] rates ranging for samples drawn via catheters (range, 3.4%-13%) than from blood obtained by venipuncture (range, 1.2%-7.3%)."  Robert Garcia et al. "Multidisciplinary team review of best practices for collection and handling of blood cultures to determine effective interventions for increasing the yield of true-positive bacteremias, reducing contamination, and eliminating false-positive central line-associated bloodstream infections" [MAG-DEL0012937] at 1225. Therefore, diverting the initial volume of blood from an IV tap is also important when using a peripheral IV configuration rather than venipuncture.

92

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

single flow path into a "pre-sample reservoir." *Id.* at 5:20-23, 5:29-41.  The flow

path consists of a "first needle" that is inserted into a fluid-containing portion of a

body (such as a vein), *id.* at 5:2-9, a "second needle" that can be inserted into the

pre-sample reservoir, *id.* at 5:20-23, and "sterile tubing" connecting the two

needles, *id.* at 5:29-32.  Through this flow path the blood travels into the pre-

sample vessel, as shown in Figure 3A (annotations and color added):



122.   When the pre-sample reservoir fills, it can be removed and replaced

with a "sample vessel" (e.g., a container for collecting and testing blood).  *Id.* at

6:16-18.  A subsequent volume of blood from the patient travels through the same

flow path but into the sample vessel, as shown in Figure 3B (annotations added):

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



Fig. 3B

The pre-sample reservoir, with its potentially contaminated blood, is kept apart from the sample vessel, reducing the likelihood that testing the blood in the sample vessel will lead to false positives.  *Id.* at 5:48-50, 5:56-62.

123.  Another way of diverting an initial blood volume, as shown in Figures 6A/6B, utilizes a flow path from the patient that branches into two separate paths, one leading to the pre-sample reservoir and the other leading to the sample vessel:



94

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

*Id.* at Figs. 6A, 6B (color added).

124.   The patent explains that "[m]any different types of diversion mechanisms can be used to divert the flow of bodily fluids from a patient," *id.* at 7:49-50, and that the diversion can take place either "manually or automatically," *id.* at 8:23-26.  In the example illustrated in Figures 6A/6B, the system includes a switchable valve (602) to allow blood to flow either toward the pre-sample reservoir or toward the sample vessel.  *Id.* at 7:50-8:6.

### B.   Prosecution History

125.   The '001 patent application was filed on March 13, 2017.  The patent application originally included 20 claims.  '001 patent file history, 2017-03-13 Claims.  A preliminary amendment was filed on the same day, March 13, 2017, canceling the original 20 claims and adding 30 new claims.  *Id.*, 2017-03-13 Preliminary Amendment & Claims.  The Applicant responded to a restriction requirement on April 11, 2017, where the Applicant noted that all pending claims read on the elected species.  *Id.*, 2017-04-11 Applicant Remarks.

126.   After a non-final rejection, I understand that the Applicant added the requirement of obtaining a bodily fluid sample from a patient "with reduced contamination" and additional requirements to the "diverter" configuration.  *Id.*, 2017-07-14 Claims.  On September 5, 2017, I understand the Examiner issued a

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



96

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



97

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

4    Q.   And you said that one of the reasons

5    you wanted them was you wanted to see what the

6    product is supposed to do.

7         What was your understanding, once

8    you educated yourself, of what the Kurin Lock is

9    supposed to do?

10        MR. HANGARTNER:  Objection.  You can

11   go ahead and answer.

12        THE WITNESS:  So, the device is

13   intended for blood collection.  The goal is

14   to reduce contamination in blood collection.

15        And it achieves that by, my

16   understanding is it is sort of a waste tube

17   process.

18        It collects the first volume of

19   blood that may have contaminants in one

20   portion, and then allows the rest of the

21   collection to go into the collection vial, to

22   reduce potential contaminations in a vial.

Page 41

1    BY MS. BROOKS:

2    Q.   And I'm sorry, you cut out again on

3    that last part.  You said reduce contaminations

4    in?

5    A.   In the collected sample.

2020-08-20 Nason Dep. Tr. at 40:4-41:5.

> **b.   1[a]: a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient; and**

133.    The Court construed the term "initial volume" (D.I. 75 at 2):

| "initial volume" | "the initial portion of blood removed from the patient and sequestered" |
|---|---|
| #001 Patent: claims 1, 4, 21-23 | |
| #483 Patent: claims 1, 8, 9, 24 | |
| #139 Patent: claims 1, 13, 19, 23, 27 | |

100

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

134.   Each of the Accused Products includes a reservoir configured to

receive an initial volume of bodily fluid withdrawn from the patient.   *See, e.g.*,

MAG-DEL0000838 (Kurin Video 07/09/2019) ("Kurin is a device designed to contain the initial volume of blood from the venipuncture site so that resident contaminants within the skin are not transferred into the blood culture sample."); MAG-DEL0826802 (Kurin Video 01/2021) ("The Kurin Lock® with Flash Technology sidelines the initial flash of blood from an accessed vein to reduce skin contaminants that enter into the blood culture sample.")

MAG-DEL0000838 at 0:44:          MAG-DEL0826802 at 0:22:

  

KUR-MAG-DE001632 (IFU_Kurin Blood Culture Collection Set with Kurin Lock™ Technology) ("The Kurin set is a sterile, single-use blood culture collection set. Kurin includes a winged needle with flexible tubing and an attached blood culture bottle holder intended for venipuncture to obtain blood culture samples. The Kurin Lock blood capture device sequesters the initial draw of blood upon venipuncture.");

KUR-MAG-DE002283 (IFU_Kurin PIV12 Blood Culture Collection Set with Kurin® Lock Technology) ("The Kurin PVV12 series of Kurin sets are sterile, single-use blood culture collection sets that include the Kurin Lock, flexible tubing, an attached blood culture bottle holder, and a male luer intended for direct connection to a freshly placed peripheral IV (PIV) catheter to obtain blood culture samples. The Kurin Lock sequesters the initial draw of blood upon first access to the peripheral catheter.")

101

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

135.    The initial volume of blood does not have to be the entire volume of blood contained in the U-shaped diversion chamber.  In my opinion, the initial volume of blood is the volume of blood that is actually sequestered in the U-shaped diversion chamber.  As shown in the testing videos, a small portion of blood near the junction may (and is expected to) escape the region bounded by the U-shaped diversion chamber.  However, the testing videos show that there is a large portion of blood that remains sequestered in the U-shaped diversion chamber. The latter is the initial volume of blood from the patient described by the patents.

136.    The U-shaped diversion chamber includes a reservoir that receives the initial volume of blood from the patient:

MAG-DEL0000838 (Kurin Video 07/09/2019) (annotated):



*See also* MAG-DEL0826802 (Kurin Video 01/2021)

KUR-MAG-DE000147 (Description of Blood Diversion):

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



KUR-MAG-DE424575 (How Kurin Works):



KUR-MAG-DE450383 ███████████████████████████████
████████████████████████████████████████████████
████████████████

137.    Bob Rogers admitted that the initial volume of blood is received in the reservoir of the U-shaped diversion chamber (also known as the side channel) of the Accused Products:

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

```
10      Q   Well, so the side channel is where the
11   first initial volume of blood goes.  Is that fair?
12         MR. HANGARTNER:  Objection.  Calls for a
13   legal conclusion.
14         THE WITNESS:  If the nurse allows, if
15   they insert a needle into the patient and the
16   patient's blood pressure is sufficient, yes, the
17   first amount of blood will go into where there is
18   an air leak, and that's the side channel.
```

2020-08-18 Rogers Dep. Tr. at 404:10-18.

      138.   Kevin Nason admitted the same:

```
17      Q.  And why is it important to try to
18   fill that side channel before the blood then
19   starts flowing down the sample path into the
20   collection chamber -- collection device?
21         MR. HANGARTNER:  Objection.
22         THE WITNESS:  Well, the function of
                              Page 59
1    that is to collect the initial volume of
2    blood in there that potentially has
3    contaminants.
```

2020-08-20 Nason Dep. Tr. at 58:17-59:3.

      **c.**    **1[b]: a diverter having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient, the diverter operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and a second operating mode in which: a) a subsequent volume of bodily fluid can flow from the inlet to the second outlet, and b) the initial volume of bodily fluid is prevented from flowing to the second outlet,**

      139.   The Court construed the term "diverter" to be a means-plus-function term (D.I. 75 at 2):

104

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



105

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

106

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



107

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



108

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



109

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



110

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



111

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



112

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



113

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

114

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

116

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



117

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

118

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



119

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



120

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



121

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



122

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



123

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



124

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



125

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



127

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



128



129

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



130

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



131

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



132

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

initial volume of bodily fluid, thereby reducing contamination of the subsequent volume of bodily fluid withdrawn from the patient.

179.    In the Kurin Lock device's first operating mode, the patient's blood pressure is greater than the air pressure escaping from the reservoir through the porous plug. ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████   Flow toward the plug is arrested as the porous plug valve absorbs moisture from blood and swells.  The pressure difference within the liquid volume of the U-shaped diversion chamber progressively decreases in magnitude as the plug seals completely. █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

The reduction in the bulk velocity of blood flow within the reservoir is consistent with a reduction in the magnitude of the axial pressure differences along the channel.   In the Kurin Lock device's second operating mode, when the porous plug valve or umbrella valve closes, the pressure differential in the reservoir equalizes and the flow is completely arrested.  Once the magnitude of pressure differences are sufficiently decreased, the diverter transitions operating mode by

133

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

causing the meniscus at the second outlet (the liquid-air interface) to burst so that

some blood enters into the second daughter channel. ████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████

████████████████████████████
████████████████████████████████
████████████████████

180.    In the first operating mode, the blood flows into the U-shaped side

channel.  As the initial volume of blood fills the U-shaped side channel and the

porous plug seals, the pressure from the blood in the U-shaped side channel

equalizes with the patient's blood pressure, which causes the second mode of

operation where the blood is directed down the sample channel:

> MAG-DEL0000838 (Kurin Video 07/09/2019) at 0:23-54 ("The initial flow
> of blood, and any contaminants therein, fills a U-shaped side channel until it
> reaches a white porous seal…. When in contact with the blood, the seal
> material is activated to lock the channel so that blood cannot exit and air
> cannot enter, blocking the initial blood and contaminants in place. With the

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

side channel sealed, a small amount of blood will bypass the contents of the side channel, flowing directly into the collection passage. The blood will advance a variable distance before automatically stopping to indicate that the set is ready for collection bottle attachment."); MAG-DEL0826802 (Kurin Video 01/2021) ("With venous access, the initial flash of blood—and contaminants within—fills a U-shaped side channel until it reaches a white porous plug. Kurin requires only about 0.15mL of precious blood, making the device ideal for peds and patients at risk for hypovolemic anemia. Although 0.15ml is a small amount, it is enough to wash out a 21 gauge needle 35 times. Once the side channel is full, blood will flow a variable distance into the adjoining sampling channel before stopping. This indicates that the set is ready for specimen collection.")

MAG-DEL0000838 at 0:30:                MAG-DEL0826802 at 0:22:

                

MAG-DEL0000838 at 0:39:                MAG-DEL0826802 at 0:47:

MAG-DEL0000838 at 0:48:                MAG-DEL0826802 at 0:47:

135

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

 

MAG-DEL0000663–670 (K162233 Summary) at 669 ("Principles of operation – The winged needle is used to access the patient's blood stream…the kurin component sequesters the initial sample of blood and the vial adapter is used to interface with a vacuum tube or culture bottle. There is no energy source, the subject device fills with blood by difference in pressure gradient.").

███████████████████████████████████████████████

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



137

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



138

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



139

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



140

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



141

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER



142

CONFIDENTIAL — PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 2

# ATTACHMENT A

## CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

**Attachment A – Infringement of U.S. Patent No. 9,855,001**

This chart applies the claims of Magnolia's U.S. Patent No. 9,855,001 ("the '001 patent") against Kurin's blood culture collection sets numbered K-11221, K-11223, K-11225, D-11221, D-21221, D-21223, M-11221, M-21221, M-11223, M-21223, T-11221, T-21221, T-11223, T-21223, D-PIV18, D-PIV12, M-PIV18, M-PIV12, T-PIV18, S-PIV4, and S-PIV10, (collectively, "the Accused Products").[1]

Based on the information Kurin has provided to date, it is Magnolia's understand that Accused Products K-11221, K-11223, K-11225 are models submitted to the FDA for approval.  March 22, 2016 Email Re Kurin Numbering System [KUR-MAG-DE294038].  It is also Magnolia's understanding that one or more of these "K" versions of the Kurin Lock did not include the umbrella valve that is present in the Kurin Lock device that is commercially available today, however, in all other respects those earlier "K" versions that did not include the umbrella valve were the same or substantially similar to the current, commercially available Kurin Lock device.

The Accused Products are substantially similar to one another.  D.I. 59 at 4 (Kurin stating that "Magnolia asserted 82 claims – later reduced to 44 – targeting a single Kurin device.").  Each of the Accused Products includes a Kurin Lock device.  *See, e.g.*, MAG-DEL0000688-693  (https://www.kurin.com/skin-contaminant-diversion/) at 688 ("The Kurin Lock® - Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful specimen diversion device that automates diversion during the routine process of drawing a blood culture.").  Kurin's website includes a "How it Works" page that includes a single animation that purports to describe and depict the operation of the Kurin Blood Collection Set that includes the Kurin Lock device. (https://www.kurin.com/skin-contaminant-discard/).  The listing of Accused Products is intended to be a list of all commercially available versions of Kurin's blood culture collection sets.

Based on the information presently available to Magnolia, the Kurin Lock device consists of five (5) individual parts. *See* Dkt. 94, Declaration of Jonathan Hangartner in Support of Kurin's Samples of the Accused Product; 2020-07-01 Motion for Leave Hearing Transcript.  As described in the Hangartner Declaration, those five components are a top plate, a bottom plate, a cap, an umbrella valve and a porous plug. *Id. See also* Kurin Drawing Numbers KUR-2005 (Top Housing) [KUR-MAG-DE001623-24], KUR-2006 (Bottom Housing) [KUR-MAG-DE001625-26], KUR-2007 (Cap) [KUR-MAG-DE001627], KUR-6010 (Hydrophobic Self-Sealing Plug) [KUR-MAG-DE001655], KUR-6011 (Umbrella Valve) [KUR-MAG-DE001656], and KUR-8036 (Assembly) [KUR-MAG-DE001659], MiniValve Part Number UM 053.002 SD (Umbrella Valve and seating suggestion) [KUR-MAG-DE003703];

---

[1] To the extent Kurin is selling other blood culture collection sets that use the Kurin Lock device, Magnolia accuses those versions as well and the analysis in this chart applies to those versions.

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

Manufacturing Procedure MP-016 [KUR-MAG-DE000104-124] and the duplicates of these drawings produced throughout KUR-MAG-DE000138-2362. A table (shown below) produced along with Kurin's engineering drawings shows that the same set of engineering drawings is for the Kurin Lock device found in every version of the Accused Product:

| top level | D-11221 | D-11223 | D-21221 | D-21223 | D-PIV12 | D-PIV18 | M-11221 | M-11223 | M-21223 | M-PIV12 | M-PIV18 | T-11221 | T-11223 | T-21221 | T-21223 | T-PIV12 | T-PIV18 | S-PIV14 | S-PIV18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IFU | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4029 | KUR-4071 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4000 | KUR-4029 | KUR-4071 | KUR-4090 | KUR-4091 |
| lower box label | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4017 | KUR-4017 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4001 | KUR-4017 | KUR-4071 | KUR-4090 | KUR-4089 |
| Shipper box label | KUR-4013 | KUR-4013 | KUR-4019 | KUR-4019 | KUR-4040 | KUR-4040 | KUR-4015 | KUR-4015 | KUR-4025 | KUR-4025 | KUR-4043 | KUR-4046 | KUR-4046 | KUR-4051 | KUR-4051 | KUR-4040 | KUR-4047 | KUR-4095 | KUR-4088 |
| tape | KUR-4023 | KUR-4023 | KUR-4024 | KUR-4024 | KUR-4025 | KUR-4025 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5021 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5040 | KUR-5040 |
| inner carton | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5023 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5022 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5024 | KUR-5041 | KUR-5041 |
| shipper box | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5031 | KUR-5041 | KUR-5041 |
| label | KUR-4022 | KUR-4022 | KUR-4023 | KUR-4023 | KUR-4038 | KUR-4038 | KUR-4020 | KUR-4020 | KUR-4026 | KUR-4029 | KUR-8029 | KUR-8031 | KUR-8031 | KUR-8034 | KUR-8033 | KUR-8030 | KUR-8039 | KUR-8040 | KUR-8041 |
| packaged device | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 | KUR-3001 |
| adhesive | KUR-4005 | KUR-4005 | KUR-4017 | KUR-4017 | KUR-4075 | KUR-4075 | KUR-4073 | KUR-4073 | KUR-4076 | KUR-4076 | KUR-4041 | KUR-4046 | KUR-4046 | KUR-4054 | KUR-4054 | KUR-4045 | KUR-4045 | KUR-4084 | KUR-4097 |
| prod label | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5017 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5015 | KUR-5036 | KUR-5036 |
| tray/pouch | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5018 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | KUR-5016 | 5037 label | 5037 label |
| lot stock | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6006 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6005 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 | KUR-6024 |  |  |
| collection adapter | KUR-6009 | KUR-6009 | KUR-6012 | KUR-6012 | KUR-6013 | KUR-6013 | KUR-6008 | KUR-6008 | KUR-6008 | KUR-6009 | KUR-6009 | KUR-6009 | KUR-6009 | KUR-6012 | KUR-6012 | KUR-6012 | KUR-6013 | KUR-6025 | KUR-6028 |
| collection set |  |  |  |  | KUR-6007 | KUR-6007 |  |  |  | KUR-6007 | KUR-6007 |  |  |  |  |  |  |  |  |
| luer adapter |  |  |  |  | KUR-6020 | KUR-6020 |  |  |  | KUR-6020 | KUR-6020 |  |  |  |  | KUR-6020 | KUR-6020 | KUR-6020 | KUR-6020 |
| male luer |  |  |  |  | KUR-6021 | KUR-6021 |  |  |  | KUR-6021 | KUR-6021 |  |  |  |  | KUR-6021 | KUR-6021 | KUR-6021 | KUR-6021 |
| female luer |  |  |  |  | KUR-6022 | KUR-6022 |  |  |  | KUR-6022 | KUR-6022 |  |  |  |  | KUR-6022 | KUR-6022 | KUR-6022 | KUR-6022 |
| vented cap for male luer |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| tubing |  |  |  |  | KUR-6023-1 | KUR-6023-1 |  |  |  | KUR-6023-1 | KUR-6023-1 |  |  |  |  | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 | KUR-6023-1 |
| tubing |  |  |  |  | KUR-6023-9 | KUR-6023-9 |  |  |  | KUR-6023-9 | KUR-6023-9 |  |  |  |  | KUR-6023-9 | KUR-6023-9 |  |  |
| extension set |  |  |  |  |  |  |  |  |  |  | KUR-6025 |  |  |  |  |  |  | KUR-6025 | KUR-6025 |
| cap for female luer |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | KUR-6028 | KUR-6028 |
| lock | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 | KUR-8036 |
| top housing | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 | KUR-2005 |
| trim housing | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 | KUR-2006 |
| cap | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 | KUR-2007 |
| adhesive | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 | KUR-3000 |
| lubricant | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 | KUR-3002 |
| plug | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 | KUR-6010 |
| valve | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 | KUR-6011 |

KUR-MAG-DE001621 (boxed to show the Kurin Lock device schematics are the same for all Accused Products).

As such, Magnolia contends that, for purposes of the infringement analysis, the Accused Products are identical except where otherwise indicated below. Magnolia reserves its right to amend these contentions as additional information becomes available.

In addition to the exemplary documents provided in the chart, Magnolia also relies on and/or reserves the right to rely on the 510(k) submissions for the Accused Products produced by Kurin at KUR-MAG-DE000137 through KUR-MAG-DE001620, the engineering drawings for the Accused Products produced by Kurin at KUR-MAG-DE001621 through KUR-MAG-DE001869, and Kurin's patent applications describing the Accused Products, including U.S. Patent Appl. Pub. 2018/0271425 [MAG-DEL0000720].

| Claim 1 | Accused Products |
|---|---|
| 1. An apparatus for obtaining a bodily fluid sample from a | Each of the Accused Products is an apparatus for obtaining a bodily fluid sample from a patient with reduced contamination. *See, e.g.,* |

Attachment A



CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



20

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



26

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

Attachment A



CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 19-97-CFC (CJB) |
| KURIN, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

## **EXHIBIT 19**

**MAGNOLIA'S OPPOSITION TO KURIN'S MOTION *IN LIMINE* NO. 3:
TO EXCLUDE EVIDENCE OR ARGUMENT THAT
KURIN'S WORD CHOICE IN MARKETING OR REGULATORY
DOCUMENTS IS EVIDENCE OF INFRINGEMENT**

Kurin seeks to exclude its own "FDA or marketing documents, emails, or other materials" that describe its accused product simply because they are inconsistent with the non-infringement arguments it now makes.  It cannot do so.

Courts routinely consider a defendant's descriptions of its product when assessing infringement.  *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1320–21 (Fed. Cir. 2014) (finding that defendant's "technical design documents[,] internal technical presentations[,] . . . planning documents, internal emails, and presentations" constituted substantial evidence of infringement); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1329 (Fed. Cir. 2021) (considering defendant's internal documents as evidence of infringement); *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1373 (Fed. Cir. 2004) (same).  Such evidence may include statements to the FDA, since there is no reason why "a fact finder should ignore a party's representation to a federal regulatory body that is directly on point." *Intendis GMBH v. Glenmark Pharms. Inc., USA*, 822 F.3d 1355, 1362 (Fed. Cir. 2016); *see also Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1385 (Fed. Cir. 2009).

During this litigation, Kurin has made numerous claims about the accused Kurin Lock that are inconsistent with its prior descriptions of the device.  For example, Kurin now asserts that "there is no evidence that the Kurin Lock 'sequesters' blood or contaminants."  D.I. 309 at 1.  But Kurin repeatedly

Ex. 19 – Magnolia's Opposition to Kurin's MIL 3

represented to the FDA and its customers that the Kurin Lock "sequesters the

initial draw of blood," Ex. 19.A (MAG-DEL0000663) at -666, and ██████████

████████████████████████████ Ex. 19.B (KUR-MAG-DE424575) at

-575.  It is proper for Magnolia and its expert, Dr. Santiago, to use such evidence

to corroborate Dr. Santiago's testing showing sequestration and his conclusions

regarding infringement.  *See nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317,

1323 (Fed. Cir. 2006) (noting that plaintiff's expert "supported his opinion by

relying on [defendant's] own technical documents").  Indeed, the Federal Circuit

has affirmed attorneys' fees where a defendant, among other things, "present[ed]

weak non-infringement theories that were contrary to . . . [its] own internal

documents."  *SRI Int'l*, 14 F.4th at 1332.

Kurin argues that its documents do not use the claim terms consistently with

the Court's constructions but tellingly does not discuss the constructions

themselves.  The Court held that the term "sequester" should be given its plain and

ordinary meaning and rejected Kurin's request for another construction.  Ex. 19.C

(Claim Construction Hr'g Tr.) at 19:1–20:1, Apr. 5, 2020.  Accordingly, Kurin's

use of the word "sequester" in communications with the FDA and clinicians who

use the product is directly relevant.  Similarly, although the Court construed

"diverter" in the '001 Patent to be a means-plus-function term, the function it

assigned is "to divert (or direct) fluid flow."  D.I. 75 at 2.  The claims also use

Ex. 19 – Magnolia's Opposition to Kurin's MIL 3

"divert" independently of "diverter." '001 Patent at 13:19. Kurin's documents that state that the Kurin Lock "automatically diverts the initial aliquot of blood," *e.g.*, Ex. 19.D (MAG-DEL0000680) at -680, are thus probative of that function.

Kurin does not cite a single case excluding a defendant's descriptions of its own product.[1] Kurin also fails to cite a case to support its suggestion that evidence from public documents predating the filing of the asserted claims is somehow improper because Magnolia could have referred to those documents in drafting the claims. There is no prohibition on drafting claims to exclude a competitor's product. *See, e.g.*, *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988); *see also* Ex. 15 (Magnolia's Mot. Lim. No. 2). In any event, the priority applications disclosing diverting and sequestering long predate Kurin's product, as do claims in predecessor patents reciting those concepts. *E.g.*, U.S. Patent No. 8,864,684 cls. 9, 12 (divert); No. 8,231,546 cls. 13, 25 (sequester).

Kurin's descriptions of its own product are highly probative of how that product functions and the Court should therefore deny Kurin's Motion *in Limine*.

---

[1] *Ferring Pharms. Inc. v. Par Pharm., Inc.* found after trial that significant evidence contradicted descriptions in defendant's documents. 267 F. Supp. 3d 501, 507 (D. Del. 2017). *Plastic Omnium* and *Intel Corp.* considered defendant's documents and concluded that they used claim terms in a manner inconsistent with their express constructions, which were different than their plain and ordinary meanings. *See Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 943 F.3d 929, 936 (Fed. Cir. 2019); *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2021 WL 1222622, at *5 (N.D. Cal. Feb. 11, 2021).

Ex. 19 – Magnolia's Opposition to Kurin's MIL 3

# EXHIBIT 19.A

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD  20993-0002

December 23, 2016

Pathway LLC.
c/o Mark Job
Regulatory Technology Services LLC
1394 25th Street North West
Buffalo, MN 55313

Re: K162233
    Trade/Device Name: Kurin Blood Culture Collection Set
    Regulation Number: 21 CFR 862.1675
    Regulation Name: Blood Specimen Collection Set
    Regulatory Class: Class II
    Product Code: JKA
    Dated: December 1, 2016
    Received: December 8, 2016

Dear Mr. Mark Job:

We have reviewed your Section 510(k) premarket notification of intent to market the device
referenced above and have determined the device is substantially equivalent (for the indications
for use stated in the enclosure) to legally marketed predicate devices marketed in interstate
commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to
devices that have been reclassified in accordance with the provisions of the Federal Food, Drug,
and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA).
You may, therefore, market the device, subject to the general controls provisions of the Act. The
general controls provisions of the Act include requirements for annual registration, listing of
devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration. Please note: CDRH does not evaluate information related to contract liability
warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA),
it may be subject to additional controls. Existing major regulations affecting your device can be
found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may
publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean
that FDA has made a determination that your device complies with other requirements of the Act
or any Federal statutes and regulations administered by other Federal agencies. You must
comply with all the Act's requirements, including, but not limited to: registration and listing (21

MAG-DEL0000663

Page 2 – Mr. Mark Job

CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801), please contact the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm for the CDRH's Office of Surveillance and Biometrics/Division of Postmarket Surveillance.

You may obtain other general information on your responsibilities under the Act from the Division of Industry and Consumer Education at its toll-free number (800) 638-2041 or (301) 796-7100 or at its Internet address http://www.fda.gov/MedicalDevices/ResourcesforYou/Industry/default.htm.

Sincerely,

*Tejashri Purohit-Sheth, M.D.*

**Tejashri Purohit-Sheth, M.D.**
**Clinical Deputy Director**
**DAGRID/ODE/CDRH    FOR**

Tina Kiang, Ph.D.
Acting Director
Division of Anesthesiology, General Hospital,
  Respiratory, Infection Control and Dental Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

Form Approved: OMB No. 0910-0120
Expiration Date: January 31, 2017
*See PRA Statement below.*

## Indications for Use

510(k) Number *(if known)*
K162233

Device Name
Kurin Blood Culture Collection Set

Indications for Use *(Describe)*
The Kurin Blood Culture Collection Set is a winged blood collection needle with flexible tubing intended for venipuncture to obtain blood samples. It is provided with a safety shield for covering the used venipuncture needle prior to disposal to aid in the prevention of needlestick injury if manually activated after the blood draw. For blood collection, the set also includes a safety shield and apparatus for connection to vacuum based collection vials.

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)          ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

### CONTINUE ON A SEPARATE PAGE IF NEEDED.

This section applies only to requirements of the Paperwork Reduction Act of 1995.

### *DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.*

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

MAG-DEL0000665

**510(k) Summary**

| | | |
|---|---|---|
| A. | **Submitter:** | Pathway LLC, on behalf of Calliope Solutions, Inc. |
| B. | **Date Prepared:** | September 7, 2016 |
| C. | **Address:** | 8779 Cottonwood Ave, Suite 105, Santee CA 92071 |
| D. | **Corporate Contact:** | David Stroup |
| E. | **Submission Contact:** | Emily Davis, Quality Consultant |

E. continued:

Pathway LLC
8779 Cottonwood Ave
Suite 105
Santee CA 92071
Ph:  949.636.4621
Email: erbakersd@gmail.com

| | | |
|---|---|---|
| F. | **Trade Name:** | Kurin Blood Culture Collection Set |
| G. | **Predicate Device(s):** | (1) BD Vacutainer Blood collection set and Safety-Lok blood collection set (K980414) |
| | | (2) Smith Medical Saf-T Holder Adapter (K923090) |
| H. | **Common Name:** | Venous Blood Collection Device |
| I. | **Classification:** | Class II |

| Regulation Number | Product Code | Classification Name | Device Class |
|---|---|---|---|
| 862.1675 | JKA | Blood Specimen Collection Device | II |

**J.  Device Description**

The Kurin device is a sterile, single use blood culture collection set.  The Kurin includes a winged needle with flexible tubing and an attached vial adapter intended for venipuncture to obtain blood culture samples. Kurin is identical in every way to existing sets used to collect blood culture samples except for the insertion into the tubing of the Kurin blood capture chamber. The Kurin blood capture device sequesters the initial draw of blood upon initial venipuncture. The set is provided with a safety shield for covering the used needle prior to disposal. The amount of blood diverted is very small, estimated at a fraction of 1 ml.

Below is a table with the three models and sizes of the subject device's that intend to be marketed.

| Model | Measurement (mm) | | | Weight (g) | Tubing | Gauge |
|---|---|---|---|---|---|---|
| | H | D | W | | | |
| K-11221 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 21 Gauge |
| K-11223 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 23 Gauge |
| K-11225 | 31mm | 13mm | 6.45mm | 15.7g | 12 in | 25 Gauge |

**K.  Intended Use**

The Kurin Blood Culture Collection Set is a winged blood collection needle with flexible tubing intended for venipuncture to obtain blood samples. It is provided with a safety shield for covering the used

MAG-DEL0000666

venipuncture needle prior to disposal to aid in the prevention of needlestick injury if manually activated after the blood draw. For blood collection, the set also includes a safety shield and apparatus for connection to vacuum based collection vials.

## L. Predicate Device(s)

The Kurin device is substantially equivalent to the following FDA cleared predicate devices:

### Predicate #1

| | |
|---|---|
| 510(k) Number: | K980414 |
| Trade Name: | Vacutainer Brand Safety-Lok Blood Collection Set Model Multiple |
| Manufacturer: | **Becton Dickinson** |
| Common/Usual Name: | Accessory to: Tubes, Vials, Systems, Serum Separators, Blood Collection |
| Regulation Number: | 862.1675 |
| Product Codes: | JKA |
| Classification: | II |

### Predicate #2

| | |
|---|---|
| 510(k) Number: | K923090 |
| Trade Name: | Saf-T Holder Multi Sample Luer Adapter |
| Manufacturer: | **Smiths Medical** |
| Common/Usual Name: | Tubes, Vials, Systems, Serum Separators, Blood Collection |
| Regulation Number: | 862.1675 |
| Product Codes: | JKA |
| Classification: | II |

## M. Substantial Equivalence

| Feature | Proposed Device The "Kurin" | VACUTAINER BRAND SAFETY-LOK BLOOD COLLECTION SET MODEL MULTIPLE K980414 | SAF-T HOLDER MULTI SAMPLE LUER ADAPTER W/ BLOOD K923090 |
|---|---|---|---|
| Indications for Use | The Kurin Blood Culture Collection Set is a winged blood collection needle with flexible tubing intended for venipuncture to obtain blood samples. It is provided with a safety shield for covering the used venipuncture needle prior to disposal to aid in the prevention of needlestick injury if manually activated after the blood draw. For blood collection, the set also includes a safety shield and apparatus for connection to vacuum based collection vials. | The VACUTAINER® brand blood collection sets and Safety-Lok™ blood collection set is a winged blood collection needle and flexible tubing for venipuncture to collect blood specimens from patients or monitoring blood pressure. The Safety-Lok™ blood collection set also contains a needle safety shield which minimizes the possibility of needlesticks if manually activated following blood collection. The VACUTAINER® brand blood collection sets and Safety-Lok™ blood collection set is also recommended for use in patients with small veins.

The VACUTAINER® brand blood collection sets and Safety-Lok™ blood collection set is also indicated for the intravenous administration of fluids and may be used for any patient | The Saf-T HOLDER® Blood Culture device is intended for use as a culture bottle or vacuum tube holder that can be attached to a female Luer connector of the Saf-T Wing® blood collection set or equivalent. |

Page **2** of **5**

MAG-DEL0000667

| | | population with consideration given to patient size, appropriateness for the solution being infused and duration of therapy. | |
|---|---|---|---|
| Device Description | The Kurin set is a sterile, single use blood culture collection set. The Kurin includes a winged needle with flexible tubing and an attached vial adapter intended for venipuncture to obtain blood culture samples. Kurin is identical in every way to existing sets used to collect blood culture sample except for the insertion into the tubing of the Kurin blood capture chamber. The Kurin blood capture device sequesters the initial draw of blood upon initial venipuncture. The set is provided with a safety shield for covering the used needle prior to disposal. The amount of blood diverted is very small, estimated at a fraction of 1 ml. | The Vacutainer Brand Blood Collection sets and safety-Lok blood collection set is a sterile winged blood collection needles with flexible tuning and a female luer adapter manufactured by Becton Dickinson Vacutainer Systems, Sumter, South Carolina. The Safety-Lok Blood Collection set is provided with a safety shield for covering the used needle prior to disposal. A male luer adapter is provided on specific reorder numbers. A male luer adapter contains a non-patient needle end for puncturing the stopper of an evacuated blood collection tube. Those without a male luer adapter are provided a protective cap on the end of the female luer adapter. | The Saf-T HOLDER® Blood Culture device is a sterile multi-sample luer adapter for venous blood sampling that includes a blood culture bottle holder with a fixed back end needle, male luer threaded connector and vacuum tube adapter. |
| Product Code | JKA | JKA | JKA |
| Patient Interface | Used only by trained professionals in a medical setting | Used only by trained professionals in a medical setting | Used only by trained professionals in a medical setting |
| **Materials and Chemical Composition** | | | |
| Kurin Materials | Makrolon Polycarbonate | unknown, medical grade plastic | unknown, medical grade plastic |
| Tubing | Transparent Flexible tubing | Substantially equivalent | NA since this is just the adapter |
| Adapter | Male or Female Luer | Substantially equivalent | Substantially equivalent |
| **Performance/Design Specifications** | | | |
| Sequesters initial blood | Yes | No | No |
| Single Use Device | Single Use | Single Use | Single Use |
| Indicated for Infusion | No | Yes | No |
| Needle Gauge | 21, 23, 25 Gauge | 21, 23, 25 Gauge | Standard vial adapter |
| Labeled Pyrogen Free | No | Yes | No |
| Sterilization | Yes, EtO | Yes, EtO | Yes, EtO |

MAG-DEL0000668

| Expiration/Shelf Life | 1 year (with protocols up to 3 years) | 3 years | 5 years |
|---|---|---|---|
| Size (LxWxH) | 21G, ¾ inch, 12 inch tubing,0.337 volume<br><br>23G, ¾ inch, 12 inch tubing,0.332 volume<br><br>25G, ¾ inch, 12 inch tubing,0.331 volume | 21G, ¾ inch, 12 inch tubing,0.337 volume<br><br>23G, ¾ inch, 12 inch tubing,0.332 volume<br><br>25G, ¾ inch, 12 inch tubing,0.331 volume | 2.5 in x 2 in |
| Principles of Operation | The winged needle is used to access the patient's blood stream, the safety shield is used cover the needle after collection, the kurin component sequesters the initial sample of blood and the vial adapter is used to interface with a vacuum tube or culture bottle.  There is no energy source, the subject device fills with blood by differences in pressure gradient. | The winged needle is used to access the patient's blood stream, the safety shield is used cover the needle after collection, the tubing and luer connector are used to attach to a vial adapter or infusion set.  There is no energy source, the subject device fills with blood by differences in pressure gradient. | Cylindrical holder for vacuum bottle or tube placement with threads that are compatible with blood collection needles and luers. |
| Biocompatibility | Conforms with ISO 10993 | Conforms with ISO 10993 | Conforms with ISO 10993 |

## N.  Non-Clinical Testing

All testing met specifications for the subject device and demonstrates substantial equivalence to the predicates.

1. Sterilization – The Kurin device is sterilized using a validated EO sterilization process which complies with ISO 11135-1:2006 Sterilization of health care products – Ethylene Oxide – Part 1: Requirements for development, validation and routine control of a sterilization process for medical devices.
2. Aging/Shelf Life Test– The Kurin device was validated to achieve 1-year shelf life with protocols for up to 3 years of shelf life for sterility and performance.
3. Functional, Leakage and Tensile Test – The Kurin set confirmed the addition of the Kurin device shows no compromise to the function of the blood collection device in regards to functionality. With the addition of the device the product does not leak and passed tensile testing in accordance with sections 5.2 and 5.3 of ISO 1135-3 - Transfusion equipment for medical use -- Part 3: Blood-taking set for single use.
4. Packaging Integrity and Shipping Test – This test was completed and the Kurin device passed all tests in accordance with ISO 11607 and ASTM D4169-14.
5. Biocompatibility Tests – The Kurin device passed two types of biocompatibility tests: the MEM Elution Test demonstrated that no leachables are present from the system and the IVH Blood Count Test which demonstrated that the blood path did not adversely affect the constituents of blood exposed to the systems fluid path.
6. User Verification Test -  Testing was conducted to evaluate if the instructions for use were easy to understand and the functionality of the device.
7. Flow Rate Test – Testing verified that the addition of the Kurin Device into the tubing of the FDA cleared BD Vacutainer® brand blood collection set and Safety-Lok™ Blood Collection set did not change the flow rate of liquid passing through the device.

MAG-DEL0000669

**O. Clinical Testing**

No clinical test data is required of the Proposed Device.

**P. Conclusion**

The above information and tests conducted demonstrate that the Subject Device is substantially equivalent to the identified predicates.

MAG-DEL0000670

# EXHIBIT 19.B

# FILED UNDER SEAL

# EXHIBIT 19.C

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -


 4
     MAGNOLIA MEDICAL                 :   CIVIL ACTION
 5   TECHNOLOGIES, INC.,              :
                                      :
 6                   Plaintiff,       :
                                      :
 7        vs.                         :
                                      :
 8   KURIN, INC.,                     :
                                      :
 9                   Defendant.   :   NO. 19-00097-CFC


10                           - - -

11                             Wilmington, Delaware
12                             Wednesday, April 15, 2020
                               9:15 o'clock, a.m.
13                             ***Telephone conference

14                           - - -

15   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

16                           - - -

17   APPEARANCES:

18
             FISH & RICHARDSON P.C.
19           BY:  DOUGLAS E. McCANN, ESQ.

20                      -and-
21

22

23

24                            Valerie J. Gunning
                              Official Court Reporter
25
```

1    APPEARANCES (Continued):

2

3                     FISH & RICHARDSON P.C.
                      BY:  MATHIAS W. SAMUEL, ESQ.

4

5                             -and-

6                     FISH & RICHARDSON P.C.
                      BY:  CORRIN N. DRAKULICH, ESQ.
7                          (Atlanta, Georgia)

8

9                             -and-

10                    FISH & RICHARDSON P.C.
                      BY:  JUANITA R. BROOKS, ESQ.
11                         (San Diego, California)

12

13                            -and-

14                    FISH & RICHARDSON P.C.
                      BY:  JAMES HUGENINE-LOVE, ESQ.
15                         (Minneapolis, Minnesota).

16

                      Counsel for Plaintiff
17

18

                      MORRIS JAMES LLP
19                    BY:  KENNETH L. DORSNEY, ESQ. and
                           CORTLAN S. HITCH, ESQ.
20

21                            -and-

22

23

24

25

1     **APPEARANCES (Continued):**

2

3                TURNER BOYD LLP
                 BY:  KAREN I. BOYD, ESQ. and
4                     JACOB ZWEIG, ESQ.
                      (Redwood City, California)
5

6                          -and-

7

8                X-PATENTS, APC
                 BY:  JONATHAN HANGARTNER, ESQ.
9                     (La Jolla, California)

10                     Counsel for Defendant

11

12                       -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

1    component for mechanism.  Again, if this is found not to be

2    a means-plus-function, then we wouldn't -- you know, we

3    believe that's an appropriate construction.

4              The difference on impact, of course, is

5    restriction specifically to the disclosed structures to

6    perform the function that's claimed, and so the result would

7    be a more narrow reading of the patents just to require one

8    of those two structures or their substantial equivalent to

9    be found in the accused device versus this broader

10   construction, which would allow for other types of

11   mechanisms beyond the two specific structures that were

12   disclosed in the patent.

13             THE COURT:  Right.  I see.  Well, you know what.

14   I read MTD the way I do, so I do think it's a

15   means-plus-function limitation, and so what I'm going to do

16   is, I will give plaintiffs a week to in a letter propose

17   what they think is the structure that's disclosed in the

18   written description to the extent it differs from what the

19   defendants have said, and I will receive that.  That letter

20   should be no more than 750 words in 14-point font, and

21   defendants will have a week to reply to that letter with a

22   750 word letter.  All right?  So that's how we're going to

23   leave that then unresolved.  I am finding I think under MTD,

24   means-plus-function applies for the reasons I've articulated

25   on the record.

```
 1                    All right.  So then let's go back.  Let's start
 2        with sequester.  And I asked defendants in my oral order
 3        yesterday about how does isolate differ.  I mean, as far as
 4        I'm concerned, you have basically conceded in your brief
 5        that the two terms are synonymous and that really the only
 6        justification for your argument is that you believe that
 7        isolate is more readily understandable by a jury.
 8                    Am I fairly characterizing your position,
 9        defendant?
10                    MS. BOYD:  Your Honor, this is Karen Boyd.  I
11        will be speaking to that point.
12                    Yes, I think that's a fair characterization.  We
13        believe that sequester and isolate mean the same thing and
14        merely that isolate would be much easier for a jury to
15        understand and apply.
16                    THE COURT:  Okay.  Thank you.  And I'm going to
17        rule in plaintiff's favor on this.  The argument, the
18        gravamen of defendant's argument I think is set forth on
19        page 22 of the joint brief, and as counsel just confirmed,
20        the two words are synonyms, they are equal in scope, and
21        just the defendant's position is that isolate is more easily
22        understood by a jury.  I don't agree with that.  I think
23        International Rectifier Corp. at 361 F3d. 1363 governs and
24        that the Federal Circuit has cautioned that we must consider
25        the word that the inventor actually chose and merely
```

1    rephrasing claim language is not claim construction.

2              All right.  Let's go to the next term, initial

3    volume.  Let me ask the plaintiff this.  On page 30 of the

4    brief, the defendants say that the asserted patents use the

5    term initial volume, bodily fluid/blood, and this is the

6    important part, "To refer to the initial portion of blood

7    removed from the patient and sequestered so that a clean

8    blood sample can be taken."

9              Will the plaintiffs agree to that definition,

10   that construction of the term?

11             MS. BROOKS:  Again, Your Honor, this is Juanita

12   Brooks speaking.

13             I would need to talk to the team about that.

14   Could Your Honor -- I'm sorry.  Page 30 and defendant's

15   answering position.

16             THE COURT:  Yes.  I mean, the defendants say

17   that the term "refers to the initial portion of blood

18   removed from the patient sequestered so that a clean blood

19   sample can be taken."

20             I'm just wondering, would you just not agree to

21   that?

22             MS. BROOKS:  I think that we might, Your Honor.

23   Could I have an opportunity?  Could we defer this and I have

24   an opportunity to talk, communicate offline with the team to

25   make sure that one of my partners isn't about to come out of

# EXHIBIT 19.D



# Blood Culture Collection Sets

Traditional blood culture collection methods provide skin microbes a direct line to the culture.

Kurin technology diverts the initial aliquot of blood which may contain skin contaminants. Roughly 20% of the microbes present in skin reside deep in the dermis.[1] With venipuncture, contaminants may be dislodged and drawn into blood culture samples leading to high rates of seemingly unavoidable false positives.

Standing guard between the venipuncture site and the culture bottle, the Kurin Lock® specimen diversion device corrals blood from the venipuncture site while the clinically relevant blood sample flows into the blood culture bottle.

## Why Use It?

Approximately 1/3 of all positive blood cultures are false positive results due to blood culture contamination.

Hospitals spend $4,500-$10,000[1] per false positive test that leads to unnecessary treatment of non-existent bloodstream infections. There are high costs for patients as well. Extended hospital stays increase the risk of hospital-acquired infections and adverse events. Unnecessary antibiotics increase the risk of allergic reactions, drug interactions, and drug-resistant superbugs.

## How does it work?

Each Kurin blood culture collection set features a Kurin Lock®, a small but powerful device that automatically diverts the initial aliquot of blood during the routine process of drawing a blood culture.



Serves as a flash chamber to provide visual confirmation of proper needle placement in the vein.



Any contaminants residing in the initial ~0.15ml volume of blood (35x a standard 21G needle) are captured in the u-shaped Kurin Lock®.



When the collection bottle is attached, blood flows directly from the vein into the culture bottle through a separate channel.

[1] Garcia RA, et al. Am J Infect Control. 2015 Nov 1;43(11):1222-37.

**Reshaping Blood Culture Collection**

MAG-DEL0000680

## Don't give contamination a pass — STICK with Kurin®

**When Kurin was used, even hospitals below the 3% benchmark reduced blood culture contamination (BCC) rates by up to 90%\* with significant cost savings.**



Four Hospitals: Blended vs. Kurin BCC Rate Reduction with Kurin Diversion

■ Baseline BCC Rate   ■ Blended BCC Rate   ■ Kurin BCC Rate

| | Crouse Hospital *Clinical Nurse Specialist* May/June 2018 **\*\*Annual Savings: $260K** | Bayfront Health *APIC Abstract: EI-101* June 2018 **\*\*Annual Savings: $430K** | Hospital A *Manuscript in process* **\*\*Annual Savings: $1.35M** | Hartford Hospital *Peer-Reviewed, Connecticut Medicine* January 2019 **\*\*Annual Savings: $857K** |
|---|---|---|---|---|
| Baseline | 1.8% | 2.6% | 4.0% | 1.7% |
| Blended | 0.8% (56%▼) | 1.2% (54%▼) | 1.5% (63%▼) | 0.4% (74%▼ Compliance Data N/A) |
| Kurin | 0.2% (89%▼) | 0.3% (90%▼) | 0.5% (88%▼) | |

3% Contamination Benchmark

\* Fluctuations in caregiver compliance are reflected in the blended rates, while Kurin rates reflect the efficacy of Kurin when it was used.
\*\* Annual savings are based on a cost of $4500/BCC.

## SIMPLE. PASSIVE. LOW WASTE. HIGH RETURN.
**Kurin is the diversion solution designed for frontline clinicians.**

- FDA 510(k) cleared
- Peer reviewed
- Automatic diversion
- Blood conserving for Peds
- Flash chamber
- Diversion for PIV draws
- Diversion for syringe draws
- Low waste packaging
- Supports antimicrobial stewardship

## KURIN PRODUCT ORDERING: 200/SKU/ Case
To place an order, email orders@kurin.com, or fax a purchase order to: 1-858-228-5160.

| Kurin for Direct Venipuncture | | | | | | |
|---|---|---|---|---|---|---|
| | BD Bactec® and Thermo Fisher VersaTREK™ REDOX™ EZ DRAW™ | | bioMérieux BacT/Alert® | | Thermo Fisher VersaTREK™ REDOX™ | |
| | 21 Gauge | 23 Gauge | 21 Gauge | 23 Gauge | 21 Gauge | 23 Gauge |
| Safety Slide Needles | D-11221 | D-11223 | M-11221 | M-11223 | T-11221 | T-11223 |
| Push Button Needles | D-21221 | D-21223 | M-21221 | M-21223 | T-21221 | T-21223 |
| Kurin for Peripheral IV Collection | | | | | | |
| 12-inch set | D-PIV12 | | M-PIV12 | | T-PIV12 | |
| 12-inch set + 6-inch extension | D-PIV18 | | M-PIV18 | | T-PIV18 | |
| Kurin for Low-Volume Syringe Draws | | | | | | |
| 4-inch set | S-PIV4 | | | | | |
| 6-inch extension | S-PIV10 | | | | | |



Need additional information? Call our customer service team at 1-888-963-9056 or email cs@kurin.com.

**Kurin, Inc.** 10755 Scripps Poway Parkway, Suite 257 • San Diego, CA 92131 • Fax: 858.228.5160 • 888.963.9056
Copyright © 2019 Kurin Inc. All rights reserved. Kurin® and Kurin Lock® are registered trademarks of Kurin, Inc. • ML-033_Rev E_0319
**FDA 510(k) Cleared.** U.S. and foreign patents and patents pending • www.kurin.com/patents.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| KURIN, INC., | ) ) ) | ████████████████ |
| Defendant. | ) ) ) | |

**KURIN'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR REGULATORY DOCUMENTS IS <u>EVIDENCE OF INFRINGEMENT</u>**

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801

OF COUNSEL:
Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

June 3, 2022

Magnolia does not dispute that the testing evidence both parties conducted is the most probative and direct evidence bearing on infringement.  Or that where such more probative evidence exists, courts have repeatedly found a defendant's description of its accused products not probative of infringement, after that evidence was already admitted at trial.  *See* MIL No. 3 at 2.  Kurin seeks to prevent that outcome here, since admission of the prejudicial evidence at issue (which are not "technical documents") would lead to an unnecessary mini-trial about what parties previously believed instead of what the direct evidence now shows.  Kurin would need to respond in kind by introducing mirroring indirect evidence, of Magnolia's own repeated historical assertions in court filings and marketplace communications that it does ***not*** believe the Kurin Lock's design "sequesters," and instead allows mixing.  *See* Ex. 3 ¶ 106; Ex. 4.  Kurin will also need to clarify for the jury that Magnolia drafted the claims at issue only after Kurin descriptions of the type at issue became publicly available.  *See* Opp. to MMT MIL No. 2.  None of Magnolia's cases involved admission of evidence that would thus necessarily inject a maelstrom of tangential issues likely to confuse the jury and waste time, including evidence Magnolia itself seeks to exclude  *See* MMT MIL No. 2.  Magnolia's attempts to distract the jury from the key evidence of how the Kurin Lock actually works should be rejected.

RICHARDS, LAYTON & FINGER, P.A.

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kripa Raman
Joshua D. Reich
Ariella Barel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
ngroombridge@paulweiss.com
cnyarady@paulweiss.com
kraman@paulweiss.com
jreich@paulweiss.com
abarel@paulweiss.com


June 3, 2022

/s/ Kelly E. Farnan

Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendant Kurin, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAGNOLIA MEDICAL TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 1:19-cv-00097-CFC (CJB) |
| v. | ) ) | ███████████████ |
| KURIN, INC., | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF ARIELLA BAREL IN SUPPORT OF KURIN, INC.'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OR ARGUMENT THAT KURIN'S WORD CHOICE IN MARKETING OR REGULATORY DOCUMENTS IS EVIDENCE OF INFRINGEMENT

I, Ariella Barel, declare as follows:

I am a member in good standing of the bar of the State of New York, First Department and am associated with Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Defendant Kurin, Inc. ("Kurin") in this action.  I have been admitted *pro hac vice* for this matter.  I respectfully submit this Declaration in support of Kurin's reply in support of its Motion *in Limine*, which is filed herewith.

1.      Attached hereto as **Exhibit 3** is a true and correct copy of an excerpt of the Amended Answer and Counterclaims of Magnolia Medical Technologies, Inc. in Case No. 3:18-cv-01060-L-JMA, dated August 3, 2018.

2.      Attached hereto as **Exhibit 4** is a true and correct copy of an email from Bob Gerberich with subject line "K Compare" and its attachment, a document titled "Steripath vs Kurin Lock Comparison MM00065 Rev C," bearing Bates numbers MAG-DEL0014337–14339 and dated March 29, 2018.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2022.

*/s/ Ariella Barel*
Ariella Barel

# EXHIBIT 3

1  CHRISTOPHER M. YOUNG (SBN 163319)
   christopher.young@dlapiper.com
2  MELISSA A. REINCKENS (SBN 314657)
   melissa.reinckens@dlapiper.com
3  **DLA PIPER LLP (US)**
   401 B Street, Suite 1700
4  San Diego, CA 92101-4297
   Tel: 619.699.2700
5  Fax: 619.699.2701

6  Attorneys for Defendant and
   Counterclaimant
7  Magnolia Medical Technologies, Inc.

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | KURIN, INC.,                          | CASE NO. 3:18-cv-01060-L-JMA |

12 |        Plaintiff,                      | **AMENDED ANSWER AND COUNTERCLAIMS OF MAGNOLIA MEDICAL TECHNOLOGIES, INC. TO COMPLAINT FOR:** |

13 |        v.                              |

14 | MAGNOLIA MEDICAL                       | **1. FALSE ADVERTISING (LANHAM ACT)** |
   | TECHNOLOGIES, INC.,                    |

15 |                                        |

16 |        Defendant.                      | **2. VIOLATION OF B&P CODE § 17500,** *et seq.* |

17 |                                        | **DEMAND FOR JURY TRIAL** |

18 |                                        | Courtroom:   5B (5th Flr - Schwartz) |
19 |                                        | Judge:       Hon. M. James Lorenz |

20 | MAGNOLIA MEDICAL                       |
   | TECHNOLOGIES, INC.,                    |
21 |                                        |

22 |        Counterclaimant,                |

23 |        v.                              |

24 | KURIN, INC.,                           |

25 |        Counterdefendant.               |

26

27      Defendant Magnolia Medical Technologies, Inc. ("Magnolia") hereby files

28  this Amended Answer to Plaintiff's Complaint:

positive blood cultures.  This representation is intended to convey, and in fact conveys, the false and/or misleading message that Kurin was the first blood culture collection device in the market that reduces false positives in blood cultures testing.

102.   Thus, despite (a) Magnolia's well-known Steripath® product being introduced years before the Kurin Blood Culture Collection Set; and (b) two (2) controlled clinical studies published in peer-reviewed journals and seven (7) clinical abstracts accepted and presented at major medical conferences demonstrating the clinical efficacy of the Steripath® product, Kurin has suggested and continues to suggest to consumers through its advertising, including on its website, that it was the *first* to market a blood culture collection set that reduces false positive blood cultures.  In doing so, Kurin is conveying false and/or misleading representations to consumers.

103.   Additionally, Kurin's "until now" claim also implies that Kurin is the *only* provider of products capable of reducing false positive results, when it knowingly is not.

104.   Kurin's representation that "until now" with the introduction of the Kurin Lock specimen diversion device, hospitals had to accept high rates of seemingly unavoidable false positive blood cultures is false and/or misleading, and has the potential to confuse consumers because it deprives consumers of accurate information regarding Kurin's devices and others in the marketplace.

## KURIN MISREPRESENTS ITS PRODUCT'S CAPABILITIES

105.   Kurin misrepresents its product's capabilities in many places on its website and otherwise.

106.   Throughout its advertising, including on its website, Kurin represents to consumers that "[e]ach Kurin blood culture collection set features a Kurin Lock™, a small but powerful specimen diversion device that automates skin contaminant diversion during the routine process of drawing a blood culture."  In addition, throughout its marketing campaign, including on its website, Kurin

repeatedly refers to its diversion technology as the Kurin Lock.  Kurin also represents to consumers on its website that the Kurin Lock "[s]tand[s] guard between the venipuncture site and the culture bottle," and explains that the "Kurin Lock diverts the initial blood specimen that may contain skin microbes from deep within the dermis. A clinically-relevant specimen then bypasses the contaminants locked within the device." Upon information and belief, Kurin Lock does not contain a lock, physical barrier, or any other mechanical isolation capability.  Upon information and belief, contrary to its representations to consumers and brand messaging, in Kurin's device there is no lock that <u>physically</u> separates the contaminants from the sample blood pathway. Accordingly, Kurin's representations to consumers that Kurin's device contains a "lock" is false and/or misleading because it implies that its blood collection set employs a physical barrier, when in fact no such physical barrier exists.

107.   Kurin also claims throughout its marketing that its product is "better." Because Magnolia invented and was the first to market a blood collection device - Steripath® - with initial specimen diversion technology, Magnolia is the industry pioneer.  Magnolia's technology is proven, and backed by nine published clinical datasets.  Kurin's statements that it is "better" is intended to convey and in fact conveys the false and/or misleading message to consumers that Kurin's blood collection set is better than Magnolia's Steripath® devices.

108.   Kurin further represents throughout its advertising that its blood collection device is easy to use, or simple, when it is not.  For example, Kurin's advertising and marketing uses the terms "seamless integration" and "effortless passive compliance," and defines those terms as meaning "no change in patient experience or caregiver practice" and "without slowing down busy clinicians," respectively.  However, upon information and belief, customers of Kurin's products have stated that—even after months of training— further training to become familiar with its specific operation is still required to use the device properly.

- 14 -

reasonable attorneys' fees incurred in this action;

7.     Magnolia requests that this Court enter such other relief as this Court deems just and proper.

### JURY DEMAND

Magnolia hereby requests a trial by jury on all of its counterclaims.

Dated:  August 3, 2018

**DLA PIPER LLP (US)**


By */s/Christopher M. Young*
CHRISTOPHER M. YOUNG
MELISSA A. REINCKENS
Attorneys for Defendant
Magnolia Medical Technologies, Inc.

1

## **CERTIFICATE OF SERVICE**

2      I certify that on August 3, 2018, I caused a true and correct copy of:

3      AMENDED ANSWER AND COUNTERCLAIMS OF MAGNOLIA
       MEDICAL TECHNOLOGIES, INC.

4

5      to be filed electronically with the Clerk of the Court through the CM/ECF System

6      which will send notification of such filing to the email addresses denoted in the

7      Electronic Mail Notice List appearing on Pacer, and I hereby certify that I have

8      mailed the aforementioned documents via the United States Postal Service to the

9      non-CM/ECF participants, if any, indicated on the Electronic Mail Notice list.

10         I certify under the penalty of perjury under the laws of the United States of

11     America that the foregoing is true and correct.

12

13     Dated:  August 3, 2018                    */s/ Christopher M. Young*
                                                CHRISTOPHER M. YOUNG
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

# FILED UNDER SEAL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 9, 2022, upon the following in the manner indicated:

Kelly E. Farnan                                              *VIA ELECTRONIC MAIL*
Nicole K. Pedi
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
*Attorneys for Defendant Kurin, Inc.*

Karen I. Boyd                                                *VIA ELECTRONIC MAIL*
Jacob S. Zweig
Jennifer Seraphine
Cyndi Claxton
TURNER BOYD LLP
702 Marshall Street, Suite 640
Redwood City, CA  94063
*Attorneys for Defendant Kurin, Inc.*

Jonathan Hangartner                                          *VIA ELECTRONIC MAIL*
X-Patents, APC
5670 La Jolla Blvd.
La Jolla, CA  92037
*Attorneys for Defendant Kurin, Inc.*

Nicholas Groombridge                    *VIA ELECTRONIC MAIL*
Catherine Nyarady
Joshua Reich
Kripa Raman
Ariella C. Barel
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
*Attorneys for Defendant Kurin, Inc.*

                                        */s/ Rodger D. Smith II*
                                        _____
                                        Rodger D. Smith II (#3778)